# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Brokers, Inc., | ) | Case No. 04-53451 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

THIS MATTER came on before the Court for trial in Winston-Salem, North Carolina upon the Objection by Brokers, Incorporated to Claim Number 16 of Hossein Ahmadi d/b/a/ H.B. Auto Sales after due and proper notice.  Benjamin Kahn and Paul Daniels appeared on behalf of the Debtor, Brokers, Incorporated ("Brokers"), and Andrew Brown appeared on behalf of the Claimant, Hossein Ahmadi d/b/a H.B. Auto Sales ("HB Auto").  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  The Court, having presided over the non-jury trial in this case, hereby makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure after careful consideration of the extensive evidence presented by the parties, the credibility of the witnesses, and the pleadings of record.

### Procedural History

On November 22, 2004 (the "Petition Date"), Brokers filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  HB Auto was not noticed as a creditor in this proceeding and did not receive notice of the deadline for filing claims.  On April 13, 2005, HB Auto filed a proof of claim (the "Claim") for a debt incurred in or around May 2002 in

an unliquidated amount with a copy of a complaint attached.  On April 27, 2005, the Court

entered a consent order modifying the automatic stay for the limited purpose of permitting HB

Auto to file a complaint in state court in order to prevent the running of the applicable statute of

limitations and to serve the complaint on Brokers.  The parties agreed that Brokers was not

required to file an answer or any other responsive pleading in state court and that the matter

would be litigated as a claim in the bankruptcy proceeding.  The parties consented to this matter

being heard by the bankruptcy court.

Accordingly, HB Auto filed the complaint against Brokers on April 29, 2005 in the North

Carolina Superior Court, High Point Division, asserting claims for negligent damage to

automobiles, negligent damage to business equipment, trespass to personalty, and punitive

damages.  In response, Brokers filed an objection to the Claim and this Court entered a

scheduling order, which was amended numerous times, setting deadlines for various pleadings

and discovery.  The complaint was amended on July 16, 2007 (the "Complaint"), and a second

scheduling order was entered and subsequently amended.  On December 3, 2007, the Court

entered an order denying Brokers's motion to dismiss HB Auto's claim for punitive damages.

On March 4, 2008, the Court granted Brokers's motion for partial summary judgment dismissing

HB Auto's claim for negligent damage to business equipment.

**Background Facts**

Prior to the death of its principal and sole shareholder, Dolan Bowers ("Bowers"),

Brokers operated as a real estate holding, management, and development company.  Its assets

consisted primarily of real estate located in Davidson, Guilford, Montgomery and Randolph

Counties.  Bowers died testate on June 6, 2003.  After significant litigation regarding the

2

ownership of the Debtor, Bowers's heirs entered into a settlement agreement acknowledging that the estate of  Bowers is the sole shareholder of the Debtor.  On January 27, 2006, the Court confirmed a plan of liquidation pursuant to which all claims have been or will be paid in full.  On the Chapter 11 Consummation Report filed on March 25, 2008, Brokers listed total known assets of the Debtor in the amount of $4,497,115.13 and estimated its total known remaining liabilities at $1,020,266.75 (including a reserve in the amount of $424,000.00 for HB Auto's Claim), leaving a total estimated net value of $3,476,848.38.

    HB Auto leased property from Brokers located at 105 South Urban Street in Thomasville, North Carolina (the "Property") from about 1994 until the fall of 2004, upon which Hossein Ahmadi operated a used car dealership along with his younger brother, Hassan Ahmadi.[1]  Hassan Ahmadi and Hossein Ahmadi are Iranian immigrants who have been legal residents in the United States for more than 25 years.  According to the custom of their country of origin, HB Auto is in the name of Hossein Ahamdi, the older brother; however, the undisputed testimony by both Hossein Ahmadi and Hassan Ahmadi showed that Hassan Ahmadi, the younger brother, is more diligent and more responsible for running the business of HB Auto.  The Ahmadis have been in the used car business since 1983, when they started a business in Thomasville, North Carolina on property also leased from Bowers.  In 1989, the Ahmadis moved their business to Greensboro but remained in contact with Bowers despite the fact that HB Auto was no longer Bowers's tenant.  Then, sometime in 1993 or 1994, the Ahmadis moved their business onto a portion of the

---

[1]HB Auto continues to operate, but is now based on property located in Lexington, North Carolina.

Property owned by Brokers.[2]  Brokers's main office was also located on this Property.  The parties did not enter into a written lease agreement, and initially, Brokers did not charge HB Auto any rent.  After a period of time, HB Auto began to pay Brokers $250 per month in rent.  As time went on, HB Auto's business grew to the point that it had hundreds of vehicles.  Brokers provided HB Auto with more space on the Property and increased the rent accordingly.  By the time HB Auto vacated the Property, it was paying $750 per month in rent.

When the Ahmadis opened HB Auto on the Property in 1994, Hassan Ahmadi had a close relationship with Bowers, both business and personal.  Hassan Ahmadi worked on Bowers's vehicles and also served as his limousine driver at times, and Bowers acted as more than merely a customer or employer to Hassan Ahmadi.  For example, Bowers assisted Hassan Ahmadi with obtaining financing for the purchase of his first home in the early 1990's.  Bowers also encouraged Brokers's employees to purchase vehicles from HB Auto by offering financing for those vehicles; therefore, many of Brokers's employees became customers of HB Auto.  Hassan Ahmadi visited Bowers's home on numerous occasions and sought out Bowers's advice on a variety of matters.  Hassan Ahmadi described the relationship as one in which he viewed Bowers as a father figure, since his own parents remained in Iran.  Hassan Ahmadi's testimony on this

_____

[2] A great deal of time was spent by counsel for the Debtor attempting to impeach Hassan Ahmadi and Hossein Ahmadi's credibility on cross examination by the introduction of certain deposition testimony into evidence.  The Court finds that, while there were a few inconsistencies, in particular as to why HB Auto relocated to the Property, the Court's clear impression is that the testimony at trial by both Hassan Ahmadi and Hossein Ahmadi was very credible, being both honest and forthright, and inconsistencies resulted from a language barrier and the disjointed style of examination in both the deposition and the trial.  Hossein Ahmadi, in particular, has difficulty understanding and expressing himself in English and this difficulty leads to confusion, both on his own behalf as well as on behalf of the party to whom he is speaking.  The Court also observed that his ability to read English is very limited.

4

subject was very credible, and Bowers's own actions in the 1990's also support this characterization.  In contrast, Bowers did not have a close relationship with Hossein Ahmadi.  Therefore, Hassan Ahmadi acted as the primary liaison between HB Auto and Brokers.

## A Description of the Property

Generally, the Property is in the shape of a triangle, with the bottom side of the triangle running alongside the highway and the two other sides meeting at the point that is the furthest away from the highway.  From 1994 to 2004, the Property was utilized by both Brokers and HB Auto.  When viewing the Property from the direction of the highway, HB Auto's office was located in a trailer in the left corner of the Property, along the highway.  HB Auto's main sales lot (the "HB Auto Sales Lot")[3] was located in that same corner of the Property.  Brokers's main office building was located in the middle of this front portion of the Property, to the right of the HB Auto Sales Lot.  HB Auto also parked a number of vehicles in the area to the right of Brokers's main office building, when facing the Property from the highway (the "Overflow Lot").

Yet another lot, upon which Brokers stored equipment and materials and HB Auto parked cars, was behind the HB Auto Sales Lot (the "Middle Lot").  HB Auto parked junk cars and cars used for parts in an area that was behind both the Overflow Lot and Brokers's office building (the "Junk Lot").  Several other buildings and trailers belonging to Brokers were scattered behind the Middle Lot and the Junk Lot.  In this area, the Property begins to slope downhill (the "Slope").

---

[3] Witness and counsel utilized a variety of names and descriptions for the various areas on the Property.  For consistency and ease of reference, the Court shall assign labels to certain areas on the Property.

All of the lots utilized by HB Auto were on the front half of the Property, before the Slope. When HB Auto initially moved onto the Property, the back third of the Property was generally wooded. A U-shaped fence surrounded the front portion of the Property. The fencing stopped at the wooded portion in the back of the Property. On at least one occasion, this fence had been cut by vandals to gain access to the Property. At some point prior to March 2002, Brokers cleared most of the land in the back of the Property and created another lot by filling in a portion of the area at the bottom of the hill with dirt (the "Lower Lot"). When the Lower Lot was created, a type of filter pond was formed at the very bottom of the hill as a result of certain drainage issues. Brokers constructed a bridge which provided access to the Lower Lot from the adjacent property. Since the Lower Lot was located behind several of Brokers's buildings and trailers and at the bottom of a hill, the Lower Lot was not visible from the HB Auto Sales Lot or HB Auto's office.

### The Business of HB Auto

HB Auto buys vehicles primarily at various automobile auctions in the Greensboro area and repairs and sells vehicles both at auctions and to the public from its place of business. The Ahmadis attend automobile auctions weekly, including the Greensboro Auto Auction, Ray's Southern Auto Auction, and Mendenhall Auto Auction. Some of the auctions they attend are only open to dealers, while others are open to the public. At these auctions, vehicles are sold within different categories that are assigned by the seller. For instance, "red light" vehicles are those vehicles that are sold without any warranty as to condition. "Damaged and disabled" or "D & D" vehicles are those vehicles that the seller could not start for whatever reason, be it the lack of a key, a dead battery, or a more serious issue. Some vehicles are also sold from a so-called

6

"salvage lane."  A vehicle's presence in that lane does not necessarily mean that it is a salvage vehicle as defined by the North Carolina Department of Motor Vehicles (the "DMV")[4].  Rather, the salvage lane at the auction is simply a designation assigned by the auction.

HB Auto is able to purchase some vehicles at auctions with its own funds.  In addition, it works with a financing company that provides short-term financing by paying for vehicles and keeping the title for a maximum of four months.  The financing company holds the title as collateral and charges a $50 fee per vehicle plus interest for this service if the vehicle is sold within 60 days.  If the vehicle is not sold, another $50 fee must be paid, as well as the interest and a percentage of the principal.  The process repeats if the vehicle is not sold within 90 days.  After 120 days, HB Auto must pay the balance and take possession of the title to the vehicle.  Consequently, HB Auto generally tries to repair and then sell vehicles financed in this manner within three to four months of purchase.  For a period of time, Brokers also provided financing to HB Auto on terms similar to those offered by the outside financing company, but without the four-month limit.  At one point, HB Auto owed Brokers in excess of $100,000, and HB Auto repaid that amount in full with interest.

HB Auto retains certain vehicles much longer than three or four months for various reasons.  In fact, it owns some vehicles for years before resale.  Some vehicles simply do not sell

---

[4] In North Carolina, a salvage motor vehicle is "[a]ny motor vehicle damaged by collision or other occurrence to the extent that the cost of repairs to the vehicle and rendering the vehicle safe for use on the public streets and highways would exceed seventy-five percent (75%) of its fair retail market value, whether or not the motor vehicle has been declared a total loss by an insurer. Repairs shall include the cost of parts and labor. Fair market retail values shall be as found in the NADA Pricing Guide Book or other publications approved by the Commissioner." N.C. Gen. Stat. § 20-4.01(33)(d).  North Carolina Gen. Stat. § 20-71.3 requires that the certificate of title of a salvage motor vehicle be branded with that designation.

for a variety of reasons, and other vehicles are extensively damaged when purchased and require lengthy repairs. Occasionally, HB Auto purchases 15 or 20 vehicles at once, which creates a backlog of too many vehicles. HB Auto intentionally retains vehicles that are of special interest to the Ahmadis. Hossein Ahmadi testified regarding the drawbacks of retaining a vehicle for an extended period of time. He testified that HB Auto tries to start a vehicle's engine every three or four months as a form of maintenance. Notwithstanding, at minimum, a vehicle's paint will generally fade if subjected to prolonged exposure.

HB Auto buys a variety of vehicles, including vehicles that have been repossessed, red light vehicles, and D & D vehicles. It also purchases vehicles that are in good condition. It buys damaged vehicles, which the Ahmadis repair and/or refurbish before reselling. As a general practice, HB Auto promptly repairs vehicles that it has purchased if necessary, and every vehicle that is to be resold undergoes a detailed cleaning at an expense of $200. This general practice does not apply to salvage or other more extensively damaged vehicles.[5] In addition, HB Auto buys "parts" or "junk" vehicles solely for the parts, which can be used to repair other vehicles. HB Auto has never operated or advertised its business as a junk yard. For the most part, when not at an auto auction, at least one of the Ahmadis is on the HB Auto lot every day, repairing and selling vehicles. HB Auto is also qualified to complete the inspection necessary to obtain a vehicle registration renewal.

Approximately 1% to 2% of HB Auto's business involves the purchase, repair, and sale of the vehicles with salvage titles. Vehicles with salvage titles up to and including six model

---

[5] For examples, see the following vehicles: #37, #58, #91, and #235.

years old must be inspected by an inspector from the DMV prior to being repaired.[6]  This initial inspection is documented on a Report of Initial Examination of Salvage Vehicle.  Once a vehicle with a salvage title is repaired, the owner prepares an Affidavit of Rebuilder/Owner, the vehicle is reinspected, and then the inspector prepares a Report of Final Examination of Rebuilt/Reconstructed Vehicle.  If the repairs are satisfactory, a clear or unbranded title may be issued for the vehicle.  Nevertheless, even if a clear title is issued, the fact that the vehicle had a salvage title must be disclosed to subsequent purchasers.[7]  Hossein Ahmadi testified that once a salvage vehicle is repaired it will continue to have a less than average value.

Roger Beck, the inspector responsible for the 174 dealerships in Davidson County, appeared at the trial and testified that he was familiar with the Ahmadis' used automobile business and that he was responsible for regulating HB Auto in the early 2000's.  He indicated that HB Auto was toward the low end of used car dealers, in that the craftsmanship was not as detailed as certain other dealers; however, he confirmed that HB Auto did not sell parts and was not a junk lot.

_____

[6] *See* N.C. Gen. Stat. § 20-71.3(b) ("Any motor vehicle up to and including six model years old damaged by collision or other occurrence, that is to be retitled in this State, shall be subject to preliminary and final inspections by the Enforcement Section of the Division. For purposes of this section, the term "six model years" shall be calculated by counting the model year of the vehicle's manufacture as the first model year and the current calendar year as the final model year.")

[7] The failure to disclose in writing that a vehicle up to and including five model years old that has been involved in a collision or other occurrence to the extent that the cost of repairing that vehicle, excluding the cost to replace the air bag restraint system, exceeds twenty-five percent (25%) of its fair market retail value at the time of the collision or other occurrence, or that it is a flood vehicle, a reconstructed vehicle, or a salvage motor vehicle prior to the transfer of the vehicle is a Class 2 misdemeanor.  N.C. Gen. Stat. § 20-71.4

## Events in Late 2001 through 2002

In the last few years of his life, Bowers's behavior toward the Ahmadis began to change. He was easily agitated and used racially and ethnically derogatory language when speaking directly to the Ahmadis and when speaking to his employees about the Ahmadis.  In late 2001 the Ahmadis' father, who lived in Iran, was diagnosed with oral cancer.  Hassan Ahmadi left the United States for Iran on December 31, 2001.  Before leaving, Hassan Ahmadi informed Bowers that his father was ill and that he was leaving the country for a period of time.  He returned to the United States with his parents, Mohammad and Zahrazad Ahmadi, on February 26, 2002, intending to obtain medical treatment for his father.  For the next several months, both Hassan Ahmadi and Hossein Ahmadi focused on caring for their parents.  Mohammad Ahmadi was very ill and received treatment at North Carolina Baptist Hospital in Winston-Salem, and neither their father nor mother spoke English.

During March and April 2002, when Mohammad Ahmadi was in the United States receiving medical treatment, Hassan Ahmadi did not go to the Property to check on HB Auto. Most weeks, Hassan Ahmadi did go to the Greensboro Auto Auction to purchase vehicles for HB Auto, as the auction was located near his house.  Vehicles purchased by HB Auto during this time period were not immediately moved to the Property, but were left on the Greensboro Auto Auction's dealer lot.  Contrary to HB Auto's general practice, these vehicles were not immediately repaired.

Hossein Ahmadi also testified that while his father was receiving treatment, he did not work on the HB Auto lot, and that he went to the Property every two or three weeks, and sometimes less frequently.  His father's medical records reflect that he began treatment on March

10

21, 2002 and was admitted into the hospital in Winston-Salem on April 11, 2002 for surgery and then remained hospitalized, part of that time in the intensive care unit, until April 22, 2002. The Court finds Hossein Ahmadi's testimony that he went to the Property even less frequently than every two or three weeks during this time credible, particularly in light of the evidence of his father's serious medical condition at the time.

On March 15, 2002, Hossein Ahmadi discovered that one of HB Auto's vehicles, a Chevrolet S-10 truck known in this proceeding as Vehicle #140, had been vandalized. Hossein Ahmadi called the police and a police report was filed on March 18, 2002. The police report indicates that the date on which the vehicle was last known to be secure by Hossein Ahmadi was 15 days earlier on March 1, 2002. These dates are consistent with the testimony that the Ahmadis were not working at the HB Auto lot on a regular basis during this time period.

At some point in the spring of 2002, after the March 15th vandalism incident, Bowers directed the Brokers's employees to move a large number of HB Auto's vehicles from the Middle Lot down the Slope and to the Lower Lot because a few vehicles were blocking access to Brokers's steel. None of Brokers's employees could recollect the dates when these vehicles were moved, but all indicated that the vehicles were moved in batches over a period of many weeks. A photo introduced into evidence obtained from Google Earth reflects that Brokers had moved many vehicles by March 28, 2002.[8] The undisputed testimony from individuals who

_____

[8] This photo also shows that a number of vehicles were pulled out of the fenced in area and parked along the highway in front of the HB Auto Sales Lot, a practice, according to Hassan Ahmadi, that was generally reserved for when HB Auto was open for business. Brokers argues that this photo is significant as evidence that the business was open on March 28, 2002, contrary to the Ahmadis' testimony that they were not working at HB Auto in March and April 2002 because they were caring for their parents. The Court does not find the presence of the vehicles along the highway particularly significant, given the fact that Hossein Ahmadi was clearly on the

worked for Brokers at the time is that on repeated occasions, over a period of several months, Bowers appeared in a "bad mood": cursing, yelling, and referring to the Ahmadis with derogatory language. He then directed Brokers's employees to move HB Auto's vehicles to the Lower Lot using forklifts. Bowers directed the employees to act without any regard for damaging the vehicles. In fact, the evidence shows that he directed Broker's employees in a manner that virtually guaranteed damage. Bowers was present while the vehicles were moved, and he was aware that vehicles were being damaged.

The three Brokers's employees who were witnesses at trial, Billy Hunt, Chris Leonard, and Harvey Dean Deweese, provided consistent and credible testimony regarding the events in the spring of 2002.[9] All of Brokers's employees who testified indicated that they moved vehicles with a forklift from not only the Middle Lot, but also the HB Auto Sales Lot and the Overflow Lot. Billy Hunt ("Hunt") worked for Brokers for approximately nine years and had a "good relationship" with Bowers, who had also employed Hunt's father for 40 years. He was a Brokers's employee at the time that the vehicles were moved, and he estimated that he was present and involved when approximately 80% of the vehicles were moved. Hunt occasionally worked for HB Auto in the evening when the Ahmadis needed assistance moving vehicles. On a few occasions while helping the Ahmadis, Hunt moved a vehicle with a forklift by stacking

---

Property approximately 10 days prior, when Vehicle #140 was vandalized, and Hossein Ahmadi is, by all accounts, not the most focused worker. The photo is simply evidence that Hossein Ahmadi left the vehicles out of the fence, rather than put them away as his brother might. Furthermore, all of the Brokers's employees who testified at trial described that the Ahmadis were absent for an extended period of time and that they were not present during the initial period of time that the majority of the vehicles were moved.

[9] At Brokers's request, during the trial each of the fact witnesses was excluded from listening to the testimony of the other fact witnesses.

wooden blocks under the vehicle to protect it.  Otherwise, HB Auto did not move any of its vehicles, other than junk vehicles, with a forklift when the vehicles were located on the Property. The undisputed testimony is that when HB Auto's vehicles were moved by Brokers, wooden blocks were not utilized.

Hunt testified that Brokers had never moved HB Auto vehicles to the Lower Lot before the incident in question.  He estimated that the first time the employees moved a batch of vehicles, Bowers appeared in a bad mood and told the employees to move vehicles to the Lower Lot.  Hunt estimated that, initially, Bowers directed Brokers's employees to move about 100 vehicles; however, Hunt never counted the cars that he moved.  At Bowers's direction, Hunt moved many more vehicles over a period of "several weeks," approximately 150 to 200 vehicles, moving them primarily from the Middle Lot, but also from the Overflow Lot and the HB Auto Sales  Lot.  All of the vehicles he moved were "good cars," some being nicer than average and some being less nice than average.  He did not move any junk vehicles or vehicles from the Junk Lot.  As directed by Bowers, he moved vehicles by lifting the vehicles with a forklift.  As he slid the forks under the vehicles, Hunt could hear noises that he believed suggested damage.  He described seeing bent drive shafts on vehicles after he moved them.  He damaged vehicles when sliding the forks under a vehicle, and those forks would poke into the adjacent vehicle.  He testified that Bowers did not appear to care if vehicles were damaged.  Bowers instructed him and others to "stack" the vehicles in the Lower Lot; however, Hunt's father, also an employee, stopped the employees from doing so.  Employees used earth moving equipment to push vehicles closer together.  Also, several of Brokers's forklifts had inoperable or malfunctioning brakes. Knowing this, Bowers instructed the employees to use the vehicle on the forklift as a brake if

necessary.  This was done by dropping the vehicle such that the forklift would then run into the vehicle and thus, stop.

Chris Leonard ("Leonard") worked for Brokers for about a year and a half, including part of the time that HB Auto's vehicles were moved.  He also moved vehicles at Bowers's instruction from the Middle Lot, the Overflow Lot, and the HB Auto Sales Lot to the Lower Lot in the spring of 2002.  He testified that he also moved some junk cars, but could not recollect how many.  The first time Bowers told Leonard to move vehicles, he instructed Leonard to stack the vehicles in the Lower Lot.  Leonard testified that he moved cars, and he damaged cars.  He described that when he went down the Slope, he had to tilt the fork back to keep the vehicle on the forks.  If the vehicle slid back, it would hit the frame of the forklift and the doors would be damaged.  Some vehicles were damaged by hitting larger equipment on the Slope.  Leonard dropped one vehicle and saw another employee, Harvey Dean Deweese, drop more than one vehicle.  Leonard described one instance when the forklift kicked out of gear while he was going down the Slope: he dropped the vehicle so that he could use it as a break to stop the forklift; the vehicle then flipped, and he picked it back up with the forklift, upside down; after that, he described that the vehicle looked "torn up," as if it had been in a wreck.  Leonard put vehicles in the Lower Lot bumper to bumper and side by side.  He also squeezed vehicles between trailers on the Slope, as instructed by Bowers.  In general, the vehicles were in good condition before Leonard moved them.

Harvey Dean Deweese ("Deweese") worked for Brokers for 16 years.  He moved approximately 30 to 50 of HB Auto's vehicles to the Lower Lot with a forklift at Bowers's instruction, despite his own protests.  All of the vehicles moved by Deweese were "good cars."

14

He did not move any vehicles out of the Junk Lot.  He moved what he described as "nice cars": cars he would have purchased.  He described that on more than one occasion, Bowers came into work cursing and yelling and in this state, he would instruct Deweese to move vehicles to the Lower Lot using a forklift.  As Deweese moved the vehicles down the Slope, he too described that he had to tilt the forks back so far that the vehicle on the forklift would slide and hit the cage.  He saw fork marks on vehicles moved.  He also had difficulty with the absence of operating breaks on the forklift and with the forklift slipping out of gear, in which case he described that then "you just went for a ride."  He described that some vehicles fell off the forks, and then those vehicles were hit by the forklift because there was no other way to stop.  He testified that some of the employees who moved vehicles were not careful and did not care about damaging the vehicles.[10]

    After the vehicles had been moved to the Lower Lot, many of the vehicles sustained further damage due to vandalism, erosion, and flooding.  Brokers's employees testified that where the Lower Lot had been partially leveled with dirt that had been hauled in, rain washed the soil away from under and around the vehicles.  Vehicles would then fall into the gully or ditch that was created by the erosion or into the drainage pond that had been built when the Lower Lot

----

[10]While none of the Brokers's employees who testified at trial were particularly eager to describe the damage they each personally inflicted upon the vehicles, Deweese was particularly inconsistent in this regard.  He described with specificity the type of damage incurred, and how it was incurred as though he were the actor.  Yet then, he would suddenly reassure the Court that he was describing what happened to other employees and that he was as careful as he could be. While the Court found Deweese generally credible, he was clearly shaken up about what had happened and very concerned about being personally blamed.  For example, he reiterated several times that he told Bowers that the vehicles did not need to be moved with a forklift, and that Bowers told Deweese that he was the employee and should do what he was told.  The Court finds that his reluctance to admit that he personally damaged any vehicles must be viewed in this light.

was created.  Some of those vehicles were then moved again with forklifts to get them out of the ditch or hole into which they had sunk, or for other reasons.  Additionally, within weeks after the first vehicles were moved to the Lower Lot, vandals and thieves came to the Lower Lot and damaged vehicles by breaking windows and stealing parts off the vehicles.  Brokers's employees testified that Bowers was aware that vandalism was occurring.  Eventually, after Bowers's truck was stolen, Brokers erected concrete barriers at the bridge that connected the Lower Lot to the adjacent property to provide protection.

On May 3, 2002, Hossein Ahmadi went to the Property after an extended absence.  Upon arriving at the Property on May 3rd, Hossein Ahmadi discovered that numerous vehicles were missing from the Middle Lot and the HB Auto Lot.  Upon making this discovery, his first reaction was to call his brother.  Hossein Ahmadi immediately left the Property, because, as he described, he was going to have a "heart attack" when he did not see his cars.  Hassan Ahmadi then arrived at the Property, located the missing vehicles on the Lower Lot, and found that some vehicles were damaged.  Hunt was present both when Hossein Ahmadi discovered that vehicles were missing and when Hassan Ahmadi arrived at the Property.  Hunt walked down to the Lower Lot with Hassan Ahmadi.  Hunt testified that Hossein Ahmadi appeared very surprised when he discovered that vehicles were missing and that Hassan Ahmadi appeared surprised when he saw the vehicles in the Lower Lot.  Hunt testified that on the same day the Ahmadis discovered that the damaged vehicles, the police were called and the sheriff came.  By that point, at least one of the vehicles that had been moved to the Lower Lot had already been vandalized.

Hassan Ahmadi called the police and a report was filed regarding the damage caused by vandals.  He also spoke to Bowers about the damages caused by Brokers.  Bowers informed him

16

that the vehicles were moved because the Ahmadis did not come to work anymore.  In response

to the damages, Bowers told Hassan Ahmadi to leave the vehicles alone and that he would take

care of it.  Hassan Ahmadi testified that based upon his long-standing relationship with Bowers,

he trusted this representation and left the majority of the vehicles as they were, in the Lower Lot.

The Ahamdis did retrieve a small number of vehicles that were not damaged or had only minor

damage and could be easily repaired, as well as the vehicles used for parts.  The Ahamdis

testified that they did not remove parts from any of the vehicles that remained in the Lower Lot.

Within in a few weeks after May 3, 2002, when the Ahmadis had returned to work on a more

regular basis, Bowers told the Ahmadis that HB Auto could bring more vehicles onto the

Property.  HB Auto resumed purchasing vehicles, bringing them to the Property, and repairing

them.  HB Auto continued to pay monthly rent.[11]

On a few more occasions in the following months when the Ahmadis were not present on

the Property, Brokers again moved HB Auto's vehicles to the Lower Lot with forklifts.  Hunt

testified that additional vehicles were moved months after the Ahmadis returned to work.

Hossein Ahmadi described that he and his brother would bring a vehicle to the Property, and that

two or three weeks later "when we wouldn't go to work, he would do that thing to - to the cars."

On one of those occasions, Hassan Ahamdi arrived, and Bowers refused to stop his employees

---

[11] Brokers admitted into evidence a copy of a letter dated February 28, 2002 in which
Bowers alleged that HB Auto owed Brokers a certain amount of rent and funds for storage and
expressed frustration over the location of some of HB Auto's vehicles, and in which Bowers
conceded that Brokers also owed HB Auto money.  Brokers has made no claim that HB Auto
owes it any funds, nor is Brokers arguing that it was somehow justified in moving the vehicles
because they were parked in the wrong location.  Therefore, this letter is not particularly
relevant, other than as evidence that by late February 2002, Bowers was becoming agitated with
the Ahmadis.

from moving the vehicles.  Furthermore, Hossein Ahmadi was there on one of the last occasions that Brokers moved vehicles to the Lower Lot.  Hossein Ahmadi began to move vehicles to the Overflow Lot to get them out of the way, but the process was slow because some of the vehicles needed to be jumped to get them started.  Meanwhile, Bowers continued to direct Brokers's employees to move vehicles to the Lower Lot with forklifts.

Bowers reassured the Ahmadis on more than one occasion that he would compensate HB Auto and told the Ahmadis to leave the vehicles as they were in the Lower Lot.  HB Auto ultimately ceased bringing any additional vehicles to the Property and relocated the business. Hunt testified that there were not any more vehicles moved by Brokers's employees once the vehicles were "all down there" and "they quit bringing vehicles in."

In August of 2002, Hossein Ahmadi purchased land onto which HB Auto could relocate. HB Auto moved in October 2002 but continued to pay $750 per month in rent to Brokers because of the vehicles left behind in the Lower Lot.  HB Auto did not attempt to move the vehicles out of the Lower Lot but simply left the vehicles as they had been placed by Brokers's employees.  Hassan Ahmadi testified that HB Auto did not put plastic tarps over the vehicles because there were simply too many vehicles to do so.  Neither he nor his brother made a list of the vehicles or damages until after Bowers's death.  At that point, they took photos of the vehicles and prepared a spreadsheet (which was admitted as "Defendant's Exhibit 2") listing the make, model, vehicle identification number ("VIN"), mileage, date of purchase, and a value before and after the incident.  Eventually, HB Auto moved the vehicles, using a rollback, to its current place of business.

The current President of Brokers, Mark Preston ("Preston"), has been an officer of

18

Brokers since January of 2004.  He also serves as the co-executor of the Estate of Dolan Bowers, and he is a licensed CPA.  On January 21, 2005, this court entered on order authorizing Preston's employment by Brokers as in independent contractor consultant to be paid at a rate of $150 per hour.  During his tenure at Brokers, Preston has overseen the liquidation of the corporation, the payment of creditors, and the resolution of certain environmental remediation activities.  Preston signed Brokers's bankruptcy petition and the disclosure statement, as well as other documents filed in this case.  As the assets of Brokers are not fully liquidated, Brokers has engaged a management company to manage rental property.  No further business development activities have been undertaken.  Preston has attended each of Brokers's quarterly board meetings while he has been an officer and director of the company.  In his testimony at trial, Preston could not recall if he was aware that the vehicles were on the Lower Lot at the time he took over as President and indicated that he simply did not pay attention to vehicles on the Property.  Preston testified that neither the subject of HB Auto's vehicles nor HB Auto's Claim against Brokers had ever been discussed at a board meeting despite the fact that the amount of HB Auto's claim was estimated at $400,000.

## Expert Testimony

At trial, HB Auto presented the testimony of Newland Spears ("Spears"), who was qualified as an expert in valuation of used vehicles.  Spears runs a paint and body shop.  His specialty is buying wrecked vehicles, repairing, and then reselling these vehicles.  He testified that he was very familiar with frame damage in general and frame damage caused by a forklift in particular, and that a forklift leaves a distinct track underneath a vehicle, including possible damage to the pinch weld clamp, rocker panels, drive shaft, floor boards, exhaust system, fuel

19

tank and lines, and on the side of the vehicle.  Spears testified that it was not possible to pick up a vehicle with a forklift and not cause some type of damage.  He conceded that an exception to this general statement would be if some type of bracing was utilized, such as wood blocks. When Spears examined HB Auto's vehicles, he did not have any knowledge of the specific events that occurred in 2002.

Spears examined each vehicle individually for forklift damage and to determine the general condition of the vehicle.  He jacked each vehicle up to examine underneath each vehicle and dictated notes to his wife as he was working.[12]  These notes on each vehicle are contained in his expert report and were entered into evidence.  While examining HB Auto's vehicles, Spears saw numerous vehicles that had been moved with a forklift more than once as evidenced by the existence of more than one set of forklift tracks.  This damage was particularly evident on vehicles that had forklift marks on both sides of the vehicle, indicating that the vehicle had been picked up from two different directions.

Spears examined the vehicles operating under the basic assumption that the vehicles were ready for sale prior to being damaged.  He examined the overall condition and "look" of each vehicle including body structure, carpet wear, seat wear, and audio systems.  He, along with the

---

[12] At times during the trial, Brokers's appeared to be questioning the veracity of Spears's assertion that he looked underneath each vehicle.  Brokers's own expert, Glenn Twigg, speculated that the vehicles were so close together, it would take a week to look under each vehicle. When so stating, Twigg did not appear to be aware of the fact that it actually took Spears, along with his wife and an employee, longer than a week.  Spears described in detail exactly how he looked underneath each vehicle, at times having to move vehicles with chains in order to afford himself with sufficient space to jack up the vehicle, and the process did, in fact, take him more than a week.  The Court found Spears's testimony very credible and specifically finds that the evidence clearly supports a finding that Spears examined underneath each vehicle and accurately documented his observations and opinions in his expert report.

assistance of his wife and one of his employees, spent approximately 41 hours in the field examining the vehicles. He recorded damage from a forklift, damage from deterioration, and missing parts. He found only one vehicle that did not have damage from a forklift. Numerous vehicles had incurred frame damage. Almost all the vehicles had incurred damage to a rocker panel and floor board. Spears indicated that the cost of a rocker panel ranges from $250 to $750. He testified that he regularly wrote estimates for repairs to rocker panels, and he repairs rocker panels regularly at a cost of as much as $3,900. He testified that damage to a rocker panel will have a drastic impact on the value of a vehicle because, even after repaired, it must be disclosed upon sale as frame damage. The Court finds that Spears's testimony regarding forklift damage on the vehicles and repair costs was credible and competent and that the notes in his expert report establish an accurate record of the damage sustained by each vehicle.

As part of his expert report, Spears calculated estimated values for each vehicle immediately after the forklift damage was incurred. He calculated these values based upon forklift damage. Spears also included an estimate of each vehicle's value as of the date of his inspection, approximately August 1, 2007. This estimate takes into account subsequent deterioration. He estimated that the vehicles have current total value of $24,625. All of his estimated values are based upon his own experience and expertise; he did not use NADA values.

Spears also testified regarding his familiarity with auto auctions. He is familiar with the Greensboro Auto Auction and testified that it is a fairly competitive auction, but at times it is possible to buy a car for $50 that is worth $5,000. In his opinion there is no relationship between the purchase price of a vehicle at an auction and the value of the vehicle.

Spears testified that the condition of a vehicle will deteriorate if it remains parked for

years at a time.  As an individual in the used car business, Spears testified that it was common

practice to perform some type of maintenance of vehicles that are sitting for an extended period

of time, such as occasionally running the engine and driving the vehicle intermittently so that the

tires were not always in the same position.  Covering a vehicle with a tarp is also a common

practice used to provide protection from the elements.  He testified that if a vehicle has a flood

history or salvage history, that history will reduce its value.

Brokers presented the testimony of Glenn Edward Twigg ("Twigg"), who was qualified

as an expert in vehicle appraisal and vehicle damage.  On his initial inspection of the vehicles,

Twigg spent approximately three hours to examine the 235 vehicles (mathematically, this

equates to approximately 45 seconds per vehicle).  He did not initially look underneath any of

the vehicles.  Twigg then prepared his expert report, listing his opinion of the condition of each

of the vehicles that he inspected.  The report contains no opinion as to vehicle value.  Twigg

explained that he did not examine underneath any of the vehicles because "underside damage

didn't mean that much to me at that time."  Twigg was deposed by counsel for HB Auto after his

initial inspection of the vehicles.  At the conclusion of this deposition, Twigg decided to return

to the location of the vehicles and examine the underside of a few randomly chosen vehicles.

Twigg did not add any notes from his second inspection to his expert report but testified

regarding his additional findings at trial.[13]

Twigg's expert report is difficult to understand, and numerous entries and notations are

confusing.  Twigg testified that his intention was to make the notation "NFLD" in his report if he

---

[13] Twigg examined five vehicles, but only retained notes regarding four of those vehicles
and, thus, was only able to testify regarding the underside of those four vehicles: #10, #13, #27
and #138.

found no forklift damage.  The notation "no damage" was intended to imply that the vehicle had

no damage separate and apart from forklift damage.  If Twigg listed some type of damage but did

not indicate NFLD, then he intended to imply that the damage was indeed forklift damage.  The

forklift damage that he did see during his initial inspection was primarily in the form of bent

doors, and Twigg testified that generally a forklift would damage a vehicle with lines that ran

"up and down."

Twigg testified that some of the vehicles had collision damage that he believed was

unrelated to being moved with a forklift unless somebody "got wild" on a forklift.[14]  Other

vehicles were missing parts, such as airbags, audio components, lamps, and bumpers.  A number

of vehicles appeared as though they had fallen into a ditch or had been involved in a rear end

collision.  In his opinion, a vehicle could be moved with a forklift and not sustain frame damage

because a forklift would not hit the rocker panel unless the forks slid too far under the vehicle.[15]

The Court will give little weight to Twigg's testimony regarding the condition of individual

vehicles, as he spent on average less than one minute examining each vehicle.[16]  In fact, Twigg

---

[14]  In describing what could have caused some of the damage he saw, Twigg unwittingly
summarized the events described by the Brokers's employees.  He was not present during the
testimony of the Brokers's employees.

[15]  As Hunt, Deweese, and Leonard described, Brokers's employees slid the forks as a far
as possible under each vehicle and tilted the forks back in order to navigate the Slope without
dropping the vehicle.

[16]  The fact that Twigg did not spend much time examining the vehicles is reflected by his
report, which contains numerous patent inaccuracies.  For example, for Vehicle #32, Twigg's
report states that the vehicle has no damage of any type, yet damage to the left side is both
visible on the photos in evidence and noted on Spears's report.  For Vehicle #50, Twigg's report
states that the vehicle has no damage of any type, yet damage to the right front is both visible on
the photos in evidence and noted on Spears's report.  For Vehicle #59, Twigg's report indicates
the vehicle has no forklift damage, yet at trial Twigg testified that some of the damage was
consistent with forklift damage.  For more examples of instances when Twigg failed to note

23

testified that it was hot on the day he examined the vehicles and he was in a hurry to "get back on the road." [17] Also, because Twigg did not initially examine underneath any of the vehicles, Twigg's opinion as stated in his report regarding whether a vehicle has forklift damage carries almost no weight.[18] Twigg himself testified that since he did not examine the underside of the vehicles, Spears is in a better position to make a judgment of how much damage the underside sustained. Lastly, the Court notes that Twigg appeared less knowledgeable than Spears about forklift damage in general.

Twigg was not familiar with any of the auto auctions that the Ahmadis regularly attended. In his opinion, there is a relationship between the purchase price of a vehicle and its value in that the purchase price indicates something about the value; though, he conceded that when he was appraising an automobile, purchase price was not generally a factor.

Regarding general values of used automobiles, Twigg testified that the most accurate value of an average, used car is the N.A.D.A. Guide ("NADA") value or Kelly Blue Book value, but that not all cars have a book value and one has to consider the overall condition. He testified that the industry standard value of a flood or salvage vehicle is 30% to 40% (or an average of 35%) less than the NADA retail, the standard value of a vehicle that had been 25% damaged and

_____

obviously visible damage, see the following vehicles: #15, #24, #53, #90, #114, #123, #136, #146, #150, #173, and #181.

[17] Twigg also stated that, at the conclusion of his initial inspection, "I was - - yeah, I was hungry. And when it gets 12 o'clock, I want to eat. And it was more like two."

[18] Twigg's testimony regarding the four vehicles that he did return to examine underneath is instructive. For instance, on his report, Twigg indicated that Vehicle #10 had no forklift damage, yet he testified that when he returned to examine underneath the vehicle, he found forklift damage to the rocker panel. Similarly, after examining under Vehicle #13, he found forklift damage to rocker panel. Lastly, on Vehicle #138, after looking underneath it, he found forklift damage to the fuel tank.

repaired is generally 10% less than NADA retail but could reach up to 20% less on newer

models, and the standard value of a vehicle that had frame damage or unibody damage but had

been properly repaired is 10% less than NADA retail.  Twigg further testified that the fact that a

vehicle has been repossessed in the past, sold in a "salvage line," or as a "red light" does not

affect the value of the vehicle.  He stated that a vehicle that sits for a number of years will

deteriorate, and while starting the engine occasionally would prevent some damage, the tires will

dry-rot if left in the same position.  The Court finds that Twigg's testimony regarding the

valuation of used automobiles and NADA values generally competent and credible.

Twigg agreed with much of Spears's testimony, but he did not feel that he could

determine what damage took place before the move, during the move, or after the move without

evidence of the condition prior to the incident.  Twigg disagreed with Spears regarding whether

some of the exterior damage, particularly on the doors, was caused by a forklift.  In addition, he

generally did not agree with Spears's values for the vehicles immediately following the incident.

Twigg did not agree with Spears's deductions for frame damage, though he was not familiar with

the cost to repair a rocker panel and could not recall the last time he had written an estimate for

rocker panel repair.  Twigg testified that in his opinion, it is less costly to repair floorboard

damage than damage to the rocker panel or frame rail.

Both Twigg and Spears provided testimony regarding specific, individual vehicles.

Evidence regarding each individual vehicle will be addressed below, in conjunction with the

Court's analysis of damages.

### Statute of Limitations

Brokers contends that HB Auto is not entitled to recover damages for injuries which

arose before April 29, 2002, the date three years prior to the date that the Complaint was filed. The Court disagrees for several reasons. North Carolina Gen. Stat. § 1-52 imposes a three-year statute of limitations for negligent damage to personal property actions. A negligence action accrues at the time the plaintiff discovers, or reasonably should have discovered, the injury or damage, as long as it is within ten years of the defendant's negligence. N.C. Gen. Stat. § 1-52(16). If the relevant facts are not admitted and in conflict, then whether a cause of action is barred by the statute of limitations is a mixed question of law and fact. *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 643, 643 S.E.2d 28, 33 (2007) (citing *Jack H. Winslow Farms, Inc. v. Dedmon,* 171 N.C. App. 754, 756, 615 S.E.2d 41, 43 (2005)).

In the instant case, HB Auto filed its negligence action within three years of its discovery of the property damage. Brokers began to move vehicles sometime after March 18, 2002. The undisputed testimony is that these actions commenced when the Ahamdis were not present. The Ahmadis became aware of the damage on May 3, 2002 when Hassan Ahmadi came to the Property and noticed that vehicles were missing. The evidence shows that the police were notified on the same date that the damage was discovered and the police report is clearly dated May 3, 2002.

Furthermore, the Court cannot conclude that HB Auto reasonably should have discovered the damages or negligence prior to May 3, 2002. Brokers moved and damaged the majority of the vehicles at a time when the Ahmadis were essentially taking a leave of absence from the business to care for their ailing father and visiting mother. Hassan Ahmadi did not go to the Property for a period of several months, and Hossein Ahmadi went only intermittently. Just ten days after his father was discharged from the hospital, Hossein Ahamdi returned to the Property

and discovered the damage.  Even if Hossein Ahmadi did stop by the office on the Property

sometime in late March or April, the Court cannot find that the damage should have reasonably

been discovered.  The Ahmadis had hundreds of vehicles, and the damaged vehicles were moved

to a location that was not utilized by HB Auto and that was not visible from the HB Auto Sales

Lot or HB Auto's office.  As a result, HB Auto is entitled to the protection of the discovery rule

in N.C. Gen. Stat. § 1-52(16).  By filing the Complaint within three years of discovering the

property damage, HB Auto is not barred by the statute of limitations from seeking damages for

injuries sustained when Brokers moved the vehicles in March and April 2002.

Furthermore, even if the Court were to find that the damage should have been discovered

in early April 2002, the Bankruptcy Code provides additional time for a stayed creditor to

commence a civil action against a debtor.  Section 108(c) of the Bankruptcy Code provides that

if a limitations period for commencing a civil action has not expired before the petition date,

then such period does not expire until 30 days after receiving notice of the termination of the

automatic stay under § 362. 11 U.S.C. § 108(c).[19]  While § 108(c) does not independently stop

the limitations period from running while the stay is pending unless expressly provided for by

applicable non-bankruptcy law, it extends such deadline for 30 days after notice of the

termination of the stay with respect to the claim at issue.  *See, e.g., In re WorldCom, Inc.*, 362

B.R. 96, 109-10 (Bankr. S.D.N.Y. 2007); *In re Meredith*, 337 B.R. 574, 576 (Bankr. E.D. Va.

2005); *In re Pagnotti*, 269 B.R. 326, 335 (Bankr. M.D. Pa. 2001).  In the present case, Brokers

---

[19] This Court previously granted summary judgment in favor of Brokers on the claim for
negligent damage to business equipment on the basis that the statute of limitations had expired.
HB Auto claimed that damage was caused by a leaking roof on a leased building.  The evidence
showed that the building began to leak in the mid-1990's and leaked for many years.  As a result,
the statute of limitations had expired prior to the petition date.

filed its bankruptcy petition on November 22, 2004.  The stay was lifted as to HB Auto on April

27, 2005 and the Complaint was filed well within 30 days of that date, on April 29, 2005.  HB

Auto's claim against Brokers did not arise until 2002; therefore, the three-year statute of

limitations had certainly not expired before the Petition Date.[20]

### Trespass to Chattel

HB Auto has asserted claims for both negligence and trespass.  The basis of a trespass to

chattel cause of action lies in the "injury to possession."  *Motley v. Thompson,* 259 N.C. 612,

618, 131 S.E.2d 447, 452 (1963).  A claim for trespass to chattel requires a showing that: (1) the

plaintiff had actual or constructive possession of the chattel in question; and (2) there was an

unauthorized interference or dispossession of that chattel.  *Fordham v. Eason*, 351 N.C. 151,

155, 521 S.E.2d 701, 704 (1999).

The first element of a trespass to chattel claim is easily satisfied in this instance.  HB

Auto had possession of the chattel in question: the vehicles.  The vehicles were parked on

various HB Auto lots on the Property, including the HB Auto Sales Lot, the Middle Lot, and the

Overflow Lot.  HB Auto also had possession of the keys to each of those vehicles.  As to the

second element, it is undisputed that Brokers removed the vehicles from their locations on HB

---

[20]  There is credible evidence that one of the vehicles moved was damaged in a separate
incident prior to March 2002 when at least one of the Ahmadis was present.  Specifically, at
some point before March 2002, Vehicle #63 was severely damaged when an I-beam dropped
onto it.  Brokers's employees had been attempting to move the I-beam with a crane.  The chain
attached to the I-beam broke and the beam fell onto the vehicle.  Brokers argues that any claim
by HB Auto for damages related to that incident is barred by the statute of limitations; however,
the Court need not address that issue as that damage was caused by a separate incident unrelated
to the claims asserted in the Complaint.  The condition of Vehicle #63 at the time it was moved
to the Lower Lot is relevant, however, to the calculation of damages.

Auto's lots to the Lower Lot. It is undisputed that the Lower Lot was located on a portion of the Property that was not rented or utilized by HB Auto and was utilized only by Brokers. Additionally, based upon the evidence presented, the Court finds that Brokers's interference and dispossession of HB Auto's vehicles were not authorized by HB Auto. As a result, Brokers is liable to HB Auto for its trespass to chattel, and HB Auto is entitled to a judgment for damages resulting from that trespass. The issue of damages will be addressed separately.

### Negligent Damage to Personal Property

To establish a claim for negligence, a plaintiff must demonstrate the existence of four essential elements: duty, breach of duty, proximate cause, and damages. *See, e.g., Stein v. Asheville City Bd. of Ed.*, 360 N.C. 321, 328, 626 S.E.2d 263, 267-68 (2006); *Estate of Mullis v. Monroe Oil* Co., 349 N.C. 196, 202, 505 S.E.2d 131, 135 (1998). A duty arises under "the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to endanger the person or property of others." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.,* 324 N.C. 63, 68, 376 S.E.2d 425, 428 (1989) (quoting *Pinnix v. Toomey,* 242 N.C. 358, 362, 87 S.E.2d 893, 897 (1955)). *See also Stein*, 360 N.C. at 328, 626 S.E.2d at 267 ("No legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care." ); *Estate of Mullis*, 349 N.C. at 204, 505 S.E.2d at 137 ("A legal duty is owed whenever one person is by circumstances placed in such a position [towards] another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other.") (internal quotations and citations omitted). A breach of that duty occurs when a person fails to

29

conform to the standard of due care required.  *Thornton v. F. J. Cherry Hosp.*, 183 N.C. App.

177, 186, 644 S.E.2d 369, 376 (2007) (citing *Davis v. N.C. Dept. of Human Res.*, 121 N.C. App.

105, 112, 465 S.E.2d 2, 6 (1995)).

      HB Auto's evidence establishes that Brokers owed a duty to HB Auto and that Brokers

breached this duty.  For whatever reason, but without permission to do so, Brokers undertook to

move HB Auto's property, and when doing so, it owed HB Auto the duty to conduct itself with

ordinary care.  There is ample evidence that Brokers did not use ordinary care when it moved

HB Auto's vehicles to the Lower Lot.  Hunt, Leonard, and Deweese all testified that they moved

the vehicles with forklifts, and they did not use wooden blocks or any other means to protect the

vehicles from the forks.  Furthermore, they transported the vehicles down a hill on forklifts with

defective brakes.  The vehicles were placed bumper to bumper in the Lower Lot next to the

drainage pond.  Brokers did not use ordinary care or skill when it moved the vehicles, and

Brokers should have recognized that HB Auto's property would be injured by its conduct.[21]  In

fact, the evidence reflects that it was plainly apparent that HB Auto's property was being injured

while the conduct was ongoing.  Brokers's employees saw, heard, and caused damage while they

were moving vehicles, and yet, they moved additional vehicles in the same fashion.  In sum,

Brokers moved the vehicles in a negligent fashion and is liable for the damages caused by that

negligence.  *See Daniels ex rel. Webb v. Reel*, 133 N.C. App. 1, 9, 515 S.E.2d 22, 27 (1999) ("At

---

      [21] Pursuant to the theory of respondeat superior, when an employee's act is within the
scope of employment, expressly authorized, or subsequently ratified by the employer, the
employer may be held liable for that act. *See, e.g., Estes v. Comstock Homebuilding Companies,
Inc.*, ___ N.C. App.___, 673 S.E.2d 399 (2009); *Stanley v. Brooks*, 112 N.C. App. 609, 613, 436
S.E.2d 272, 274 (1993).  In this case, Brokers has not asserted that any of its employees acted
without authority or outside the scope of employment.

its most basic level, liability for negligence is premised on the fact that a party is performing a particular undertaking in a negligent fashion.").

While HB Auto has presented evidence that establishes Brokers's negligence, it must also show that Brokers's negligence was the proximate cause of the injury. Proximate cause has been described as:

> [A] cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Hairston v. Alexander Tank & Equipment Co.,* 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984) (citations omitted). Foreseeability is an element of proximate cause, though the plaintiff need not prove that the defendant should have foreseen the exact injury that occurred. *Id*. at 233-34, 311 S.E.2d at 565. For the purposes of proximate cause, foreseeability includes those events that were reasonably foreseeable, but does not extend to those events that were simply "possible." *Id*. at 234, 311 S.E.2d at 565. *See, e.g., Williamson v. Liptzin*, 141 N.C. App. 1, 10-19, 539 S.E.2d 313, 319-24 (2000) (holding that plaintiff's dangerousness was not foreseeable; therefore, defendant's negligence was not the proximate cause of plaintiff's injuries). Other factors to consider when making a determination as to proximate cause include: (1) whether it appears that the cause, when using usual judgment, was likely to produce the result; (2) whether the relationship between cause and effect is too attenuated; (3) whether there is a direct connection without intervening causes; (4) whether the cause was a substantial factor in bringing the result; and (5) whether there was a natural and continuous sequence between cause and effect.

*Williamson v. Liptzin*, 141 N.C. App. at 11, 539 S.E.2d at 319-20 (citing *Wyatt v. Gilmore*, 57 N.C. App. 57, 59, 290 S.E.2d 790, 791 (1982)).

HB Auto contends that Brokers's negligence caused injury to its property including: (1) damage caused directly by moving vehicles with a forklift; (2) other damage, such as collision type damage, incurred during the process of moving the vehicles; (3) damage caused by deterioration of the vehicles due to exposure, including water damage; and (4) damage caused by vandals. First, the Court finds that Brokers's negligence was the proximate cause of the damage to HB Auto's vehicles caused directly by forklifts. Clearly, it was foreseeable, using ordinary judgment, that the vehicles would be gouged, scraped, and dented. In addition, it was also foreseeable that other damage would be incurred during the process of moving vehicles down a hill on forklifts with inoperable brakes. In fact, the evidence clearly shows that Bowers, who directed Brokers's employees to use the forklifts, was aware of the problems with the brakes and instructed employees to use the vehicles as brakes. Certainly, Brokers's negligence was the proximate cause of the collision type damage incurred while moving the vehicles.

Brokers contends that even if it moved HB Auto's vehicles in a negligent manner, it is not responsible for the subsequent damages caused by deterioration, flooding, and vandalism because such damages were not proximately caused by Brokers. Many of the vehicles sustained damage because portions of the Lower Lot eroded and flooded. Some vehicles were washed into ditches and others were flooded. The evidence clearly shows that the Lower Lot is situated at the bottom of a hill. Brokers was aware of drainage issues when it built the Lower Lot, as evidenced by the fact that a drainage pond was built. The Court finds that when Brokers placed the vehicles at the bottom of a hill next to its drainage pond, the flooding was foreseeable. In

32

addition, a certain amount of deterioration was foreseeable.  Brokers packed hundreds of vehicles together bumper to bumper and side to side in a remote and relatively difficult to access portion of the Property.  Clearly, it should have been foreseeable that the Ahmadis would not be able to quickly and easily retrieve the vehicles or maintain these vehicles, such as by driving them occasionally, once they were deposited in the Lower Lot.  Though the Court finds that deterioration was foreseeable, HB Auto did have a duty to mitigate damages, which the Court will address in conjunction with the calculation of damages.

In contrast, damage caused by criminal acts was not foreseeable.  In North Carolina, as a general rule, "the intervening or superseding criminal acts of another preclude liability of the initial negligent actor when the injury is caused by the criminal acts." *Tise v. Yates Constr. Co.*, 345 N.C. 456, 460, 480 S.E.2d 677, 680 (1997).  This rule stems from the concept of foreseeability: intentional, criminal acts of third parties generally cannot be reasonably foreseen by the negligent actor. *Al-Hourani v. Ashley*, 126 N.C. App. 519, 521-23, 485 S.E.2d 887, 889-90 (1997) (finding that defendant's negligence in allowing third parties to carry gasoline away from the defendant's premises in unapproved containers, but then using it to burn plaintiff's brother was a reasonably unforeseeable intervening and insulating action).  Nevertheless, if there is evidence that the criminal acts that occurred were reasonably foreseeable, the negligent actor may be held liable. *Connelly v. Family Inns of America, Inc.*, 141 N.C. App. 583, 588, 540 S.E.2d 38, 41 (2000).  "The most probative evidence on the question of whether a criminal act was foreseeable is evidence of prior criminal activity committed." *Id.* (citing *Sawyer v. Carter*, 71 N.C. App. 556, 558, 322 S.E.2d 813, 815 (1984).  Specifically, courts consider the location, type, number, and frequency of criminal incidents prior to the negligent act.  *Id.  See, e.g.,*

33

*Murrow v. Daniels*, 321 N.C. 494, 502, 364 S.E.2d 392, 398 (1988) (finding that evidence of 100 incidents of criminal activity in five years at intersection where defendant's motel was located was sufficient to raise the issue of fact concerning the question of foreseeability"); *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 642, 281 S.E.2d 36, 40 (1981) (holding that the court could not conclude that the criminal act was unforeseeable as a matter of law when presented with evidence of 31 total prior criminal incidents and four or five that were of a similar type); *Liller v. Quick Stop Food Mart, Inc*., 131 N.C. App 619, 623, 507 S.E.2d 602, 605 (1998) (considering the type of prior criminal incidents and finding that six violent incidents over a three-year span were sufficient to raise an issue as to whether further violent crime was foreseeable); *Sawyer v. Carter*, 71 N.C. App. at 562, 322 S.E.2d at 817 (evidence of single robbery of convenience store five years earlier, coupled with evidence of occasional robberies of other convenience stores and businesses at unspecified locations over extended period of time, insufficient evidence of foreseeability and duty to survive defendant's summary judgment motion); *Brown v. N.C. Wesleyan College, Inc.,* 65 N.C. App. 579, 583, 309 S.E.2d 701, 703 (1983) ("Based upon this forecast of evidence, we conclude that the scattered incidents of crime through a period beginning in 1959 were not sufficient to raise a triable issue as to whether the abduction and subsequent murder of plaintiff's intestate was reasonably foreseeable.").

In this case, HB Auto presented little evidence of criminal incidents prior to the time that the vehicles were moved to the Lower Lot. On at least one occasion, the fence had been cut by vandals to gain access to vehicles parked in the Property and there was also an incident on March 15, 2002 when a Chevrolet S-10, Vehicle #140, was vandalized. Once the vehicles were moved, however, the evidence reflects that criminal activity began almost immediately. Based

upon the evidence presented, the Court cannot find that these activities were foreseeable. These criminal acts were intervening causes and Brokers is not liable for damages caused thereby.

## Contributory Negligence

Brokers contends that HB Auto should be barred from recovering any damages incurred after the vehicles were discovered in the Lower Lot because HB Auto was contributorily negligent by leaving the vehicles there. "Contributory negligence is the breach of duty of a plaintiff to exercise due care for his or her own safety, such that the plaintiff's failure to exercise due care is a proximate cause of his or her injury." *Thompson v. Bradley*, 142 N.C. App. 636, 640, 544 S.E.2d 258, 261 (2001). In North Carolina, a finding of contributory negligence results in a complete bar to a negligence claim. *Cobo v. Raba*, 347 N.C. 541, 545, 495 S.E.2d 362, 365 (1998). When a defendant's negligence is gross negligence, however, a plaintiff's ordinary negligence does not bar recovery. *Yancey v. Lea*, 354 N.C. 48, 51, 500 S.E.2d 155, 157 (2001). Gross negligence includes willful or wanton conduct done with a reckless disregard for the rights or safety of other people or property. *Id*. at 52, 500 S.E.2d at 157. Conduct is wanton when it is done with a wicked purpose or done needlessly. An act is willful "when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason." *Id.* Thus, an act or conduct rises from ordinary negligence to gross negligence when it is done with a certain level of knowledge or consciousness. *Id*. at 53, 500 S.E.2d at 158. *See also Clayton v. Branson*, 170 N.C. App 438, 445-46, 613 S.E.2d 259, 265-66 (2005) (finding no gross negligence where defendant drove 30 to 35 miles above the legal speed limit even though defendant was aware that plaintiff was not wearing a seatbelt); *Sawyer v. Food Lion, Inc*., 144 N.C. App. 398, 403, 549 S.E.2d 867, 870-71 (2001) (holding that defendant's failure to cover

floor holes was not willful, wanton, or with a deliberate or wicked purpose); *Wilburn v. Honeycutt*, 135 N.C. App. 373, 376, 519 S.E.2d 774, 776 (1999) (holding that evidence tending to show that defendant driving on a long, straight road with no obstructions and that defendant saw plaintiff and plaintiff's horse and either intentionally of with reckless indifference willfully ran into them and drove on without stopping was sufficient to preclude defendant's motion for direct verdict on the issue of willful and wanton conduct).

Here, Brokers's conduct was both willful and wanton. The evidence paints a picture of Brokers's reckless disregard for HB Auto's property and a wicked purpose. The employees were instructed to move the vehicles with forklifts, without any wood blocks or other bracing. Because the forklifts had faulty brakes, the employees were instructed to use the vehicles themselves as brakes, dropping the vehicle such that the forklift would hit the vehicle and stop. Though they did not do so, Brokers's employees were instructed to stack vehicles on top of one another. Earth moving equipment was used to push the vehicles. All of the employees described that when instructing the employees to move the vehicles, Bowers appeared angry or in a "bad mood" and would refer to the Ahmadis with racial and ethnic slurs. After carefully considering the evidence, the Court finds that Brokers's actions were taken with a conscious disregard for HB Auto's property and constitute gross negligence.

Brokers contends that even if its conduct constitutes gross negligence, HB Auto also acted in a manner that constitutes gross negligence by continuing to place vehicles on the Property after it discovered that Brokers had moved vehicles with a forklift to the Lower Lot and by failing to take action to prevent criminal acts and deterioration of the vehicles in the Lower Lot. Despite a finding of gross negligence on behalf of a defendant, a plaintiff's claim is barred

36

if the plaintiff's own actions rise to the same level of negligence as the defendant's. *Coleman v. Hines*, 133 N.C. App. 147, 150, 515 S.E.2d 57, 60 (1999). Even if this Court were to make a finding that HB Auto was negligent in failing to remove the vehicles from the Lower Lot to prevent vandalism and deterioration, or if the Court found that HB Auto was negligent when it continued to bring vehicles to the Property even after it discovered that Brokers had moved vehicles to the Lower Lot, HB Auto's negligence would not rise to the level of Brokers's gross negligence. It is not disputed that HB Auto leased portions of the premises including the HB Auto Sales Lot, the Middle Lot, the Overflow Lot, and the Junk Lot. Brokers had taken vehicles from numerous different lots, not just one location. HB Auto was paying Brokers its monthly rent, and it had not been evicted, nor had eviction proceedings been commenced. The fact that HB Auto continued to utilize areas of the Property that it leased from Brokers after it discovered that Brokers had moved some of its vehicles does not constitute willful or wanton conduct, or conduct done with a wicked purpose. In contrast, Brokers moved HB Auto's vehicles to the Lower Lot in a willful and wanton manner. Similarly, the evidence does not support a finding that HB Auto's conduct was willful and wanton when it left the vehicles in the Lower Lot, or that it acted with a wicked purpose. Moving hundreds of vehicles is an onerous task, and the fact that HB Auto continued to pay rent of $750 per month to Brokers while the vehicles remained in the Lower Lot is evidence that HB Auto had a good faith belief that Brokers was, somehow, going to make HB Auto whole. Moreover, the extent to which HB Auto should have prevented the vandalism and deterioration is an issue of mitigation of damages rather than negligence.

**Damages**

In North Carolina, as a general rule, the measure of damages for injury to personal property is the difference between the fair market value of the property immediately before the injury and the fair market value of the property immediately after the injury. *Sprinkle v. N.C. Wildlife Res. Comm'n*, 165 N.C. App 721, 726, 600 S.E.2d 473, 477 (2004). Accordingly, to find damages, the court must be presented with competent evidence of the value of the property before the injury and after the injury. *Id.* at 726-27, 600 S.E.2d at 477. The plaintiff must establish the amount of damages with reasonable certainty. *CDC Pineville, LLC v. UDRT of N.C., LLC*, 174 N.C. App. 644, 655, 622 S.E.2d 512, 520 (2005). "While the claiming party must present relevant data providing a basis for a reasonable estimate, proof to an absolute mathematical certainty is not required." *State Props., LLC v. Ray*, 155 N.C. App. 65, 76-77, 574 S.E.2d 180, 188 (2002) (citation omitted) (concluding that plaintiff's evidence on damages in the form of a witness opining on the cost of remediation was sufficient to provide a basis for a jury's calculation of damages with a reasonable certainty).

Various sources of evidence may be competent to calculate the difference between the value of the property before and after the injury with a reasonable certainty. Competent evidence of value includes the opinion of an expert or lay witness who has knowledge of the property value based on experience, information and observation. *See Huff v. Thornton*, 287 N.C. 1, 5, 213 S.E.2d 198, 202 (1975) (finding that witnesses who were obviously better qualified by their occupational experience than the jury to form an opinion as to the nature and extent of the damage, the practicability of repair, and the fair market value of property before and after damage were qualified to testify as an expert witnesses); *United Leasing Corp. v. Guthrie*, 666 S.E.2d 504, 508 (N.C. App. 2008) (finding project manager's lay opinion as to

value of inventory admissible); *Sexton v. Barber*, 71 N.C. App. 175, 177-78, 321 S.E.2d 467, 468 (1984) (finding testimony of witness with experience as car dealer and knowledge of property admissible); *Williams v. Hyatt Chrysler-Plymouth, Inc.*, 48 N.C. App. 308, 317, 269 S.E.2d 184, 190 (1980) (finding plaintiff's opinion of the value of a vehicle, when plaintiff owned vehicle for 26 months and drove the vehicle approximately 40,000 miles, competent evidence); *Hubbard v. Lumbermen's Mutual Cas. Co.*, 24 N.C. App. 493, 496, 211 S.E.2d 544, 546 (1975) (holding that plaintiff's testimony as to value of vehicle before and after theft was competent evidence to support trial court's finding of damages).  Standardized valuation guides such as NADA, purchase price, and the cost of repairs or improvements after purchase may also be considered.  *In re Chrapliwy*, 207 B.R. 469, 473-74 (Bankr. M.D.N.C. 1996) ("Price lists or guidelines such as *NADA* should serve as a starting point for the valuation of the collateral before the court. Either party then should be permitted to offer evidence regarding the condition and worth of the particular collateral in question and whether it should be valued below or above the published value which is used as the starting point.  The *NADA* value thus is some evidence of the value of the automobile but is not conclusive."); *Lincoln v. Grinstead*, 94 N.C. App. 122, 127, 379 S.E.2d 671, 674 (1989) (considering the purchase price and the cost of newly installed stereo equipment when determining value).  Additionally, evidence of estimated cost of repairs is competent to assist in determining the difference between the value of the property before the injury and after the injury.  *Roberts v. Pilot Freight Carriers, Inc.*, 273 N.C. 600, 606, 160 S.E.2d 712, 717 (1968).  "If there is a question regarding the reliability of the evidence presented to support an award of damages, the questions should go to the weight of the evidence, and generally should not be grounds for exclusion of the evidence."  *CDC Pineville, LLC*, 174 N.C.

App. at 655, 622 S.E.2d at 520. *See also Huff,* 287 N.C. at 6, 213 S.E.2d at 202 ("The fact that [the witnesses] had not actually visited the house prior to the occurrence would go to the weight to be given their estimate of its prior value, not to its admissibility.").

In a tort action, a defendant is also responsible for all pecuniary losses which are the natural and probable consequence of the misconduct given the facts as they existed at the time the misconduct was committed and which can be ascertained with a reasonable degree of certainty. *Watts v. N.C. Dept. of Env't and Natural Res.,* 182 N.C. App. 178, 185-86, 641 S.E.2d 811, 818 (2007). *See also Huff,* 287 N.C. at 8-9, 213 S.E.2d at 204 (allowing recovery for damage to plaintiffs' home as well as for loss of use of their home while it was under repair from the damage sustained when defendants' truck struck the residence)*; Sprinkle*, 165 N.C. App at 729, 600 S.E.2nd at 478 (holding that loss of use recovery is generally allowed for injury to pleasure vehicles). The scope of the recovery of damages in a tort action, which includes consequences that are the natural and probable result of the misconduct, is more liberal than the scope of recovery of damages in a contract action. *Champs Convenience Stores, Inc. v. United Chem. Co.*, 329 N.C. 446, 462, 406 S.E.2d 856, 865-66 (1991) (including overhead expenses incurred while plaintiff unable to operate business as part of damages).

Here, the Court received a variety of evidence related to value including the date when HB Auto purchased the vehicle, the purchase price, the NADA value, HB Auto's estimate of value prior to the incident, HB Auto's estimate of value after the incident, Spears's estimate of value after incident, Spears's estimate of value on August 1, 2007, photos, various testimony and exhibits documenting condition, title histories, and bills of sale. The Court received more information regarding some vehicles than others. The Court has carefully considered the

evidence presented as to each vehicle, including the reliability, relevance, and credibility thereof, in order to determine the fair market value of each vehicle immediately before Brokers moved the vehicle to the Lower Lot with a forklift and the fair market value of each vehicle immediately after Brokers moved the vehicle to the Lower Lot.  These figures are necessary to determine the amount of initial damages, that is, those damages incurred during the process of moving the vehicles.  The Court has also examined the evidence to determine the present fair market value [22] of each vehicle damaged, which is necessary to calculate the amount of damages caused by the deterioration of the vehicles due to exposure and damages that were the natural and probable consequence of Brokers's misconduct.  Lastly, the Court has examined the record for evidence of intervening criminal acts to determine what amount, if any, is attributable to intervening criminal acts and, therefore, for which Brokers is not liable.

**Findings applicable to all vehicles:**

First, the Court was presented with various evidence relevant to determining the fair market value of each vehicle immediately before the injury including the NADA value, HB Auto's original estimate of value, the date of purchase, and the purchase price.  The date of purchase is relevant to determine whether the vehicle had been sitting on the Property, unused, for an extended period of time prior to the incident.  Such a fact might suggest that the vehicle's condition had deteriorated or that the vehicle was not marketable for whatever reason.  The Court was presented with some evidence of vehicle condition at the time of purchase such as bills of sale, title histories, and mileage information.  The bills of sale document certain

---

[22] The "present fair market value" in this case is the value as of August 2007, when the vehicles were examined by Spears.

"announced conditions" such as salvage history, high mileage, or frame damage. The Court was also provided with extensive testimony regarding the valuation of used vehicles.

HB Auto urges the Court to find that the fair market value of each vehicle immediately before the injury is the NADA value, while Brokers contends that the fair market value of each vehicle immediately before the injury was the purchase price. All parties agree, however, that the NADA value is the value of an "average" vehicle. In this case, the Court has received specific evidence regarding the condition of each vehicle and the majority of the vehicles were in less than average condition, therefore the evidence does not support a finding that the value of each vehicle was equal to the NADA value for an "average" vehicle. Notwithstanding, the NADA value is relevant when viewed in light of the evidence regarding each vehicle's condition and the very credible testimony of both Spears and Twigg regarding standard industry deductions taken from the NADA value for various vehicle conditions or types of history.

In contrast, the purchase price carries little weight. The vehicles were purchased at auctions, in a wholesale setting where, according to both the Ahmadis and Spears, the purchase price can be very low. It follows that a noticeably high purchase price may be evidence that a vehicle was in particularly good condition or very desirable for some other reason. It is undisputed that HB Auto's business revolves around repairing and refurbishing vehicles prior for resale, thereby making a profit. That is, HB Auto is in the business of increasing the fair market value of vehicles subsequent to purchase. Finally, the testimony of Twigg, who stated that the purchase price was not a factor he considered when he appraised vehicles, and Spears, who stated that there is no relationship between the purchase price of a vehicle at auction and the value of the vehicle, also leads this Court to conclude that the purchase price should be given

very little weight.

After careful consideration, however, the Court finds that HB Auto's original estimates of value, carry a great deal of weight, given the Ahmadis' relevant experience, familiarity, and knowledge despite the fact that HB Auto now contends that the NADA value should be utilized. HB Auto's estimates of value are contained on Defendant's Exhibit 2, a spreadsheet that was prepared in excess of a year prior to the trial under the direction of HB Auto's prior counsel. When viewed in conjunction with the other evidence in this case, particularly the testimony of Spears and Twigg and each vehicle's individual history in this case, these values are generally very credible. Some of these estimates of value prior to being damaged by Brokers exceed the NADA value.[23]  At trial, however, HB Auto did not assert that any of the vehicles were worth more than the NADA value, and Hassan Ahmadi testified, when asked to describe the condition of the vehicles before he left for Iran, that "some of them was average, some of them was below average, but they were in good condition."  Therefore, the Court finds that none of the vehicles were worth more than the NADA value of an average vehicle prior to being moved to the Lower Lot by Brokers.

Next, the Court was presented with extensive evidence relevant to the value of each vehicle immediately after the injury including  HB Auto's estimate, Spears's estimate, witness testimony, photos, Twigg's report, and Spears's report.  Spears inspected the vehicles in 2007 at HB Auto's present location and his expert report contains a detailed and credible description of

---

[23]  It is an ironic pattern, or perhaps telling, that many of the vehicles that HB Auto listed as having a value greater than NADA value are vehicles that remained unsold for an extended period of time.  Some examples include the following vehicles: #45, #74, #78, #82, #114, #118, #125, #129, #131, #155, #166, and #167.  The Court can only speculate that perhaps these vehicles did not sell quickly because they were not priced competitively.

the forklift damage sustained by each vehicle.  The Court has reviewed the evidence of damage

as to each vehicle as documented by Spears to ensure that each vehicle was, indeed, damaged.

The testimony by the Ahmadis, Hunt, Leonard, and Deweese supports a finding that any forklift

damage identified by Spears and Twigg on a vehicle purchased while HB Auto operated its

business on the Property was caused by Brokers's negligence and trespass.

       In Spears's report, he calculated his estimates operating under the assumption that all of

the vehicles were "ready for sale" prior to being moved and he considered *only* forklift damage,

not other collision type damage.  There is undisputed evidence that some vehicles sustained

other types of damage when moved.  Also, some of the vehicles were not in a condition that

could be properly described as "ready for sale."  As a result, Spears's estimates do not carry

much weight, though they may shed some light on the condition of the vehicle when viewed in

conjunction with other evidence.  In contrast, HB Auto's estimate as contained in Defendant's

Exhibit 2 considers the total value of each vehicle after the incident (rather than a hypothetical

value based upon an "average" vehicle with only forklift damage).  The Ahmadis have extensive

experience and expertise in the used vehicle and auto repair business, and they were able to

inspect each vehicle shortly after the incident, rather than five years later.  HB Auto's estimates

are comparable, on average,[24] to those of Spears, though each figure was calculated

independently of the other.  The Court concludes that HB Auto's estimate for the value of each

---

      [24] The average value of the 218 vehicles for which Spears provided a post-incident
estimate is $1,205.  According to HB Auto's estimates, the average value for those same vehicles
is $1,111.

vehicle immediately after the injury is generally very reliable and competent evidence.[25]  Unless otherwise noted to the contrary, the Court finds that HB Auto has established Brokers damaged each vehicle and that the value of each vehicle immediately after being moved to the Lower Lot is equal to HB Auto's estimate of value after the incident.

Lastly, as to all of the vehicles, the Court finds that the evidence presented by HB Auto through its expert, Spears, of each vehicle's present value (as of August 1, 2007) is both reliable and credible.  Spears was qualified by the Court as an expert in the valuation of used vehicles and he individually examined each vehicle for which HB Auto claims damages.  No evidence of present value was presented by Brokers.  Therefore, the Court finds that the present value of each vehicle is equal to Spears's estimate of value as of August 1, 2007.

A review of the evidence presented as to each vehicle and the Court's findings specific to each vehicle are set forth below.[26]  In addition, the Court's findings related to the calculation of damages are summarized in a chart attached as Exhibit A.

**Vehicle #1**

Description: 1997 Pontiac Grand Am, VIN 1G2NE52T4VC795673, 4-door, red
Mileage: 86,138
Date purchased by HB Auto: November 21, 2001
Purchase price: $1,955

---

[25] Brokers attempted to impeach Spears's credibility with conflicting deposition testimony regarding his estimated values.  When asked to value various vehicles by examining photos, Spears suggested a few values that were different than those in his report.  As the Court has already stated, it found Spears credible and does not find the fact that he could not value the vehicles by photo in a deposition particularly relevant.

[26] The Court has listed the vehicles individually, but in doing so, by no means intends to limit any of its findings to one particular vehicle that may be more generally applicable to multiple vehicles.  Rather, these finding are cumulative.

NADA value on August 1, 2002:[27] $5,300
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $900
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The bill of sale indicates that at the time HB Auto purchased the vehicle, the check engine light was on and a right window was inoperable.  The vehicle was sold as a red light.  In the title history, the damage disclosure statement indicates that the vehicle had not sustained damage exceeding 25% of the total value.  The vehicle had no salvage, flood, theft or reconstruction history.  Spears's expert report indicates forklift damage on the right front door, right rear door, and floorboard, and it notes that the vehicle's interior has deteriorated, the tires are dry-rotted, and the paint is faded. Twigg's expert report states Vehicle #1 has no damage and no forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #1 had a value of $3,900 immediately before the incident.  The vehicle was in less than average condition at the time of purchase, but none of the announced conditions on the bill of sale were conditions that would permanently impact the vehicle's value.  HB Auto's own value of Vehicle #1 is 74% of the NADA value, and as such, falls well within the parameters for vehicle valuation as described by Twigg and Spears.

**Vehicle #2:**

Description:1997 Plymouth Neon, VIN 1P3ES27C7VD148108 4-door, blue
Mileage: 112,531
Date purchased by HB Auto: June 13, 2001
Purchase price: $1,450
NADA value on August 1, 2002: $3,425
HB Auto's estimate of value prior to incident: $2,900
HB Auto's estimate of value after incident: $900
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates that at the time HB Auto purchased the vehicle,

---

[27]  For all of the vehicles, the Court is using the NADA value on August 1, 2002 as set forth on the document identified as "Plaintiff's Exhibit #3," which was admitted specifically for, among other things, those NADA values.  The parties stipulated that the NADA values on the exhibit are the correct NADA value with appropriate mileage deductions taken.

it had over 100,000 miles and frame damage.  The damage disclosure statement on the title does not indicate that the vehicle has been damaged to the extent that the cost of repair exceeded 25% of the fair market value.  The vehicle was sold to HB Auto at auction as a red light.  Spears's expert report indicates forklift damage to the floor boards, rocker panel, and the left front and rear doors. Spears also notes faded and peeling paint, dry-rotted tires due to deterioration, and missing parts, including the vehicle's airbags.  Twigg's expert report indicates the vehicle has forklift damage with a minor dent on the left rear door and "bad paint."

Based upon the evidence presented, the Court finds that Vehicle #2 had a value of $2,900 immediately before the incident, which is HB Auto's estimate of value.  There is evidence that the vehicle had certain conditions (frame damage and high mileage) at the time of purchase  that would continue to impact its value even after repairs, but it had not been damaged in excess of 25% of its fair market value.  HB Auto's own value for Vehicle #2 is 84.7% of the NADA value, and falls in line with the expert testimony that the standard value of a vehicle with repaired frame damage is 10% less than the NADA retail value.  The Court notes that this vehicle was purchased on June 13, 2001 and as a general practice HB Auto promptly repaired vehicles for resale.

Lastly, since interior parts such as the airbags are missing, the Court can only assume the existence of an intervening criminal act.  The vehicle was not purchased during those few months that the Ahmadis were not repairing vehicles; therefore, the airbags would have been intact prior to being moved.  The Ahmadis did not use these vehicles for parts after they were moved to the Lower Lot.  This criminal act (that is, the break-in and theft of parts) relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury.  The Court simply cannot determine with any reasonable degree of certainty the amount of subsequent damage proximately caused by Brokers.  Therefore, the Court will not award damages for injury to Vehicle #2 subsequent to it being

moved to the Lower Lot.

**Vehicle #3**:

> Description: 1991 Ford Aerostar, VIN 1FMDA31U8MZA21659, white
> Mileage: 8,107
> Date purchased by HB Auto: June 26, 2001
> Purchase price: unknown
> NADA value on August 1, 2002: $4,075
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $500
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The odometer disclosure on title indicates that the mileage stated is in
> excess of the mechanical limits of the vehicle's odometer. Spears's expert report
> indicates forklift damage to the floorboards, rocker panels and drive shaft. His report
> also notes faded paint and dry-rotted tires due to deterioration. Twigg's expert report
> indicates no forklift damage. The photos entered into evidence show vertical
> indentations on the right side of the vehicle.

Based upon the evidence presented, the Court finds that Vehicle #3 had a value of $3,000 immediately before the incident, which is equal to HB Auto's estimate of value. The NADA value at that time was $4,075 (a figure which takes into account the mileage) and there is little evidence of the vehicle's condition at the time of purchase other than that the mileage on the vehicle was very high. Therefore, HB Auto's own value for Vehicle #3 which is only 73.6% of the NADA value, is reasonable even given that the mileage has exceeded the mechanical limits of the odometer. While the deduction off the NADA value is large, HB Auto was in a position to know of other conditions which would lower the vehicle's value. HB Auto has also established that Brokers damaged the vehicle when moving it to the Lower Lot, reducing its value to $800.

**Vehicle #4:**

> Description: 1996 Mercury Mystique, VIN 1MELM6534TK612748, 4-door, white
> Mileage: 70,753
> Date purchased by HB Auto: July 10, 2001
> NADA value on August 1, 2002: $5,100

48

<u>HB Auto's estimate of value prior to incident</u>: $2,900
<u>HB Auto's estimate of value after incident</u>: $1,500
<u>Spears's estimate of value after incident</u>: $500
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $100
<u>Other evidence</u>:  Spears's expert report indicates the vehicle has forklift damage to the floor board and rocker panel.  It also notes that the interior is deteriorated, the tires are dry-rotted, the paint is faded, and the vehicle has miscellaneous dings.  Twigg's expert report states no damage and no forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #4 had a value of $2,900 immediately before the incident.  The NADA value at that time was $5,100, and there is little evidence of the vehicle's condition at the time of purchase.  HB Auto's own value for Vehicle #4 is only 56.9% of the NADA value and is very reasonable, even assuming the vehicle was in less than average condition when purchased.

**Vehicle #5**

<u>Description</u>: 1997 Dodge Stratus, VIN 1B3EJ46X3VN646286
<u>Mileage</u>: 85,804
<u>Date purchased by HB Auto</u>: March 20, 2001
<u>NADA value on August 1, 2002</u>: $4,950
<u>HB Auto's estimate of value prior to incident</u>: $4,100
<u>HB Auto's estimate of value after incident</u>: $1,500
<u>Spears's estimate of value after incident</u>: $1,200
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $150
<u>Other evidence</u>: The damage disclosure statement on title does not indicate that the vehicle had been damaged to the extent that the cost of repair exceeded 25% of the fair market value when HB Auto purchased it. Spears's expert report indicates the vehicle has forklift damage to floor boards and rocker panels.  His report also notes that the interior is deteriorated, the tires are dry-rotted, and the paint is faded and cracking.  Twigg's expert report indicates the vehicle has "bad paint" and no forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #5 had a value of $4,100 immediately before the incident, which is equal to HB Auto's estimate of value.  The vehicle was five years old at the time of purchase and there was not a disclosure that it had been damaged in excess of 25% of its fair market value.  HB Auto's own value for Vehicle #5 is only

82.8% of the NADA value and is within the range of reasonableness as set forth by the experts,

even assuming the vehicle was in less than average condition when purchased.

**Vehicle #6**

> Description: 1991 Mercury Cougar, VIN 1MEPM6049MH616584, 2-door, green
> Mileage: 109,509
> Date purchased by HB Auto: January 16, 1999
> Purchase price: unknown
> NADA value on August 1, 2002: $3,300
> HB Auto's estimate of value prior to incident: $2,100
> HB Auto's estimate of value after incident: $500
> Spears's estimate of value after incident: $650
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: Spears's expert report indicates the vehicle has forklift damage to the
> floor boards and rocker panel, and also that the interior and tires are dry-rotted, and the
> paint is faded and peeling.  Twigg's expert report indicates the vehicle has forklift
> damage with the front bumper cover damaged.  The photo of Vehicle #6 shows damage
> to the front of the vehicle.

Based upon the evidence presented, the Court finds that Vehicle #6 had a value of $2,100

immediately before the incident, which is equal to HB Auto's estimate of value.  The NADA

value at that time was $3,300.  The Court notes that the vehicle had been sitting on the lot for an

extended period: in excess of three years.  HB Auto's own value for Vehicle #6 is well below the

NADA value (only 63.64% of the NADA value), and the Court concludes that this figure is

credible especially in light of the fact that it had been sitting, deteriorating, for so long.  The

Court notes that there is no dispute among the experts that this vehicle sustained some form of

forklift damage.

**Vehicle #7**:

> Description: 1988 BMW 735i, VIN WBAGB4313J3203451, 4-door, white
> Mileage: unknown
> Date purchased by HB Auto: April 10, 2000
> NADA value on August 1, 2002: $7,300
> HB Auto's estimate of value prior to incident: $3,500

<u>HB Auto's estimate of value after incident</u>: $1,000
<u>Spears's estimate of value after incident</u>: $2,000
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $1,000
<u>Other evidence</u>:  Spears's expert report indicates the vehicle has forklift damage to the floor boards and rocker panel, the right rear door, and the right rear door window.  The tires are dry-rotted, the paint is faded and the interior depreciated.  Twigg's expert report indicates forklift damage on the left rear door and broken glass.  The photos of Vehicle #7 show that the right rear door is damaged, the window is broken, and the frame around that window is damaged.  Hossein Ahmadi testified that HB Auto repainted the vehicle after it was purchased and that HB Auto was unable to complete work on vehicles within its usual three or four-month time frame.

Based upon the evidence presented, the Court finds that Vehicle #7 had a value of $3,500 immediately before the incident, which is equal to HB Auto's estimate of value.  There is evidence that the vehicle had been prepared for sale prior to being moved inasmuch as HB Auto had painted its exterior.  While the vehicle had been owned by HB Auto for approximately two years prior to the incident, there is evidence that the delay in resale was due in part to the vehicle being repainted.  HB Auto's own value for Vehicle #7 is credible and competent as it is less than half of the applicable NADA value.  The Court further notes that as the value of Vehicle #7 immediately after incident was $1,000 and Spears's estimate of present value (as of August 1, 2007) is $1,000, the vehicle suffered no material depreciation in value during the time period that it sat on the Lower Lot.

**Vehicle #8**

<u>Description</u>: 1995 Mitsubishi Eclipse, VIN 4A3AK44Y8SE023860, green
<u>Mileage</u>: 74,098
<u>Date purchased by HB Auto</u>: May 17, 2000
<u>Purchase price</u>: $1,850
<u>NADA value on August 1, 2002</u>: $7,275
<u>HB Auto's estimate of value prior to incident</u>: $4,200
<u>HB Auto's estimate of value after incident</u>: $1,800
<u>Spears's estimate of value after incident</u>: $1,100
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $200
<u>Other evidence</u>: The bill of sale reflects that the vehicle was sold to HB Auto at auction

in the salvage line and it has the words "Flood not on title" written on it.  Hassan Ahmadi testified that this notation was on Vehicle #8's bill of sale because Greensboro Auto Auction announced the vehicle as a flood vehicle, though there is no history of such on the title itself.  Hassan Ahmadi testified that the fact that the vehicle was announced as a flood vehicle would affect the value by 10 - 15%.  The damage disclosure statement on the title does not indicate that the vehicle has been damaged to the extent that the cost of repair exceeded 25% of the fair market value.  Spears's expert report indicates that the vehicle has forklift damage to the floor boards and rocker panel, and it states that the tires are dry-rotted, the paint is faded, the interior is rotten and glass is broken.  Twigg's expert report indicates no forklift damage and "rough vehicle."  The photo shows the broken glass and what appears to be mud coating the inside of the wheel well.

Based upon the evidence presented, the Court finds that Vehicle #8 had a value of $4,200 immediately before the incident, which is equal to HB Auto's estimate of value.  The NADA value at that time was $7,275.  Hassan Ahmadi testified that the value of the vehicle was reduced by 10-15% simply because it was sold at auction as a flood vehicle, even though the title did not indicate it had a flood history.  As both experts and the Ahmadis testified, the fact that the vehicle was sold in the salvage line does not impact its value.  The Court notes, however, that Vehicle #8 had been sitting on HB Auto's lot for approximately two years, with no explanation as to why.  The Court finds that this fact reflects poorly on the vehicle's value.  Therefore, the Court finds that HB Auto's own value for Vehicle #8 is credible and includes an ample discount for the possible flood history as it is more than 40% off the applicable NADA value.  The Court also confirms that HB Auto has established forklift damage that reduced the value of Vehicle #8 to $1,800.

**Vehicle #9**

Description: 1999 Ford E-150, VIN 1FMRE11W9XHA42921, white Van
Mileage: 162,262
Date purchased by HB Auto: November 27, 2002
Purchase price: $1,000
NADA value on August 1, 2002: $10,000
HB Auto's estimate of value prior to incident: $6,000

HB Auto's estimate of value after incident: $3,100
Spears's estimate of value after incident: $2,800
Spears's estimate of present value (as of August 1, 2007): $300

Vehicle #9 must be excluded from the list of vehicles damaged by Brokers's negligence. This vehicle was purchased in late November 2002, which was after HB Auto had relocated to the new location, and therefore, must have been damaged in an incident separate to that which is at issue in the Complaint. Accordingly, HB Auto is not entitled to any damages attributable to Vehicle #9.

**Vehicle #10**

Description: 1996 Mitsubishi Mirage, VIN JA3AA11A5TU019170, red, 2-door
Mileage: 79,696
Date purchased by HB Auto: August 12, 1998
Purchase price: $1,000
NADA value on August 1, 2002: $3,500
HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $400
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Spears's expert report indicates the vehicle has forklift damage to the floor boards, rocker panel, right quarter, and right door. His report also notes that the interior and tires are dry-rotted, the paint is faded, and some exterior parts are missing. The copy of the title admitted into evidence if virtually illegible, but it does not contain a disclosure that the vehicle was damaged in excess of 25% of its value. The photos of Vehicle #10 show vertical and other indentations on the right rear of the vehicle. Twigg testified that Vehicle #10 was one of the few vehicles he examined underneath. He found damage to the right rocker panel, however his expert report indicates no forklift damage. He also indicated that the paint needed to be touched up and lamps were missing.

Based upon the evidence presented, the Court finds that Vehicle #10 had a value of $2,975 immediately before the incident. HB Auto's estimate of the value of the vehicle prior to the incident is $3,500, and the NADA value of the vehicle at that time was also $3,500. The Court notes, however, that Vehicle #10 had been sitting on HB Auto's lot for approximately three and a half years prior to the incident with no explanation as to why. This fact reflects

poorly on the vehicle's value.  Ample evidence was presented that the condition of a vehicle

deteriorates when it sits, parked, for extensive periods of time.  At minimum, even if the vehicle

was started and driven periodically, the paint would fade.  Because HB Auto's own value for

Vehicle #10 includes no reduction off the NADA value for such deterioration, the Court cannot

find that this figure is credible and finds that a deduction from the NADA value is appropriate.

The Court notes that Twigg and Spears agree that this vehicle sustained forklift damage on its

rocker panel.

**Vehicle #11**

> Description: 1992 Infinity G-20, VIN JNKCP01P8NT310048, gold, 4-door
> Mileage: 77,193
> Date purchased by HB Auto: May 6, 1998
> Purchase price: $2,450
> NADA value on August 1, 2002: $7,825
> HB Auto's estimate of value prior to incident: $4,500
> HB Auto's estimate of value after incident: $2,500
> Spears's estimate of value after incident: $1,000
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence:  Spears's expert report indicates that the vehicle has forklift damage to
> the floor board and rocker panel.  His report also states that the tires are dry-rotted, the
> paint is faded, cracking, and peeling, and the interior is depreciated.  Twigg's expert
> report states "bad paint" and no forklift damage.  The photo shows peeling paint and
> cracks in the leather on the dashboard.  In trial, Hossein Ahmadi confirmed in testimony
> that Vehicle #11 was purchased in 1998.

Based upon the evidence presented, the Court finds that Vehicle #11 had a value of

$4,500 immediately before the incident, which is equal to HB Auto's estimate of value.  While

the NADA value at that time was $7,825, Vehicle #11 had been sitting on HB Auto's lot for

approximately four years, with no explanation as to why.  This fact reflects poorly on the

vehicle's value.  HB Auto's value for Vehicle #11 includes a discount off the applicable NADA

value sufficient to account for the vehicle's deterioration prior to the incident.  After considering

all of the evidence, the Court finds HB Auto's estimate the most credible and competent

evidence of Vehicle #11's value immediately before it was damaged by Brokers.

**Vehicle #12**

> Description: 1997 Mazda Millenia, VIN JM1TA2218V1308949, white, 4-door
> Mileage: 119,874
> Date purchased by HB Auto: May 15, 2002
> Purchase price: $3,950
> NADA value on August 1, 2002: $7,825
> HB Auto's estimate of value prior to incident: $6,500
> HB Auto's estimate of value after incident: $3,000
> Spears's estimate of value after incident: $2,500
> Spears's estimate of present value (as of August 1, 2007): $300
> Other evidence: The bill of sale indicates the vehicle was sold to HB Auto at auction as
> damaged and disabled and as a red light.  The vehicle had a blown head gasket and
> "miles over."  The damage disclosure statement on the title indicates that the vehicle had
> not been damaged to the extent that the cost of repair exceeded 25% of the fair market
> value, and it was not a flood vehicle.  Spears's expert report states that a forklift damaged
> the rocker panel and scratched the right side, the tires are dry-rotted, the paint is faded,
> the interior is depreciated, and the right front end is damaged.  Twigg's expert report
> indicates "bad paint," no damage, and no forklift damage.  Hossein Ahmadi testified that
> when HB Auto purchases a vehicle with a broken head gasket, he takes the vehicle to the
> lot and fixes the head gasket, which would involve the purchase of a replacement head
> gasket and approximately five hours of labor.

As to this particular vehicle, Brokers questions the validity of HB Auto's estimate of

value on the basis that the purchase price was $3,950 and, therefore, contends that Vehicle #12

could not have had a value of $6,500 just a few months later.  Notwithstanding, the Court finds

that HB Auto's estimate of the value of Vehicle #12 immediately before the incident is credible.

First, the Court has received ample testimony that the purchase price of a vehicle is not generally

a factor in calculating value.  Further, Hossein Ahmadi testified that the head gasket would have

been repaired, which would involve the expense of obtaining a replacement part and multiple

hours of labor.  The vehicle was purchased at auction and, as Hossein Ahmadi testified, the

$6,500 value is based upon what HB Auto would have sold the vehicle for at that time and that

the difference between the purchase price and the vehicle's value after repair and detailing is

"the way it works" for HB Auto's business.  The evidence establishes that Vehicle #12 had not

been damaged in excess of 25% of its fair market value and was not a flood or salvage vehicle.

HB Auto's estimate of the value of Vehicle #12 is only 83.1% of the NADA value.  The Court

concludes that the value of Vehicle #12 immediately prior to being damaged was $6,500 and that

its value immediately following was $3,000.

**Vehicle #13**

> Description: 1994 Mazda MPV, VIN JM3LV5222R0622176, van
> Mileage: 135,005
> Date purchased by HB Auto: June 13, 2001
> Purchase price: $500
> NADA value on August 1, 2002: $3,125
> HB Auto's estimate of value prior to incident: $2,900
> HB Auto's estimate of value after incident: $1,800
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates the vehicle was sold as a red light and indicates
> damaged and disabled with "miles over."  As to the odometer reading, the title discloses
> that the mileage stated is in excess of the vehicle's mechanical limits.  Spears's expert
> report indicates that the vehicle has forklift damage to the floor board and rocker panel,
> the tires and interior are dry-rotted, the paint is faded, and the windows are "busted."
> Twigg testified that he examined underneath Vehicle #13 and found the left front rocker
> panel damaged and right rear damage that could have been related to a forklift.  Twigg's
> expert report indicates forklift damage to the left quarter panel.  The photos also show
> damage to the right rear of the vehicle and a long vertical indentation on the left side of
> the vehicle.

Based upon the evidence presented, the Court finds that Vehicle #13 had a value of

$2,900 immediately before the incident, which is equal to HB Auto's estimate of value.  The

NADA value at that time was $3,125.  While there is evidence that the mileage on the vehicle is

high, this fact is already accounted for with appropriate deductions in the listed NADA value.

After considering all of the evidence, the Court finds HB Auto's estimate the most credible and

competent evidence of Vehicle #13's value immediately before it was damaged by Brokers.

Spears and Twigg agree that this vehicle was damaged by a forklift.

**Vehicle #14**

> Description: 1994 Mazda 626, VIN 1YVGE22CXR5196879, 4-door
> Mileage: 109,180
> Date purchased by HB Auto: August 2, 2001
> Purchase price: $650
> NADA value on August 1, 2002: $3,350
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: Spears's expert report indicates that the vehicle has forklift damage to
> the floor boards and rocker panel, the tires are dry-rotted, the paint is faded, and the
> interior is depreciated. Twigg's expert report indicates "bad paint" and no forklift
> damage.

Based upon the evidence presented, the Court finds that immediately before the incident

Vehicle #14 had a value of $2,500, which is equal to HB Auto's estimate of value. As with

Vehicle #13, while there is evidence that the mileage on the vehicle is high, this fact is already

accounted for with appropriate deductions in the listed NADA value. The Court notes that HB

Auto's estimate is only 74.6% of the NADA value. After considering all of the evidence, the

Court finds HB Auto's estimate is credible and competent evidence of Vehicle #14's value

immediately before it was damaged by Brokers.

**Vehicle #15**

> Description: 1999 Kia Sephia, VIN KNAFB1213X5797788, black, 4-door
> Mileage: 67,972
> Date purchased by HB Auto: February 20, 2002
> Purchase price: $750
> NADA value on August 1, 2002: $5,175
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $500
> Spears's estimate of value after incident: $1,000

Spears's estimate of present value (as of August 1, 2007): $25

Other evidence: The bill of sale indicates Vehicle #15 was sold to HB Auto as a red light as damaged and disabled.  The damage disclosure statement on the title indicates that the vehicle had not been damaged to extent that the cost of repairs exceeded 25% of the value and that it was not a flood, salvage, or reconstructed vehicle.  Spears's expert report indicates that the vehicle has forklift damage on the right doors and rear suspension, the interior and tires are dry-rotted, the paint is faded, some glass is broken, and miscellaneous interior and exterior parts are missing.  Twigg testified that the damage on Vehicle #15 is consistent with a straight heavy impact to the rear of the vehicle, not forklift damage, and was in excess of 25% of the value.  Also, the rear glass had been cut out or had been broken out by the trunk lid popping up from the rear impact, and the left front fender, hood, and bumper cover were missing.  Twigg's expert report lists rear bumper cover damage, rear glass removed, and implies forklift damage.  Twigg testified that he should have made the notation "NFLD" on his report but overlooked it.

Based upon the evidence presented, the Court finds that immediately before the incident, Vehicle #15 had a value of $3,000, which is equal to HB Auto's estimate of value.  The Court notes that HB Auto's estimate is only 58% of the NADA value.  After considering all of the evidence, the Court finds HB Auto's estimate is credible and competent.  In addition, the Court notes that Twigg's testimony that Vehicle #15 sustained a heavy impact in the rear is consistent with testimony by Hunt that some of the vehicles were pushed together with large earth moving equipment.  HB Auto's estimate that the value decreased from $3,000 to only $500 as a result of the damage inflicted by Brokers is also consistent with this evidence.

The Court also finds that there is clear evidence of the occurrence of an intervening criminal act after Brokers moved Vehicle #15 to the Lower Lot.  Various vehicle parts, including the fender, hood, and bumper cover, were stolen.  This unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury.  Therefore, the Court will not award damages for injury to Vehicle #15 subsequent to it being moved to the Lower Lot.

**Vehicle #16**

58

Description: 1994 Infiniti Q-45, VIN JNKNG01D7RM256580, green, 4-door
Mileage: 121,952
Date purchased by HB Auto: February 14, 2001
Purchase price: $5,080
NADA value on August 1, 2002: $8,125
HB Auto's estimate of value prior to incident: $7,500
HB Auto's estimate of value after incident: $3,000
Spears's estimate of value after incident: $5,000
Spears's estimate of present value (as of August 1, 2007): $300
Other evidence: The bill of sale indicates Vehicle #16 was sold to HB Auto as is, as a red light with "over 100,000 miles." Spears's expert report indicates there is forklift damage on the rocker panel, floor boards, and front bumper, and that the paint is faded, the tires dry-rotted, windshield cracked, and interior depreciated. Twigg's expert report indicates "bad paint" and no forklift damage. The photo reflects the damage to the front bumper.

Based upon the evidence presented, the Court finds that Vehicle #16 had a value of $7,500 immediately before the incident, which is equal to HB Auto's estimate of value. The NADA value at that time was $8,125. While there is evidence that mileage on the vehicle is high, this fact is already accounted for with appropriate deductions in the listed NADA value. The Court notes that HB Auto's estimate is closer to the NADA value than most of HB Auto's vehicles; however, the purchase price was also closer to the NADA value than most. After considering all of the evidence, the Court finds HB Auto's estimate is credible and competent evidence of Vehicle #16's value immediately before it was damaged by Brokers. Also, the evidence supports a finding that Vehicle #16 was damaged by Brokers when it moved it to the Lower Lot, reducing the value to $3,000.

**Vehicle #17**

Description: 1991 Infiniti G-20, VIN JNKCP01P6MT211193, 4-door, red
Mileage: 102,639
Date purchased by HB Auto: December 2, 1998
Purchase price: $600
NADA value on August 1, 2002: $2,900
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $500

Spears's estimate of value after incident: $600
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence:  Spears's expert report indicates that Vehicle #17 has forklift damage on the rocker panels, floor boards, right rear and front doors, and fender, and that the paint is faded, the tires and interior dry-rotted, and miscellaneous interior and exterior parts are missing.  Twigg's expert report contains no information on Vehicle #17.  The photos reflect that the vehicle is severely damaged from both impact damage and vandalism. The hood is missing and it appears that parts have been ripped out of the engine.

Based upon the evidence presented, the Court finds that Vehicle #17 had a value of $2,500 immediately before the incident, which is equal to HB Auto's estimate of value.  The NADA value at that time was $2,900.  There is little evidence the vehicle's condition at the time of purchase.  HB Auto's own value for Vehicle #17 is 86.2% of the NADA value and is within the range of reasonableness as set forth by the experts.

The Court also finds that there is clear evidence of the occurrence of an intervening criminal act after Brokers moved Vehicle #17 to the Lower Lot.  This unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury.  The Court cannot determine what subsequent damages were proximately caused by Brokers and will not award damages for injury to Vehicle #17 subsequent to it being moved to the Lower Lot.

**Vehicle #18:**

Description: 1991 Hyundai Scoop, VIN KMHVE32J0MU023562, 2-door
Mileage: 81,610
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: unknown
HB Auto's estimate of value prior to incident: $2,800
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: no opinion
Spears's estimate of present value (as of August 1, 2007): no opinion
Other evidence: Copy of Virginia title shows the vehicle was signed over to HB Auto at some point, but no date is listed.

60

The Court finds that HB Auto has not met its burden for proving damages attributable to Vehicle #18. There is no evidence that this vehicle was one of those moved to the Lower Lot by Brokers other than the fact that it is listed on Plaintiff's Exhibit 3, which lists it as stolen. There is no photo of the vehicle. There is no evidence as to when the vehicle was stolen or whether a police report had been filed. Spears was unable to inspect this vehicle to verify forklift damage, and HB Auto provided no alternative source of evidence of damages to this vehicle, if indeed the vehicle was moved to the Lower Lot by Brokers.

**Vehicle #19**

> Description: 1996 Chevrolet Cavalier, VIN 1G1JC5246T7106644, 4-door, white
> Mileage: 113,305
> Date purchased by HB Auto: May 30, 2001
> Purchase price: $1,000
> NADA value on August 1, 2002: $2,500
> HB Auto's estimate of value prior to incident: $2,800
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale indicates the vehicle was sold to HB Auto at auction as a red light in the salvage line and notes "miles over." The damage disclosure statement on the title does not indicate that the vehicle had been damaged to the extent that the cost of repair exceeded 25% of the fair market value. Spears's expert report indicates there is forklift damage to the floor boards, rocker panels, left front door, and right front door and it notes that the tires and interior are dry-rotted and the paint is faded. Twigg's report contains no information on this vehicle. The photos show vertical indentations on the front doors.

The Court finds that the value of Vehicle #19 was $2,500 immediately prior to being damaged by Brokers. The Court notes that the vehicle had no announced conditions when purchased by HB Auto other than high mileage (which is accounted for in the NADA value).

**Vehicle #20:**

Description: 1990 BMW 750iL,[28] VIN WBAGC831XLDC76644, 4-door
Mileage: 241,402
Date purchased by HB Auto: January 23, 2002
Purchase price: $425
NADA value on August 1, 2002: $8,425
HB Auto's estimate of value prior to incident: $4,500
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $3,500
Spears's estimate of present value (as of August 1, 2007): $400
Other evidence: The bill of sale indicates Vehicle #20 had been a taxi and had "miles over." It was sold to HB Auto as a red light in the salvage line. The damage disclosure statement on the title indicates that the vehicle had not been damaged to the extent that the cost of repair exceeded 25% of the fair market value. Spears's expert report indicates there is forklift damage to the floor boards, rocker panels, and exhaust, and that the tires are dry-rotted, interior depreciated, and the paint is faded. Twigg's report states the vehicle has no damage and no forklift damage. The photo reveals no obvious damage. Twigg testified that the fact that Vehicle #20 was a taxi hurts its value.

The Court finds that the value of Vehicle #20 was $4,500 immediately prior to being damaged by Brokers, which is the value estimated by HB Auto. This estimate is only 53.4% of the NADA value and is credible even in light of the evidence that this vehicle has a value less than NADA value because it was a taxi.

**Vehicle #21**

Description: 1995 Geo Prizm,[29] VIN 1Y1SK5280SZ044139, 4-door, black
Mileage: 187,040
Date purchased by HB Auto: October 3, 2001
Purchase price: $995
NADA value on August 1, 2002: $3,100
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $1,400
Spears's estimate of value after incident: $400
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates "over 100,000 miles" and that HB Auto

---

[28] Plaintiff's Exhibit 3 contains typographical errors regarding Vehicle #20's make and year.

[29] Various charts admitted into evidence indicate that this vehicle is a 1996 model, but the title states it is a 1995 model.

purchased it at auction as a red light.  The damage disclosure statement on the title indicates that the vehicle had not been damaged to the extent that the cost of repair exceeded 25% of the fair market value, but that the mileage stated is in excess of the mechanical limits of the odometer.  Spears's expert report indicates there is forklift damage on the floor board and the front bumper, which is torn off.  It also indicates that the paint is faded and peeling, the tires and interior dry-rotted, and the windshield is cracked.  Twigg's expert report states "bad paint" and no forklift damage.  The photo in evidence shows the damaged front bumper.

Based upon the evidence presented, the Court finds that Vehicle #21 had a value of $2,500 immediately before the incident, which is equal to HB Auto's estimate of value.  The NADA value at that time was $3,100.  There is little evidence of the vehicle's condition at the time of purchase, though the mileage has exceeded the mechanical limits of the odometer.  HB Auto's value is certainly within the bounds of reasonableness based upon the expert testimony. HB Auto has also established that forklift damage caused by Brokers's negligence and trespass damaged Vehicle #21 in the amount of $1,100.  Unlike the majority of the vehicles, Spears's report does not list rocker panel damage along with the floorboard damage, and there is evidence that rocker panel damage is more costly to repair than floorboard damage.  Nevertheless, in this instance, Brokers also damaged the vehicle's front bumper, therefore this amount is credible.

**Vehicle #22**

> Description: 2000 Pontiac Grand Am, VIN 1G2NF52E9YC514406
> Mileage: 39,214
> Date purchased by HB Auto: July 11, 2001
> Purchase price: $2,900
> NADA value on August 1, 2002: $10,725
> HB Auto's estimate of value prior to incident: $6,000
> HB Auto's estimate of value after incident: $3,000
> Spears's estimate of value after incident: $2,800
> Spears's estimate of present value (as of August 1, 2007): $500
> Other evidence: The damage disclosure statement on the title does not indicate that when HB Auto purchased the vehicle, it had been damaged to the extent that the cost of repair exceeded 25% of the fair market value.  Spears's expert report indicates there is forklift damage to the floor boards, rockers, the right quarter, and both right doors.  It also

indicates that the paint is faded, the tires dry-rotted, and it has miscellaneous missing parts.  Twigg's expert report indicates no damage, forklift or otherwise.

Based upon the evidence presented, the Court finds that Vehicle #22 had a value of $6,000 immediately before the incident, which is HB Auto's estimate of value.  The NADA value was over $10,000, and the vehicle did not have any known conditions at the time of purchase that would continue to impact its value even after repairs.  The vehicle was only one model year old when purchased and it had no history of 25% damage.  HB Auto's own value of Vehicle #22 is 55.9% of the NADA value, and falls well below the parameters set forth by the experts in this case.

**Vehicle #23**

> Description: 1997 Plymouth Neon, VIN 1P3ES27C5VD200268, 4-door, red
> Mileage: 143,766
> Date purchased by HB Auto: July 11, 2001
> Purchase price: $890
> NADA value on August 1, 2002: $2,600
> HB Auto's estimate of value prior to incident: $2,600
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $1,000
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates the vehicle was sold to HB Auto at auction as a red light, as is, with announced conditions including "engine locked" and over 100,000 miles.  Title indicates mileage in excess of mechanical limits of the odometer.  The damage disclosure statement on the title does not indicate that the vehicle had been damaged to the extent that the cost of repair exceeded 25% of the fair market value.  Spears's expert report indicates there is forklift damage on the floor boards, rockers, right front door, right fender, right rear door, right quarter and suspension.  It also indicates that the paint is faded, the tires and interior are dry-rotted, and some miscellaneous parts are missing.  Twigg's expert report indicates forklift damage to the right fender.  Spears testified that when he inspected Vehicle #23, he was not aware that when the vehicle was sold to HB Auto, it had a locked engine.  Hassan Ahmadi testified that Vehicle #23 was repaired with a new starter.

Based upon the evidence presented, the Court finds that Vehicle #23 had a value of $2,600 immediately before the incident, which is equal to HB Auto's estimate of value.  The

64

NADA value at that time was also $2,600. There is evidence of some mechanical problems at the time of purchase, but there is also evidence that the vehicle was repaired. Though the mileage has exceeded the mechanical limits of the odometer, the $2,600 value takes into account the high mileage. While HB Auto had very few vehicles that were actually worth the NADA value. The Court takes note of the fact that the purchase price of the vehicle at auction was $890, and that price was paid by HB Auto knowing that the vehicle needed repairs which would require the expense of parts and labor, as well as the usual $200 detailing expense. There is no dispute that this vehicle shows signs of forklift damage.

**Vehicle #24**

Description: 1995 Chevrolet S-10, VIN 4GCCS1442SK262474
Mileage: 104,395
Date purchased by HB Auto: May 16, 2001
Purchase price: $450
NADA value on August 1, 2002: $3,975
HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $150
Other evidence: Spears's expert report indicates Vehicle #24 has forklift damage on the right door, right bedside, right fender, drive shaft, exhaust, and the paint is faded, the tires and interior are dry-rotted, and the vehicle has dings and dents. Twigg's expert report states "rough vehicle" and indicates forklift damage to the right side. Twigg testified, based upon his inspection of the photos, that Vehicle #24 appeared to have rear collision damage, and in his opinion the only way a forklift could cause that type of damage with a forklift would be "to keep backing up and ramming it" in the rear. Twigg testified that the tailgate damage and the right bedside damage appeared to be from the same accident and that he was not sure if some of the damage was forklift damage or not. He further testified that he did not "have an excuse" for why he failed to list all the damage on his report. The photos show a long vertical dent on the vehicle and other scrapes, as well as the rear end damage.

Brokers argues that Vehicle #24 must have been damaged before it was moved to the

Lower Lot because it shows signs of damage from a rear end collision, and therefore its value

65

must have been lower than the NADA value immediately prior to the incident.  The Court finds

Brokers's assertion that the vehicle must have been damaged prior to being moved without merit.

There is ample evidence that Brokers employees moved the vehicles in a manner that would

inflict the type of damage that would be incurred from a rear end collision.  In fact, Twigg's

description of the type of impact required to create the damage he saw on Vehicle #24 matched

Brokers's employees' description of what was actually done.  HB Auto's estimate of the value

immediately prior to the injury is $3,500, which is less than 90% of the NADA value.  The Court

finds that HB Auto's estimate is the best evidence of Vehicle #24's value prior to being damaged

by Brokers and is credible.  HB Auto has also established that Brokers damaged this vehicle

extensively, reducing its value to $800.

**Vehicle #25**

> Description: 1996 Subaru Legacy, VIN 4S3BD4351T7207102, 4-door, green
> Mileage: 85,891
> Date purchased by HB Auto: May 15, 2002
> Purchase price: $1,100
> NADA value on August 1, 2002: $7,200
> HB Auto's estimate of value prior to incident: $4,500
> HB Auto's estimate of value after incident: $2,000
> Spears's estimate of value after incident: $1,100
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates HB Auto purchased Vehicle #25 at auction as
> damaged and disabled and with suspension damage.  The damage disclosure statement
> indicates that the vehicle had not been damaged to the extent that the cost of repair
> exceeded 25% of the fair market value, and that it had no flood, salvage, or
> reconstruction history.  Spears's expert report indicates forklift damage to the floor
> boards and rocker panel, and that the paint is faded, the tires dry-rotted, and the interior
> depreciated.  Twigg's expert report indicates the vehicle has forklift damage with the left
> front fender and left panel damaged.  Hassan Ahmadi testified that to remedy the
> suspension damage HB Auto repaired the left lower control arm after purchase.

Vehicle #25 was obviously one of the vehicles moved by Brokers after the initial wave in

March 2002 since it was purchased in May 2002.  Based upon the evidence presented, the Court

finds that Vehicle #25 had a value of $4,500 immediately before the incident, which is equal to

HB Auto's estimate of value.  The vehicle did not have any known conditions at the time of

purchase that would continue to impact its value even after repairs, and the vehicle had been

repaired.  HB Auto's own value of Vehicle #25 is 62.5% of the NADA value, and falls well

below the parameters set forth by the experts in this case.

**Vehicle #26**

> Description: 1994 Mazda B-2300, VIN 4F4CR12A4RTM11998
> Mileage: 128,035
> Date purchased by HB Auto: February 28, 2002
> NADA value on August 1, 2002: unknown
> HB Auto's estimate of value prior to incident: $2,800
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: no opinion
> Spears's estimate of present value (as of August 1, 2007):  no opinion
> Other evidence: HB Auto lists this vehicle as stolen.  The damage disclosure statement
> on the title indicates that the vehicle had not been damaged to the extent that the cost of
> repair exceeded 25% of the fair market value and it is not a flood or reconstructed
> vehicle.  Spears's expert report states he cannot offer an opinion because he cannot view
> the vehicle.  Twigg's report states nothing regarding Vehicle #26.

The Court finds that HB Auto has not met its burden for proving damages attributable to

Vehicle #26.  Other than the fact that the vehicle is listed on Plaintiff's Exhibit 3 as stolen, there

is no evidence that this vehicle was one of those moved to the Lower Lot by Brokers.  There is

no photo of the vehicle and at trial there was no testimony regarding this vehicle.  There is no

evidence as to when the vehicle was stolen or whether a police report was filed.  The experts

were unable to inspect this vehicle or offer an opinion as to whether it was damaged when

moved, and HB Auto provided no alternate source of evidence that damages were sustained, if

indeed the vehicle was moved to the Lower Lot by Brokers.

**Vehicle #27**

<u>Description</u>: 1993 Mazda 626, VIN 1YVGE22B8P5211299, 4-door
<u>Mileage</u>: 95,427
<u>Date purchased by HB Auto</u>: October 11, 2001
<u>NADA value on August 1, 2002</u>: $4,900
<u>HB Auto's estimate of value prior to incident</u>: $2,700
<u>HB Auto's estimate of value after incident</u>: $1,800
<u>Spears's estimate of value after incident</u>: $2,000
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $100
<u>Other evidence</u>: The damage disclosure statement on the title indicates that the vehicle had not been damaged to the extent that the cost of repair exceeded 25% of the fair market value and it is not a flood, salvage, or reconstructed vehicle. Spears's expert report lists forklift damage to the floorboards and rockers, and that the paint is faded and tires and interior dry-rotted. Twigg's expert report indicates no damage. Twigg also testified Vehicle #27 was one of the few he looked under, and that he did not see damage to the rocker or floor.

Based upon the evidence presented, the Court finds that Vehicle #27 had a value of $2,700 immediately before the incident, which is equal to HB Auto's estimate of value. The NADA value was $4,900, and the vehicle did not have any known conditions at the time of purchase that would continue to impact its value even after repairs. HB Auto's own value of Vehicle #27 is only 55.1% of the NADA value, and falls well below the parameters set forth by the experts in this case. While the deduction off NADA value is large, HB Auto was in a position to know of other conditions which would lower the vehicle's value when it created that document.

Relying on Twigg's testimony, Brokers also asserts that Vehicle #27 was not damaged by a forklift. As the Court has already stated, Spears was a more credible and knowledgeable about forklift damage than Twigg. The fact that Twigg did not initially feel it important to look under the vehicles at all is telling. Therefore, the Court finds Brokers's assertion that the vehicle was not at all damaged without merit, and that Spears and HB Auto's indication that the vehicle sustained a small amount of damage (approximately $900 worth) is more credible.

**Vehicle #28**

Description: 1988 Honda Accord, VIN 1HGCA5645JA216666, 4-door, gold
Mileage: 238,683
Date purchased by HB Auto: February 15, 2002
NADA value on August 1, 2002: $2,525
HB Auto's estimate of value prior to incident: $1,900
HB Auto's estimate of value after incident: $900
Spears's estimate of value after incident: $400
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The damage disclosure statement on the title indicates that the vehicle had not been damaged to the extent that the cost of repair exceeded 25% of the fair market value and it is not a flood, salvage, or reconstructed vehicle. The vehicle's odometer has exceeded its mechanical limits. Spears's expert report indicates the vehicle has forklift damage to the rocker panel, floor boards, and the right front. It notes that the paint is faded, interior depreciated, and tires dry-rotted. Twigg's expert report indicates forklift damage on the hood, right door, and right front side lamp. The photo shows the damage to the right front of the vehicle.

Based upon the evidence presented, the Court finds that Vehicle #28 had a value of $1,900 immediately before the incident, which is equal to HB Auto's estimate of value. The NADA value at that time was $2,525 (a figure which takes into account the mileage). HB Auto's own value for Vehicle #28, which is only 75.25% of the NADA value, is reasonable even given that the mileage has exceeded the mechanical limits of the odometer. Twigg and Spears agree that this vehicle was damaged with a forklift.

**Vehicle #29**

Description: 1991 Oldsmobile Cutlass, VIN 1G3WT34TXMD372063, convertible
Mileage: 98,368
Date purchased by HB Auto: March 11, 2000
Purchase price: unknown
NADA value on August 1, 2002: $5,454
HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $600
Spears's estimate of value after incident: $3,800
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: Spears's expert report indicates the vehicle has forklift damage to the rocker panel, floor boards, and the right door. The report also states that the paint is

faded, and the interior, top and tires are dry-rotted. Twigg's expert report indicates the convertible roof is rotten and it has no forklift damage. Twigg testified that the roof was not damaged by a forklift, but as a result of deterioration, and that some of this deterioration may have occurred prior to being moved by Brokers. The photos show the deteriorated roof.

Based upon the evidence presented, the Court finds that Vehicle #29 had a value of $3,500 immediately before the incident, which is equal to HB Auto's estimate of value. The NADA value at that time was $5,454. There is little evidence of the vehicle's condition at the time of purchase; however, subsequent to purchase and prior to being moved to the Lower Lot, the vehicle had been sitting for approximately two years. While HB Auto has given no explanation as to why the vehicle sat for so long, HB Auto's original valuation reflects a large discount from the NADA value, and it is even less than what Spears felt the vehicle could have been worth immediately *after* the incident. Thus, the Court finds that the value of $3,500 is sufficiently low to account for any possible deterioration prior to 2002.

**Vehicle #30**

> Description: 1989 Honda Accord, VIN 1HGCA5644KA019067, 4-door
> Mileage: 171,083
> Date purchased by HB Auto: June 19, 1999
> Purchase price: unknown
> NADA value on August 1, 2002: $2,800
> HB Auto's estimate of value prior to incident: $2,100
> HB Auto's estimate of value after incident: $700
> Spears's estimate of value after incident: $550
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: Vehicle #30 was seized and then sold to HB Auto by the Department of Justice. Spears's expert report indicates the vehicle has forklift damage to the rocker panel and floor board. His report also states that the paint is faded and peeling, the interior and tires are dry-rotted, and there is front-end damage. Twigg's expert report lists "poor condition," no damage, bad paint, and no forklift damage. The photo of this vehicle clearly reveals that the interior has been vandalized as the radio and other parts have been ripped out.

Based upon the evidence presented, the Court finds that Vehicle #30 had a value of

$2,100 immediately before the incident, which is equal to HB Auto's estimate of value. The Court notes that HB Auto's estimate is only 75% of the NADA value, and therefore, includes a sufficient deduction for deterioration from sitting. After considering all of the evidence, the Court finds HB Auto's estimate is credible and competent evidence of the vehicle's value immediately before it was damaged by Brokers.

The Court also finds that there is clear evidence of the occurrence of an intervening criminal act after Brokers moved Vehicle #30 to the Lower Lot. It is clear that various interior parts were stolen. This unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury. Therefore, the Court will not award damages for injury that Vehicle #30 incurred after it was moved to the Lower Lot.

**Vehicle #31**

> Description: 1995 Mitsubishi, VIN JA3AP47H7SY015214
> Mileage: unknown
> Date purchased by HB Auto: unknown
> Purchase price: unknown
> NADA value on August 1, 2002: unknown
> HB Auto's estimate of value prior to incident: $5,000
> HB Auto's estimate of value after incident: $2,500
> Spears's estimate of value after incident: no opinion
> Spears's estimate of present value (as of August 1, 2007): no opinion
> Other evidence: none

The Court finds that HB Auto is not entitled to any damages attributable to Vehicle #31. The Court has no evidence regarding this vehicle, not even a copy of the title, or evidence of damages it sustained other than the fact that it is included in HB Auto's list. HB Auto has not carried its burden of proving that it is entitled to any damages attributable to this vehicle.

**Vehicle #32**

Description: 1993 Mazda, VIN JM1HD4613P0210147, 4-door
Mileage: 164,067
Date purchased by HB Auto: December 7, 2001
NADA value on August 1, 2002: $3,125
HB Auto's estimate of value prior to incident: $4,000
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $2,800
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence:  Spears's expert report indicates the vehicle has forklift damage to the rockers, the floor boards, the left front fender and quarter, and the suspension.  It notes that the paint is faded, the interior and tires dry-rotted, and the windows "busted."  Twigg's expert report indicates no damage and no forklift damage.  The photos show interior deterioration and damage to the left front part of the vehicle.

Based upon the evidence presented, the Court finds that the value of Vehicle #32 was $3,125 immediately prior to being damaged by Brokers.  HB Auto has also established that Brokers damaged this vehicle, reducing its value to $1,200.

**Vehicle #33**

Description: 1989 Saab 900, VIN YS3AS45D8K3021951
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: unknown
HB Auto's estimate of value prior to incident: $1,800
HB Auto's estimate of value after incident: $600
Spears's estimate of value after incident: no opinion
Spears's estimate of present value (as of August 1, 2007): no opinion
Other evidence: The title indicates Vehicle #33 was repossessed on August 8, 1998 and then purchased by HB Auto.  No mileage information is disclosed.  It is listed as stolen by HB Auto.

The Court finds that HB Auto is not entitled to any damages for Vehicle #33.  HB Auto lists the vehicle as stolen but presented no evidence regarding when it was stolen, nor a police report.  The Court has no evidence regarding the type of damages the vehicle sustained other than it being included in HB Auto's list.  There is no photo of the vehicle and neither expert could inspect it.  The Court finds that HB Auto has not carried its burden of proving that it is

72

entitled to any damages for this vehicle.

**Vehicle #34**

> Description: 1997 Plymouth Breeze, VIN 1P3EJ46CXVN551185
> Mileage: 102,047
> Date purchased by HB Auto: November 13, 2001
> Purchase price: unknown
> NADA value on August 1, 2002: $4,150
> HB Auto's estimate of value prior to incident: $3,800
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $1,000
> Spears's estimate of present value (as of August 1, 2007): $150
> Other evidence: The damage disclosure statement on the title does not indicate that the
> vehicle had been damaged to the extent that the cost of repair exceeded 25% of the fair
> market value when HB Auto purchased it.  Spears's expert report indicates the vehicle
> has forklift damage to the rocker panels and the right mirror, and also that the rear glass
> is "busted," the paint is faded, and the tires are dry-rotted.  Twigg's expert report
> indicates Vehicle #34 sustained forklift damage to the right mirror and rear glass.

Based upon the evidence presented, the Court finds that Vehicle #34 had a value of

$3,800 immediately before the incident, which is equal to HB Auto's estimate of value.  The

NADA value at that time was $4,150.  This vehicle was five model years old when HB Auto

purchased it.  HB Auto's original value falls within the parameters set forth by the experts in this

case, and the Court finds it credible.

**Vehicle #35**

> Description: 1991 Chevrolet Caprice, VIN 1G1BL53E1MW173624, 4-door, red
> Mileage: 187,737
> Date purchased by HB Auto: June 12, 2001
> NADA value on August 1, 2002: $3,100
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $200
> Other evidence: Spears's expert report indicates the vehicle has forklift damage to the
> drive shaft and the left rear door.  It also indicates that the paint is faded and the tires and
> interior are dry-rotted.  Twigg's expert report indicates the vehicle has no damage and no
> forklift damage.  From the photo, it appears as though this vehicle has been in mud and

water.

Based upon the evidence presented, the Court finds that Vehicle #35 had a value of

$3,000 immediately before the incident, which is equal to HB Auto's estimate of value and less

than the NADA value.  The Court also notes that the evidence supports an ending value of $200.

## Vehicle #36

Description: 1991 Buick Park Avenue, VIN 1G4CW53L4M1644191, 4-door
Mileage: 188,600
Date purchased by HB Auto: November 13, 2001
NADA value on August 1, 2002: $3,850
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: Spears's report indicates that the vehicle has forklift damage to the right doors, the floor board, and rockers and that the paint is faded, the tires are dry-rotted, and interior is depreciated.  Twigg's expert report indicates that the vehicle has forklift damage with the right mirror broken.

Based upon the evidence presented, the Court finds that Vehicle #36 had a value of

$3,000 immediately before the incident, which is equal to HB Auto's estimate of value.  This

value is only 77.9% of the NADA value at that time.  It falls within the parameters set forth by

the experts in this case, and the Court finds it credible.

## Vehicle #37

Description: 1995 Nissan 240-SX, VIN JN1AS44D7SW024222, 2-door
Mileage: 75,828
Date purchased by HB Auto: June 1, 2000
Purchase price: unknown
NADA value on August 1, 2002: $5,025
HB Auto's estimate of value prior to incident: $5,000
HB Auto's estimate of value after incident: $3,000
Spears's estimate of value after incident: $1,800
Spears's estimate of present value (as of August 1, 2007): $300
Other evidence: Vehicle #37 was purchased as a salvage vehicle as defined by N.C. Gen. Stat. § 20-4.01(33)(d).  HB Auto submitted documentation into evidence that the vehicle

was reconstructed and inspected by Inspector Beck.  An unbranded title was issued on May 18, 2001.  Spears's report indicates that the vehicle has forklift damage on the floor board and rocker panel.  His report also states that the paint is "faded/clear peeling," the tires are dry-rotted, and the interior is faded.  Twigg's expert report indicates that the vehicle has no damage and no forklift damage.

The Court finds that the value of Vehicle #37 was $3,266 immediately prior to being damaged by Brokers.  HB Auto originally estimated that the vehicle was worth $5,000, but the evidence does not support this value.  HB Auto's estimated value is simply too high to be credible because it does not properly account for the vehicle's salvage history.  Consequently, based upon the expert testimony, the Court finds that vehicle's value is 35% less than the NADA value.

**Vehicle #38**

Description: 1995 Mazda 626, VIN 1YVGE22C2S5392515, 4-door
Mileage: unknown
Date purchased by HB Auto: repossessed by HB Auto (as lienholder) December 12, 1998
NADA value on August 1, 2002: $4,825
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $1,000
Spears's estimate of present value (as of August 1, 2007): $150
Other evidence:  Spears's report indicates that the vehicle has forklift damage on the floor board and the front bumper and that the paint is faded and rusting, the tires are dry-rotted, and the windshield is cracked.  Twigg's expert report indicates that the vehicle has "bad paint," no damage, and no forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #38 had a value of $3,000 immediately before the incident, which is equal to HB Auto's estimate of value.  The NADA value at that time was $4,825; however, this value does reflect the mileage since that information is not available.  The Court notes that the vehicle had been sitting on the lot for an extended period after it was repossessed by HB Auto: in excess of three and a half years.  This fact reflects poorly on the value of the vehicle.  HB Auto's value for Vehicle #38 is well below

NADA value, only 62.2% of the NADA value, and the Court, after consideration, concludes that this figure is credible. The Court further notes that the floor board damage is the only damage to the underside of this vehicle; however, with the evidence that the front bumper was also damaged, HB Auto has established that the vehicle's value was reduced to $800 immediately after the incident.

**Vehicle #39**

Description: 1994 GMC King Cab, VIN 1GTCS19Z0R8505226, truck, blue
Mileage: 126,186
Date purchased by HB Auto: August 31, 2001
NADA value on August 1, 2002: $3,950
HB Auto's estimate of value prior to incident: $4,500
HB Auto's estimate of value after incident: $1,500
Spears's estimate of value after incident: $1,200
Spears's estimate of present value (as of August 1, 2007): $300
Other evidence: Spears's expert report indicates that the vehicle has forklift damage to the drive shaft and the exhaust, and it notes that the paint is faded, the tires are dry-rotted, the interior is rotten, and glass is broken. Twigg's expert report lists no forklift damage and a missing transmission. Twigg testified that, in his opinion, Spears' report could not be correct because the drive shaft had to have been taken out since transmission had been taken out. Consequently, Twigg reasoned that Spears could not have seen the damaged drive shaft. Twigg subsequently testified that he did not look in the truck bed and he did not dispute Spears's representation that the damaged drive shaft was in the truck bed.

HB Auto originally estimated that Vehicle #39's value exceeded NADA value. The Court concludes, based upon the evidence presented, that this vehicle was in average condition at minimum, and its value was $3,950 immediately prior to being damaged by Brokers. HB Auto has established that this vehicle sustained forklift damage, despite Twigg's report to the contrary.

**Vehicle #40**

Description: 1991 Mazda RX-7, VIN JM1FC3322M0905426, 2-door, black
Mileage: 107,455
Date purchased by HB Auto: November 27, 1998
Purchase price: unknown

NADA value on August 1, 2002: $6,675
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $1,400
Spears's estimate of value after incident: $1,700
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: Spears's expert report indicates that the vehicle has forklift damage to the floor boards, rockers, and ground effects, and it also notes that the paint is faded and the tires and interior are dry-rotted. Twigg's expert report lists forklift damage to the left quarter panel. Hossein Ahmadi testified that HB Auto had owned Vehicle #40 for an extended period of time because it is a collector's item. This type of vehicle is no longer being made.

Based upon the evidence presented, the Court finds that Vehicle #40 had a value of $3,900 immediately before the incident. The vehicle had been sitting on the lot for over three years, but Hossein Ahmadi provided a knowledgeable and credible explanation for this fact. Even so, HB Auto's own value for Vehicle #40 is well below NADA value (only 58.4% of the NADA value) and well within the parameters of a reasonable value as set forth by the experts in this case.

## Vehicle #41

Description: 1985 Mercedes M-b, VIN WDBBA45C5FA025073, green
Mileage: unknown
NADA value on August 1, 2002: $12,950
HB Auto's estimate of value prior to incident: $17,000
HB Auto's estimate of value after incident: $10,000
Spears's estimate of value after incident: $3,000
Spears's estimate of present value (as of August 1, 2007): $500
Other evidence: Spears's expert report indicates that the vehicle has forklift damage to the floor board and rocker panel, and it also notes that the paint is faded, the tires are dry-rotted, and the interior is rotten. Twigg's expert report lists "rough vehicle," "very poor paint," and no forklift damage. Vehicle #41 had a salvage title as defined by N.C. Gen. Stat. § 20-4.01(33)(d) when HB Auto purchased it in 1994. HB Auto submitted documentation into evidence that the vehicle was reconstructed and inspected. An unbranded title was issued and the vehicle was transferred into the Ahmadis's father's name on January 13, 1995 because he liked the vehicle. The Ahmadis then utilized the vehicle as a personal vehicle for a period of time. At some point the vehicle was placed on the Property, but Hossein Ahamdi could not recall when that occurred. Hossein Ahmadi testified that before his father passed away his father signed a reassignment of

title, but Hossein Ahmadi could not located the form.  Hassan Ahmadi testified that the vehicle was worth $12,950 in August 2002.

The Court finds that HB Auto is not entitled to any damages for Vehicle #41 because the evidence reflects that HB Auto did not own this vehicle at the time of the incident and could not sell this vehicle.

**Vehicle #42**

Description: 1990 Honda Civic, VIN 1HGED4666LA057512[30]
Mileage: 195,666
Date purchased by HB Auto: unknown
NADA value on August 1, 2002: $3,400
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $200
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Vehicle #42 is titled in the name of Seth Yaw Obene and dated 11/19/98. HB Auto is listed as the first lienholder, and it repossessed the vehicle due to nonpayment.  Twigg's expert report indicates the vehicle has a missing hood, as well as no damage and no forklift damage.  Spears's report indicates the vehicle has forklift damage to the left quarter, floor boards, and rocker panel.  It also states that the paint is faded and peeling, the interior is depreciated, the tires are dry-rotted, and it is missing miscellaneous exterior body parts.  The photo in evidence shows the missing hood and other signs of vandalism.

HB Auto has not presented sufficient evidence to establish the amount of damages to which it is entitled for Vehicle #42.  HB Auto claims that Brokers damaged this vehicle when it moved it to the Lower Lot, reducing its value to either $500 (Spears's estimate) or $200 (HB Auto's estimate).  As the court has already found, Spears's estimate of value immediately after the incident, standing alone, carries little weight.  Furthermore, for this particular vehicle, the evidence does not support HB Auto's estimate of the value.  On Defendant's Exhibit 2, HB Auto lists only 13 vehicles out of 235 that had a value below $300 after being moved to the Lower

---

[30] Various exhibits admitted into evidence identify the VIN as 4HGED4666LA057512, but the title indicates the VIN is 1HGED4666LA057512.

Lot, and only five of those vehicles[31] were reduced to less than 10% of HB Auto's starting value. Spears's report indicates that Vehicle #42 sustained damage fairly typical to most of the vehicles moved: damage to the left quarter, the floor boards, and the rocker panel. These damages do not fully explain HB Auto's low value. There is, however, evidence that this vehicle was vandalized after Brokers moved it to the Lower Lot. It is clear from both the photo and Spears's expert report that various exterior and interior parts have been stolen. Based upon the testimony by Brokers's employees that some of the vandalism and theft began within just a few weeks after the vehicles were moved, the Court concludes that Vehicle #42 must have been vandalized by the time HB Auto was able to assess the damage. Consequently, HB Auto's estimate of value immediately after the incident includes damages from this vandalism, which was an intervening criminal act. As a result, HB Auto has not established the value of the vehicle immediately after the incident with reasonable certainty, and it has not established that Brokers's actions proximately caused the subsequent damage to the vehicle.

**Vehicle #43**

> Description: 1996 Pontiac Sunfire, VIN 4G2JB3245TB205115, convertible, black
> Mileage: 108,817
> Date purchased by HB Auto: September 6, 2000
> Purchase price: $2,210
> NADA value on August 1, 2002: $5,950
> HB Auto's estimate of value prior to incident: $3,200
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $3,500
> Spears's estimate of present value (as of August 1, 2007): $300

---

[31] The four other vehicles for which HB Auto estimated a value that was less than 10% of HB Auto's starting value include: (1) Vehicle #63, which is the vehicle upon which Brokers dropped an I-beam; (2) Vehicle #180, which suffered front collision damage as well as damage to the floor boards, rockers, right fender and quarter; (3) Vehicle #19, which suffered damaged to the suspension, floor boards, rockers, left door and fender; and (4) Vehicle #199, which suffered damage to the left side of the vehicle, left rear door shade, right rocker, and right rear wheel.

Other evidence: The bill of sale indicates HB Auto purchased Vehicle #43 at auction as a red light, with over 100,000 miles, and a torn top. The damage disclosure statement on the title does not indicate that the vehicle had been damaged to the extent that the cost of repair exceeded 25% of the fair market value when HB Auto purchased it. The vehicle was assigned to Mendenhall Auto Auction for sale on November 24, 2001. Hassan Ahmadi testified that in order to sell vehicles to individuals through Mendenhall, a very small, less sophisticated auto auction, sellers assign vehicles to Mendenhall. If a vehicle is not sold, it is reassigned back to the seller. Hassan Ahamdi testified that HB Auto had been working with Mendenhall for such a long time that HB Auto would not have a vehicle that did not sell reassigned back to it if it was going try to sell it again through Mendenhall at a later date. Nevertheless, HB Auto could still obtain a reassignment from Mendenhall if necessary. Spears's expert report indicates that the vehicle has forklift damage to the floor boards, rockers, right quarter, and door. His report also states that the paint is faded, the interior is depreciated, and the top and tires are dry-rotted. Twigg's report indicates damage by a forklift to the right mirror and quarter panel.

Based upon the evidence presented, the Court finds that Vehicle #43 had a value of $3,200 immediately before the incident. The vehicle had been sitting on the lot for over a year and a half, and HB Auto had tried unsuccessfully to sell it at auction. These facts speak poorly of the vehicle's value. A value of $3,200 reflects this history, as it is only 53.8% of the NADA value. After considering all of the evidence, the Court finds HB Auto's estimate is credible and competent evidence of the vehicle's value immediately before it was damaged by Brokers. In addition, the Court finds that HB Auto's explanation as to why the vehicle remained assigned to Mendenhall Auto Auction credible and finds that HB Auto would have had the right to sell Vehicle #43. Therefore, HB Auto is entitled to damages for this vehicle. The Court notes that Twigg and Spears agree that this vehicle was damaged by a forklift.

**Vehicle #44**

Description: 1996 Pontiac Grand Am, VIN 1G2NE12M1TM502031, 2-door, green
Mileage: 114,147
Date purchased by HB Auto: April 25, 2001
Purchase price: $2,065
NADA value on August 1, 2002: $4,025
HB Auto's estimate of value prior to incident: $4,000

HB Auto's estimate of value after incident: $1,500
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The bill of sale indicates HB Auto purchased Vehicle #44 at auction as a red light with frame damage and over 100,000.  Twigg's expert report lists that the front bumper cover and left quarter are damaged and the mirror was broken by a forklift. Spears's expert report lists forklift damage to the floor boards, right door and quarter, fender, and front bumper.  Also, the vehicle has faded paint, dry-rotted interior and tires, and a cracked windshield.

The Court finds that the value of Vehicle #44 was $3,622 immediately prior to being damaged by Brokers.  HB Auto originally estimated that the vehicle was worth $4,000, and the NADA value is $4,025, but these values fail to properly account for the vehicle's disclosed frame damage which, pursuant to the expert testimony, impairs the vehicle's value by 10% of the NADA value.

**Vehicle #45**

Description: 1994 Pontiac Grand Prix, VIN 1G2WJ12M4RF215702, red
Mileage: 84,273
Date purchased by HB Auto: April 7, 1999
NADA value on August 1, 2002: $3,150
HB Auto's estimate of value prior to incident: $4,900
HB Auto's estimate of value after incident: $3,500
Spears's estimate of value after incident: $1,000
Spears's estimate of present value (as of August 1, 2007): $150
Other evidence: Spears's expert report lists forklift damage to the floor board.  Also, the paint has faded and rusted, and the interior and tires are dry-rotted.  Twigg's expert report lists nothing regarding this vehicle.

Vehicle #45 sat on the lot for approximately three years prior to being moved by Brokers. Based upon the testimony of the experts and of Hossein Ahmadi regarding deterioration from sitting, the Court finds that the value of the vehicle immediately prior to being moved to the Lower Lot was $2,677.  In this instance, this value is actually lower than HB Auto's estimate of the value of the vehicle immediately after the incident.  Through Spears's report, HB Auto has

shown that this vehicle sustained some damage during the move to the Lower Lot; however, the amount of damage is small, the only damage being to the floorboards. The Court does not have sufficient evidence to assign a dollar value to that damage with any reasonable certainty. Therefore, the Court will not award any damages for this vehicle caused by the move.

**Vehicle #46**

> Description: 1995 Plymouth Voyager, VIN 2P4GH45R4SR192355, van
> Mileage: 129,453
> Date purchased by HB Auto: October 3, 2001
> Purchase price: $450
> NADA value on August 1, 2002: $3,500
> HB Auto's estimate of value prior to incident: $2,800
> HB Auto's estimate of value after incident: $2,000
> Spears's estimate of value after incident: $1,500
> Spears's estimate of present value (as of August 1, 2007): $75
> Other evidence: The bill of sale indicates Vehicle #46 was sold to HB Auto at auction as a red light and damaged and disabled. The damage disclosure statement certifies that the vehicle had not been damaged to the extent that the cost of repair exceeded 25% of the fair market value, nor was it a flood, salvage, theft, or reconstructed vehicle when purchased by HB Auto. Spears's expert report indicates that the vehicle has damage to the floor board, rocker, and front door from a forklift. It also notes that the tires and interior are dry-rotted and the paint is faded and peeling. Twigg's expert report lists "bad paint," no damage, and no forklift damage. The photo shows the damaged door.

Based upon the evidence presented, the Court finds that Vehicle #46 had a value of $2,800 immediately prior to the incident. There is evidence that this vehicle did not have any history that would impact its value permanently, and this value falls within the parameters set forth by the experts in this case. The Court notes that HB Auto has clearly established forklift damage on this vehicle.

**Vehicle #47**

> Description: 1993 Plymouth Vista, VIN JP3CB50G9PZ027429, red
> Mileage: 153,403
> Date purchased by HB Auto: August 25, 1999
> Purchase price: $750

NADA value on August 1, 2002: $2,450
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $700
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The damage disclosure statement on the title indicates the mileage is in excess of the vehicle's mechanical limits. Twigg's report contains no comments regarding this vehicle. Spears's report lists damage to the rocker panel and floor boards, a dent on the right front door, and a dent on the right fender. It also lists cracked glass, a rotten interior, dry-rotted tires, and faded, rusted paint.

Vehicle #47 sat for over two and a half years prior to the incident, and HB Auto has offered no explanation, such as it being a collector's item or undergoing lengthy repairs. Spears, Twigg, and Hossein Ahmadi each testified that a vehicle that sits for extended periods of time will deteriorate. Therefore, the Court finds that the vehicle was in less than average condition due to excessive exposure and that the value of Vehicle #47 immediately prior to the incident was $2,205.

**Vehicle #48**

Description: 1999 Plymouth Breeze, VIN 1P3EJ46C7XN563328, 4-door, black
Mileage: 84,287
Date purchased by HB Auto: March 20, 2002
Purchase price: $1,305
NADA value on August 1, 2002: $6,400
HB Auto's estimate of value prior to incident: $4,000
HB Auto's estimate of value after incident: $2,500
Spears's estimate of value after incident: $1,800
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: The bill of sale discloses that HB Auto purchased Vehicle #48 at auction with frame damage, a bad transmission, and "sst." The damage disclosure statement certifies that the vehicle had not been damaged to the extent that the cost of repair exceeded 25% of the fair market value, nor was it a flood, salvage, theft, or reconstructed vehicle. Hossein Ahmadi testified that the frame damage had been repaired before HB Auto purchased the vehicle, and that Greensboro Auto Auction was required by law to disclose the prior frame damage. The testimony is unclear as to whether this vehicle's bad transmission was repaired by HB Auto. At trial, Hossein Ahmadi confirmed in testimony that this particular vehicle was purchased during the time period that he and his brother were not repairing vehicles, but then he speculated that if the "bad transmission"

83

just needed transmission fluid, they would have taken care of that. Hassan Ahmadi testified that he changed the transmission filter in this vehicle and put fluid in it. Spears's expert report indicates that the floor boards, rockers, left door and fender were damaged by a forklift, and that the paint is faded, the tires are dry-rotted, and the interior is deteriorated. Twigg's report indicates no damage and no forklift damage.

Immediately before the incident, the NADA value of Vehicle #48 was $6,400; however, there is evidence of prior frame damage. As previously stated, a history of frame damage will reduce the value of a vehicle by approximately 10% of the NADA. There is also evidence that this vehicle was in need of some repairs. This vehicle was purchased during the time period that the Ahmadi's father was receiving treatment in the United States. Thus, according to Hossein Ahmadi's testimony, it would have remained on Greensboro Auto Auction's lot for a period of time. While Hassan Ahmadi testified that he changed the filter on this vehicle, the Court will assume that the vehicle was not otherwise repaired or prepared for sale. After consideration of the foregoing, the Court concludes that the value of Vehicle #48 immediately prior to being damaged by Brokers was $4,000, which is only 62.5% of the NADA value.

**Vehicle #49**

Description: 1994 Oldsmobile Cutlass, VIN 1G3WH15X6RD360104, 2-door
Mileage: 68,485
Date purchased by HB Auto: February 23, 2000
Purchase price: $750
NADA value on August 1, 2002: $5,276
HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $900
Spears's estimate of present value (as of August 1, 2007): $75
Other evidence: The bill of sale states this vehicle was sold to HB Auto at auction as red light, in the salvage line with a salvage history. Twigg's report indicates the vehicle has forklift damage with "bad paint," left fender damage, and a minor dent. Spears's report indicates the vehicle has forklift damage to the floor board, rockers, and left fender. The report also notes that the paint is faded, cracking, and peeling, the interior is rotten, and the tires are dry-rotted. Hassan Ahmadi testified that the vehicle did have a salvage history when HB Auto purchased it, but it had been issued a clean title.

84

The Court finds that the value of Vehicle #49 was $3,165 immediately prior to being damaged by Brokers. This vehicle has a salvage history, and therefore, according to the expert testimony, it had a value between 30% and 40% less than the NADA value prior to being moved to the Lower Lot. In addition, this vehicle had been sitting on the Property for approximately two years prior to the incident, and this sitting would have further reduced its value as a result of deterioration. Consequently, the Court finds that the evidence supports a finding that the value was 40% less than the NADA value. The Court notes that Twigg and Spears agree that the vehicle was damaged by a forklift.

**Vehicle # 50**

Description: 1993 Oldsmobile Achieva, VIN 1G3NL5435PM044383, 4-door, blue
Mileage: 119,704
Date purchased by HB Auto: January 9, 2002
Purchase price: $50
NADA value on August 1, 2002: $1,975
HB Auto's estimate of value prior to incident: $2,000
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $300
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates that this vehicle was sold to HB Auto at auction in the damaged and disabled category with "miles over." The damage disclosure statement certifies that the vehicle had not been damaged to the extent that the cost of repairs exceeded 25% of the fair market value, nor was it a flood, salvage, theft, or reconstructed vehicle. Twigg's report indicates no damage and no forklift damage. Spears's report lists forklift damage to the floor board, exhaust, and right front fender, and notes the paint is faded and peeling, the tires are dry-rotted, the interior is deteriorated, and the vehicle has miscellaneous dings. Hossein Ahmadi recalled the day that he purchased this vehicle and testified that the purchase price was extremely low because no one else was present to bid and the seller was the lienholder. Hossein Ahmadi described that he "stole" the vehicle (he reassured the Court that he did not mean this literally). He also testified that he valued the vehicle at $2,000 because that was what he could have sold it for on the lot. The photos of this vehicle show damage to the right front fender and several other dents. Twigg testified, based upon the photo, that the vertical indentation next to the door on this vehicle was not consistent with forklift damage, but could have been caused by the wind blowing the door back, and that another dent near the wheel would not have been caused by a forklift. He also testified that the

minimum value of the vehicle was $500, but that he would use a guide book to establish the value.  Spears testified that the doors on a vehicle manufactured by GM, such as Vehicle #50, are not designed in such a way that wind could blow the door back.  Rather, a great deal of force would be required.

The Court finds that the value of Vehicle #50 was $1,975 immediately prior to being damaged by Brokers.  Hossein Ahmadi's testimony that HB Auto could have sold the vehicle on the lot for $2,000 is credible, as is his description of the circumstances under which he bought the vehicle, thereby obtaining such a low price.  The Court again notes that the NADA value as listed incorporates a deduction for the high mileage.

The parties also dispute the extent of the forklift damage on Vehicle #50 and whether some of the damage was caused by wind.  The Court finds Spears's testimony that the dent next to the door could not have been caused by the wind credible.  Furthermore, Spears clearly noted forklift damage on this vehicle, including damage to the floor board, exhaust, and right front fender.  In contrast, Twigg's report on this vehicle is clearly not accurate.  Damage to the exterior of the vehicle is readily apparent on the photos in evidence, yet Twigg's report indicates that Vehicle #50 had no damage, forklift or otherwise.  The Court concludes that the evidence supports the post-incident value of $1,200, as estimated by HB Auto.

**Vehicle #51**

Description: 1994 Nissan Maxima GXE, VIN JN1HJ01F6RT231986, 4-door, blue
Mileage: 174,676
Date purchased by HB Auto: January 9, 2002
Purchase price: $350
NADA value on August 1, 2002: $3,725
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $700
Spears's estimate of present value (as of August 1, 2007): $150
Other evidence: The bill of sale indicates the vehicle was sold to HB Auto in the salvage line, with the timing belt broken and mileage over 100,000.  The disclosure on the title

indicates the mileage stated is in excess of the mechanical limits, the vehicle has not been damaged such that it needed repairs costing more than 25% of the fair market value, and it is not a flood, reconstruction or salvage vehicle.  Twigg's expert report lists no damage, no forklift damage, and "bad paint."  Spears's report indicates the vehicle has forklift damage including scratches on the right side, a dent on the right rear quarter, and rocker panel damage.  The report also notes that the paint is faded, peeling, and rusting, and the tires and interior are dry-rotted.  At trial, Hossein Ahmadi confirmed upon inquiry that he purchased this vehicle the same day as Vehicle #50.  Hassan Ahmadi testified on cross that he did not specifically recall repairing the timing belt on this vehicle.

Based upon the evidence presented, the Court finds that Vehicle #51 had a value of $3,000 immediately before the incident, which is equal to HB Auto's estimate of value.  The NADA value at that time was $3,725.  Hassan Ahmadi testified that he did not recall repairing the  broken timing belt on this vehicle, which is consistent with the fact that he was in Iran at the time this vehicle was purchased while his brother remained in the United States and continued to work at HB Auto.  The value of $3,000, 80.5% of the NADA value, falls within the parameters set forth by the experts in this case, and the Court finds it credible.

**Vehicle #52:**

> Description: 1997 Nissan Sentra, VIN 1N4AB41D0VC704251, 4-door, white
> Mileage: 82,942
> Date purchased by HB Auto: August 8, 2001
> Purchase price: $450
> NADA value on August 1, 2002: $4,600
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $1,500
> Spears's estimate of value after incident: $600
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale indicates that HB Auto purchased Vehicle #52 at auction in the salvage line and that the airbags were out.  The damage disclosure statement does not state that the vehicle had been damaged to the extent that the cost of repair exceeded 25% of the fair market value.  Hassan Ahmadi testified, when asked about the missing airbags for Vehicle #52, that HB Auto immediately puts new airbags in if they are missing and that the airbags for this vehicle would cost $400.  Spears's expert report indicates that the rocker panel and floor board had been damaged from a forklift.  It also notes that miscellaneous interior and exterior parts are missing, the paint is faded, and the tires are dry-rotted.  Twigg's report indicates a right front collision, parts missing, and no

forklift damage.  Looking at a photo of the vehicle, Twigg testified that the front bumper and grille were missing and they would not have been removed by a forklift.  He speculated, because these parts were not removed by a forklift, the damage must have been preexisting.  He further speculated that the missing parts could have had "wreck damage" and then been removed.  The photo shows the damaged front end of the vehicle.

Based upon the evidence presented, the Court finds that Vehicle #52 had a value of $2,500 immediately before the incident.  At trial, Brokers attempted to show that the airbags were never replaced after this vehicle was purchased and that the front parts were missing before it was moved to the Lower Lot.  Thus, Brokers contends that those conditions should be reflected in the value of the vehicle immediately before the incident.  As to the missing parts, Twigg's testimony simply does not establish that the damage was preexisting.  Twigg was clearly unaware of any of the facts and circumstances surrounding the move, aside from the fact that a forklift was utilized.  His speculation that the vehicle had been in a collision and then the parts were removed could just as easily apply to damage that occurred during the move to the Lower Lot, since numerous vehicles sustained collision type damage when moved.  Furthermore, the Court notes that when the vehicle was sold to HB Auto, there was no notation of the missing front end parts on the bill of sale.  Though the Court realizes that such a disclosure would not have been required by law, numerous other bills of sale from the same auction house list missing parts.  A value of $2,500 is only 54.4% of the NADA value and falls within the parameters set forth by the experts in this case.  The Court finds that the evidence supports the post-incident value of $1,500, as estimated by HB Auto.

Lastly, despite the testimony that some of the missing parts may have been removed because they were wrecked, the fact that interior parts are also missing leads the Court to conclude that this vehicle was vandalized after it was moved to the Lower Lot.  Therefore, the

Court cannot determine with any reasonable certainty the amount of damages sustained after the

vehicle was in the Lower Lot and were proximately caused by Brokers's negligence. The Court

will not award damages for injury incurred subsequent to when Vehicle #52 was moved to the

Lower Lot.

**Vehicle #53**

> Description: 1992 Mitsubishi Diamante, VIN JA3XC57B7NY034423, 4-door
> Mileage: 142,405
> Date purchased by HB Auto: June 7, 2000
> Purchase price: $1,050
> NADA value on August 1, 2002: $3,750
> HB Auto's estimate of value prior to incident: $3,900
> HB Auto's estimate of value after incident: $2,000
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: The bill of sale indicates that HB Auto purchased Vehicle #53 at auction
> in the red light category with over 100,000 miles and a damaged floor pan. Spears's
> expert report lists that the vehicle has forklift damage to the left side, the left rocker, and
> the floor board. It also notes that the paint is faded, the dash is cracked, four wheels were
> stolen, and the interior is dry-rotted. Spears confirmed in testimony at trial that four tires
> were missing and he did not count that as forklift damage. Twigg indicated the vehicle
> had no damage and no forklift damage. The photo shows the vehicle has also rusted
> extensively.

This vehicle had been sitting on HB Auto's lot for almost two years prior to being

moved. Based upon the testimony of the experts and Hossein Ahmadi regarding deterioration

from sitting, the Court finds that the value of the vehicle immediately prior to being moved to the

Lower Lot was $3,375 which represents a 10% discount off the NADA value. There is evidence

of an intervening criminal act after Brokers moved Vehicle #53 to the Lower Lot: the wheels

were stolen. This unforeseeable intervening act relieves Brokers of liability for subsequent

damage by breaching the causal connection between its own negligence and the subsequent

injury. Therefore, the Court will not award damages for injury to Vehicle #53 subsequent to it

being moved to the Lower Lot.

**Vehicle #54**

> Description: 1995 Mitsubishi Eclipse, VIN 4A3AK44Y0SE135942, 2-door
> Mileage: 90,868
> Date purchased by HB Auto: September 6, 2000
> Purchase price: $1,950
> NADA value on August 1, 2002: $6,500
> HB Auto's estimate of value prior to incident: $4,900
> HB Auto's estimate of value after incident: $2,000
> Spears's estimate of value after incident: $2,000
> Spears's estimate of present value (as of August 1, 2007): $150
> Other evidence: The bill of sale indicates that Vehicle #54 was sold to HB Auto at
> auction in the salvage line and with the notation: "crank shaft pully bad." Twigg's report
> lists "bad paint" and no forklift damage. Spears's report lists forklift damage including
> that the front bumper is broken and loose and the left rocker panel, right rocker panel,
> and passenger door are damaged. It also notes that the paint is faded, chipped, and
> rusted, the tires and interior are dry-rotted, and the right front wheel is stolen. Twigg
> testified that it would cost $150 - $200 for HB Auto to repair the crank shaft. He did not
> agree that if the vehicle was purchased for $1,950 and simply the crank shaft was
> repaired, the vehicle would be worth NADA value.

Based upon the evidence presented, the Court finds that Vehicle #54 had a value of

$4,900 immediately before the incident, which is equal to HB Auto's original estimate of value.

The value is 75.4% of the NADA value and falls within the parameters set forth by the experts in

this case, even allowing for a reduction in value due to deterioration. There is evidence of an

intervening criminal act after Brokers moved Vehicle #54 to the Lower Lot in that a wheel was

stolen. Given this evidence of vandalism, the Court cannot determine with reasonable certainty

the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower

Lot. Therefore, the Court will not award damages for injury to Vehicle #54 subsequent to it

being moved to the Lower Lot.

**Vehicle #55**

Description: 1997 Mitsubishi Galant, VIN 4A3AJ56G6VE049147, 4-door

90

Mileage: 79,442
Date purchased by HB Auto: March 20, 2002
Purchase price: $2,320
NADA value on August 1, 2002: $6,900
HB Auto's estimate of value prior to incident: $4,500
HB Auto's estimate of value after incident: $1,500
Spears's estimate of value after incident: $1,200
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates Vehicle #55 had frame damage and bad brakes and tires when HB Auto purchased it at auction. Spears's expert report indicates the vehicle has forklift damage to the floor board and exhaust; also the paint is faded and peeling, the interior is rotten, the tires are dry-rotted, the door molding is missing, and the grille is missing. Twigg's report states nothing about this vehicle. Hossein Ahmadi confirmed that, because this vehicle was purchased while the Ahmadi's father was receiving treatment in the United States, this vehicle would not have been immediately repaired, other than perhaps replacing the tires, prior to being moved. He also confirmed that a vehicle with repaired frame damage similar to Vehicle #55 would be not be an average vehicle. Twigg testified that in his opinion, fixing the brakes, repairing the frame damage, and replacing the tires alone would not render the vehicle "average."

Brokers has clearly established that Vehicle #55 was not in "average" condition prior to it being damaged, and certainly, it did not have a value equal to NADA value. For the sake of valuation, the Court will assume that the vehicle was not repaired prior to being moved to the Lower Lot. The Court finds that Vehicle #55 had a value of $4,500 immediately before the incident, which is equal to HB Auto's original estimate of value. This value is 65.2% of the NADA value and is low enough to account for the history of frame damage (a 10% reduction in value) and the vehicle's less than average condition. With Spears's expert report and other evidence, HB Auto has established that Brokers damaged this vehicle when it moved the vehicle to the Lower Lot, reducing its value to $1,500.

**Vehicle #56**

Description: 1996 Nissan 200-SX, VIN 1N4AB42D6TC504065
Mileage: 170,478
Date purchased by HB Auto: July 18, 2001
Purchase price: $1,255

91

<u>NADA value on August 1, 2002</u>: unknown
<u>HB Auto's estimate of value prior to incident</u>: $3,900
<u>HB Auto's estimate of value after incident</u>: $1,100
<u>Spears's estimate of value after incident</u>: no opinion
<u>Spears's estimate of present value (as of August 1, 2007)</u>:  no opinion
<u>Other evidence</u>: The bill of sale indicates that when HB Auto purchased Vehicle #56 at auction, it was sold as a red light, as is, with over 100,000 miles, and frame damage.  HB Auto lists this vehicle as sold.

The Court finds that HB Auto is not entitled to any damages attributable to Vehicle #56.

Although the Court has more evidence regarding this vehicle than it does regarding Vehicle #31, which was also sold, such as a copy of the title, the bill of sale, and photos, there is still no evidence of forklift damage other than the fact that the vehicle is included in HB Auto's list.  HB Auto has not carried its burden of proving that it is entitled to any damages for this vehicle.

**Vehicle #57**

<u>Description</u>: 1998 Ford Escort, VIN 1FAFP10P9WW166862[32]
<u>Mileage</u>: 122,138
<u>Date purchased by HB Auto</u>: August 8, 2001
<u>Purchase price</u>: unknown
<u>NADA value on August 1, 2002</u>: unknown
<u>HB Auto's estimate of value prior to incident</u>: $2,500
<u>HB Auto's estimate of value after incident</u>: $500
<u>Spears's estimate of value after incident</u>: no opinion
<u>Spears's estimate of present value (as of August 1, 2007)</u>: no opinion
<u>Other evidence</u>: HB Auto lists this vehicle as lost.

The Court finds that HB Auto is not entitled to any damages attributable to Vehicle #57.

There is no evidence that this vehicle was one of those damaged by Brokers other than the fact that it is included in HB Auto's list, and there is no evidence of forklift damage.  HB Auto has not carried its burden of proving that it is entitled to any damages for this vehicle.

**Vehicle #58**

---

[32]  The various charts admitted into evidence identify the VIN for Vehicle #57 as 1FAFP10P9WW166882, but the title indicates the VIN is actually 1FAFP10P9WW166862.

Description:1997 Chevrolet Lumina, VIN 2G1WL52M8V1171548, 4-door, white
Mileage: 97,613
Date purchased by HB Auto: June 22, 2000
NADA value on August 1, 2002: $4,450
HB Auto's estimate of value prior to incident: $4,500
HB Auto's estimate of value after incident: $1,100
Spears's estimate of value after incident: $900
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Vehicle #58 was purchased by HB Auto as a salvage vehicle as defined by N.C. Gen. Stat. § 20-4.01(33)(d). HB Auto submitted documentation into evidence that the vehicle was reconstructed and inspected by Inspector Beck. An unbranded title was issued on May 18, 2001. Spears's report indicates that the vehicle has forklift damage on the floor board, rocker panel, and right front door. It also notes that the paint is faded and peeling, miscellaneous parts were stolen, a window is "busted," and the interior and tires are dry-rotted. Twigg's expert report indicates that the right door and hood are damaged from a forklift, and the vehicle has "bad paint." Hassan Ahmadi testified that while the previous owner's insurance company had declared the vehicle a total loss because damages exceeded 25% of its value, it was not severely damaged and could be fixed easily. HB Auto expended $500 to repair the vehicle by using used parts and charging only $20/hr for labor. The documentation of repairs supports this testimony.

Vehicle #58 had a salvage history; therefore, even after being repaired, its value was 30% to 40% less than the NADA value pursuant to the expert testimony in this case. The Court has also considered the fact that the vehicle was owned by HB Auto for two years prior to the incident, but a year of that time the vehicle was in the process of being repaired and reinspected. The Court finds that the value of the vehicle immediately prior to being moved to the Lower Lot was $2,893 which represents a 35% discount off the NADA value. Also, Spears's report indicates that parts have been stolen off of this vehicle. Given the evidence of this intervening criminal act, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot. Therefore, the Court will not award damages for injury to Vehicle #58 subsequent to it being moved to the Lower Lot.

**Vehicle #59**

Description: 1992 Acura Integra, VIN JH4DB1658NS003582, 4-door
Mileage: 168,012
Date purchased by HB Auto: April 6, 2001
NADA value on August 1, 2002: $3,500
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Twigg's expert report notes that Vehicle #59's front lamps are missing, it shows signs of a hard collision to the right side, and it has no forklift damage. Spears's report indicates that the floor board, rockers, right front door, and right rear door were damaged by a forklift, and the vehicle is missing miscellaneous exterior parts, a window is "busted," paint is faded, the interior is rotten, and the tires are dry-rotted. The photos show the exterior damage. Twigg testified at trial that one of the dents on the vehicle's door is consistent with a forklift, and he would not say whether the damage to the right rear of the vehicle was forklift damage because if "somebody got wild on a forklift and decided to knock the car out the way or slam it around, it – it's possible." He testified that the damage on the right side looked like it was caused by a hard blow and did not deny that it could have been caused by a forklift without brakes running into it. Twigg testified that damage to the front of the vehicle, including the missing grille and lamp and the damaged bumper, did not appear to be forklift damage and was consistent with a collision. Inspector Beck confirmed during testimony that, based upon the photo of this vehicle, the inspection sticker expired prior to 2002; therefore, it would have needed to be inspected prior to any sale in 2002.

The Court finds that Vehicle #59 was in average condition for a vehicle with similar mileage and its value immediately prior to being moved to the Lower Lot was $3,500. In addition, at trial, Brokers appeared to be challenging HB Auto's contention that this vehicle was damaged by a forklift. Twigg's report indicates that, in his opinion, there was no forklift damage. At trial, however, he unambiguously testified that some of the damage did appear to be forklift damage. Also, the circumstances described by Twigg necessary to inflict the type of damage to the front and rear of the vehicle match the descriptions of the employees who moved the vehicles. The Court finds that HB Auto has established that Brokers caused Vehicle #59 to sustain both forklift and collision damage and that its value after the incident was $1,000.

94

**Vehicle #60**

Description: Lexus ES-300, VIN JT8VK13T8P0122268
Mileage: 123,770
Date purchased by HB Auto: January 26, 1999
Purchase price: $7,600
NADA value on August 1, 2002: $7,825
HB Auto's estimate of value prior to incident: $9,000
HB Auto's estimate of value after incident: $3,000
Spears's estimate of value after incident: $2,000
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: Twigg's expert report lists that Vehicle #60's left door glass is missing, it has "bad paint," and there is no forklift damage. Spears's report indicates the vehicle has forklift damage on the floor boards and rockers. It also notes that the paint is faded and peeling, glass is broken, the tires are dry-rotted, and the interior is rotten.

The Court finds that the value of Vehicle #60 immediately prior to being moved to the Lower Lot was $6,651. There is evidence that this vehicle was in below average condition just before Brokers moved it. It had been sitting on HB Auto's lot for over three years prior to being moved, and HB Auto gave no explanation regarding why the vehicle sat for so long. The condition of the vehicle would have deteriorated during this time period. Lastly, the Court finds that HB Auto has established forklift damage.

**Vehicle #61:**

Description: 1993 Plymouth Voyager, VIN 2P4GH25K4PR122997
Mileage: 73,257
Date purchased by HB Auto: September 10, 1997
Purchase price: unknown
NADA value on August 1, 2002: $3,439
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $300
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Twigg's expert report lists "roof rusted bad" and no forklift damage. Spears's report indicates the vehicle has forklift damage on the floor boards, rockers, right fender, doors, and quarter. It also notes that the paint is faded and peeling, the tires and interior are dry-rotted, the windshield is cracked, and glass is "busted."

Based upon the evidence presented, the Court finds that Vehicle #61 had a value of $2,500 immediately before the incident, which is equal to HB Auto's original estimate of value. The NADA value at that time was $3,439, and the vehicle had been sitting on HB Auto's lot for approximately five years, with no explanation as to why. This fact reflects poorly on the vehicle's value. HB Auto's value for Vehicle #61 is only 72.7% of the NADA value and is low enough to account for the vehicle's deterioration prior to the incident. After considering all of the evidence, the Court finds HB Auto's estimate the most credible and competent evidence of Vehicle #61's value immediately before it was damaged by Brokers.

**Vehicle #62:**

> Description: 1989 Audi, VIN WAUFC0440KN003174, 4-door
> Mileage: unknown
> Date purchased by HB Auto: August 5, 2000
> NADA value on August 1, 2002: $4,200
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $750
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The disclosure on Vehicle #62's title indicates the odometer is not the actual mileage. Twigg's expert report notes that the right door and fender are damaged from a forklift. Spears's report indicates the vehicle has forklift damage on the floor boards, rockers, right front door, fender, and rear door. It also noted that the paint is faded and the tires and interior are dry-rotted. Twigg testified that when an odometer is not working, as on Vehicle #62, he would try to find the last known mileage, but as a general rule he would not "fuss" about it too much unless there was proof that the mileage was higher than average. He agreed that this condition might result in a 5% reduction in value at most. The photos show the right side damage.[33]

Based upon the evidence presented, the Court finds that Vehicle #62 had a value of $2,500 immediately prior to the incident. The NADA value at that time was $4,200; however,

---

[33] The Court notes that in the binder of photos submitted into evidence, one of the photos of Vehicle #62 was misidentified as Vehicle #97, which is also an 1989 Audi but is quite distinguishable from Vehicle #62.

the vehicle had been sitting on the Property for a year and a half, and the odometer was not in working order.  These facts reflect poorly on the vehicle's value.  A value of $2,500 is only 59.2% of the NADA value.  It is low enough to account for the vehicle's deterioration prior to the incident and falls within the parameters set forth by the experts.  The experts agree this vehicle was damaged by a forklift.

**Vehicle #63:**

> Description: 1993 Mazda 626, VIN 1YVGE22A4P5162013
> Mileage: unknown
> Date purchased by HB Auto: July 27, 2001
> NADA value on August 1, 2002: $3,650
> HB Auto's estimate of value prior to incident: $4,500
> HB Auto's estimate of value after incident: $400
> Spears's estimate of value after incident: $600
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: A handwritten notation on the front of Vehicle #63's title states "Dollen Damage Roff."  Spears's expert report lists forklift damage to the left rear door, floorboards, rockers, windshield, and top.  It also notes that the tires and interior are dry-rotted, the paint is faded, and the vehicle has a missing grille.  Twigg's report lists roof damage from a forklift.  The photos show the damaged roof.  Hossein Ahmadi testified that this vehicle was damaged when an I-beam was dropped onto it by Brokers's employees.

Vehicle #63 was damaged in a separate incident prior to being moved to the Lower Lot with a forklift.  The Court does not have sufficient evidence to distinguish between the damages incurred when the I-beam fell on the vehicle and those incurred when Brokers moved the vehicle to the Lower Lot.  Clearly, the value was not equal to the NADA value, nor was it equal to HB Auto's original estimate of value, which is actually greater than the NADA value.  Accordingly, HB Auto has not established the value of the vehicle immediately prior to the incident nor has it established the amount of damages incurred during the process of moving the vehicle with reasonable certainty.  Therefore, the Court finds that Vehicle #63 had a value of $400

immediately prior to the incident as well as immediately subsequent to the incident.

**Vehicle #64:**

Description: 1998 Ford Windstar, VIN 2FMZA51U2WBC37594, van
Mileage: 89,022
Date purchased by HB Auto: August 2, 2000
Purchase price: $7,085
NADA value on August 1, 2002: $7,175
HB Auto's estimate of value prior to incident: $7,900
HB Auto's estimate of value after incident: $3,900
Spears's estimate of value after incident: $3,500
Spears's estimate of present value (as of August 1, 2007): $300
Other evidence: The bill of sale indicates Vehicle #64 was sold to HB Auto at auction as a red light with no announced conditions. The damage disclosure statement on the title does not indicate whether the vehicle had been damaged such that repairs were in excess of 25% of its fair market value. Spears's expert report indicates that the vehicle has forklift damage to the floor boards, rocker panel, and front passenger's door, and also that the paint is faded, cracking, and peeling, the tires are dry-rotted, the interior is depreciated, and miscellaneous interior and exterior parts are missing. Twigg's report indicates the vehicle has forklift damage to the right mirror and the left tail light is missing. The photo shows that the right door and mirror are damaged.

Based upon the evidence presented, including the damage disclosure statement, the high purchase price, and HB Auto's original estimate of value, the Court finds that Vehicle #64 was in average condition and that the value of the vehicle immediately prior to being moved to the Lower Lot was $7,175. Given that parts of this vehicle are missing, particularly interior parts, the Court also concludes that an intervening criminal act occurred after Brokers moved Vehicle #64 to the Lower Lot. Consequently, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot. The Court will not award damages for injury subsequent to it being moved to the Lower Lot.

**Vehicle #65:**

Description: 1994 Ford Mustang, VIN 1FALP42T9RF234788

Mileage: 80,016
Date purchased by HB Auto: April 18, 2001
Purchase price: $1,400
NADA value on August 1, 2002: $7,533
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $4,500
Spears's estimate of present value (as of August 1, 2007): $650
Other evidence: The bill of sale indicates this vehicle was sold to HB Auto at auction as damaged and disabled with the engine and transmission gone. Hassan Ahmadi testified that he bought Vehicle #65 because HB Auto already owned the parts to put in the vehicle. Twigg's report indicates that the vehicle has forklift damage with the left mirror and right quarter glass broken. Spears's report indicates the vehicle has forklift damage to the rocker panel, floor board, and exhaust. Also, miscellaneous body parts are missing, glass is broken, the paint is faded, the interior is depreciated, the airbags are missing, and the wheels and tires are missing. The photo in evidence shows that this vehicle appears to have been vandalized, with various parts taken out of the interior.

After reviewing the evidence, the Court finds that Vehicle #65 had a value of $3,900 prior to being moved to the Lower Lot. While the vehicle was missing an engine and transmission when purchased, obviously these parts had been replaced prior to the incident, as neither Twigg nor Spears noted that these parts were missing on their reports. A value of $3,800 is only 51.8% of the NADA value, thereby allowing for a sufficient deduction even if this vehicle were to be considered a salvage vehicle.

There is evidence of an intervening criminal act after Brokers moved Vehicle #65 to the Lower Lot. Given the evidence of vandalism, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot. Therefore, the Court will not award damages for injury to Vehicle #65 subsequent to it being moved to the Lower Lot.

**Vehicle #66**

Description: 1996 Hyundai Elantra, VIN KMHJF24M3TU257318
Mileage: 115,156

99

Date purchased by HB Auto: July 25, 2001
Purchase price: $500
NADA value on August 1, 2002: $1,825
HB Auto's estimate of value prior to incident: $2,900
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $650
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates HB Auto purchased Vehicle #66 as a red light in the salvage line and notes it had a second and third lien. The damage disclosure statement on the back of the title does not indicate whether the vehicle was damaged such that repairs exceeded 25% of the fair market value. Spears's expert report lists forklift damage to the floor boards and rocker panel. It also notes that the paint is faded and peeling, the interior and tires are dry-rotted, the vehicle is missing miscellaneous interior parts, and the windshield is cracked. Twigg's expert report simply lists bad paint and no damage. The photo shows that the paint is rusted.

The Court finds that the value of the vehicle immediately prior to being moved to the Lower Lot was $1,825 and that it was in average condition. As for forklift damage, the Court notes that Twigg's report does not list "NFLD," thereby implying that Vehicle #66 did have forklift damage. He also listed "no damage." As a result, it is unclear to the Court precisely what forklift damage Twigg identified. Regardless, Spears clearly identified and specifically itemized various damages, and the Court finds this evidence competent and credible. Lastly, there is evidence that parts have been stolen out of this vehicle, therefore, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot. The Court will not award damages for injury to Vehicle #66 subsequent to it being moved to the Lower Lot

**Vehicle #67**

Description: 1997 Suzuki Esteem, VIN JS2GB31SXV5101640, 4-door, white
Mileage: 113,811
Date purchased by HB Auto: September 5, 2001
Purchase price: $550
NADA value on August 1, 2002: $3,075
HB Auto's estimate of value prior to incident: $2,900

100

HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates HB Auto purchased Vehicle #67 at auction as a red light and damaged and disabled, with "miles over." The damage disclosure statement on the back of the title does not indicate that the vehicle was damaged such that repairs exceeded 25% of the fair market value. Spears's report lists forklift damage to the left fender, door, and quarter, the right fender and door, the floor boards, and the rockers. Also, the interior is rotten, the windshield is cracked, the paint is faded, and the tires are dry-rotted. Twigg's report indicates that the left fender and door are damaged. The photo shows the damage to the left side and the rotten interior. Twigg testified at trial that he believed that the wreck damage preceded the vehicle being moved with a forklift because the damage on the exterior of the vehicle appeared to have been caused by opening the driver's door "severely all the way around" until the strap that holds the door broke and the door hit the front fender. Twigg also testified that, based upon the purchase price of $550, the damage must have happened after it was purchased. Twigg further testified that he did not indicate "NFLD" on his report because the left fender could be or could not be from a forklift. Later, he testified that he had just "failed to put no forklift damage."

Brokers argues that Vehicle #67 had sustained the damage to its left side prior to being moved to the Lower Lot, and that its pre-incident value must reflect as such. Having reviewed the evidence, the Court finds that this vehicle sustained significant exterior damage after HB Auto purchased it. Furthermore, this damage is consistent with the type of damage that was inflicted by Brokers when it moved vehicles to the Lower Lot, and Spears clearly identified this damage as forklift damage. During his testimony, Twigg appeared unsure of his opinion on this vehicle, and in fact, his testimony was inconsistent. The Court finds that the value of Vehicle #67 immediately prior to being moved to the Lower Lot was $2,900. Also, the Court finds that the value of the vehicle after the incident was $500.

**Vehicle #68:**

Description: 1994 Dodge Caravan, VIN 2B4GH2535RR664705, van
Mileage: 112,311
Date purchased by HB Auto: November 28, 2001
Purchase price: $450

101

NADA value on August 1, 2002: unknown
HB Auto's estimate of value prior to incident: $2,800
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: no opinion
Spears's estimate of present value (as of August 1, 2007): no opinion
Other evidence: The bill of sale indicates Vehicle #68 was sold to HB Auto at auction as damaged and disable with "miles over."  The damage disclosure statement indicates the vehicle was not damaged such that repairs exceeded 25% of the fair market value, nor is it a salvage, flood, theft or reconstructed vehicle.

The Court finds that HB Auto is not entitled to any damages attributable to Vehicle #68.

HB Auto did not meet its burden to show that this vehicle was one of those damaged by Brokers, and there is no evidence of forklift damage.

**Vehicle #69:**

Description: 1992 Acura Vigor, VIN JH4CC2657NC020172
Mileage: 122,570
Date purchased by HB Auto: July 10, 2001
NADA value on August 1, 2002: $6,050
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence:  Twigg's expert report lists that the left fender, hood, left lamps, and grille are missing and that the vehicle has no forklift damage.  Spears's expert report states that the vehicle has forklift damage to the floor boards and rocker panel.  It also indicates that the tires and interior are dry-rotted, the paint is faded and peeling, miscellaneous interior and exterior parts are missing, the vehicle has miscellaneous dents, and the glass is broken.  The photo in evidence shows that Vehicle #69 has been extensively vandalized.

After reviewing the evidence, the Court finds that Vehicle #69 had a value of $3,900 prior to being moved to the Lower Lot.  This value is only 64.5% of the NADA value, which is well within the parameters set forth by the experts.  There is, however, evidence of an intervening criminal act after Brokers moved Vehicle #69 to the Lower Lot.  Given this evidence of vandalism, the Court cannot determine with reasonable certainty the amount of damage

proximately caused by Brokers once this vehicle was moved to the Lower Lot.  Therefore, the

Court will not award damages for injury to Vehicle #69 subsequent to it being moved to the

Lower Lot.

**Vehicle #70**

> Description: 1995 Ford Contour, VIN 1FALP6536SK194173,[34] charcoal
> Mileage: 158,130
> Date purchased by HB Auto: February 21, 2001
> Purchase price: $550
> NADA value on August 1, 2002: $1,725
> HB Auto's estimate of value prior to incident: $2,400
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: $1,000
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates that HB Auto purchased Vehicle #70 at auction
> as a red light, damaged and disabled, with miles over, and "transmission bad."  Spears's
> expert report indicates that the vehicle has forklift damage to the floor boards, the
> rockers, and the left fender and doors.  It also lists that the paint is faded and the interior
> and tires are dry-rotted.  Twigg's expert report indicates that the left fender was damaged
> by a forklift.

The Court finds that the value of Vehicle #70 immediately prior to being moved to the

Lower Lot was $1,725.  While the vehicle had some announced conditions when sold to HB

Auto, HB Auto's ordinary practice was to promptly repair vehicles.  None of the announced

conditions were of the type described by the experts that would affect a vehicle's value after

repair.  The Court notes that Spears and Twigg agree that this vehicle has been damaged by a

forklift.

**Vehicle #71:**

---

[34] Various exhibits admitted into evidence list the VIN for Vehicle 70 as beginning with
the number 4, but the title indicates it begins with the number 1.

Description: 1989 Ford F-150, VIN 1FTEX15H8KKB70037,[35] truck
Mileage: 41,949
Date purchased by HB Auto: May 30, 2001
Purchase price: $800
NADA value on August 1, 2002: $4,840
HB Auto's estimate of value prior to incident: $4,800
HB Auto's estimate of value after incident: $2,200
Spears's estimate of value after incident: $1,200
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: The bill of sale indicates HB Auto purchased the vehicle at auction as a red light and damaged and disabled with the notation "miles over." The odometer disclosure certifies that the mileage reflected is accurate. Spears's report lists forklift damage to the drive shaft, left door, and bedside, and that the paint is faded and rusting, the "glass busted," the interior is rotten, and the tires are dry-rotted. Twigg's report states that the vehicle has forklift damage, the grille is missing, and "body full of junk."

After reviewing the evidence, the Court finds that Vehicle #71 had a value of $4,800 prior to being moved to the Lower Lot. The Court notes that when purchased by HB Auto, the vehicle did not have any conditions that would cause a permanent reduction in value, such as flood or salvage history. The Court notes that Spears and Twigg agree that this vehicle was damaged by a forklift.

**Vehicle #72:**

Description: 1995 Ford Contour, VIN 1FALP6531SK103746,[36] 4-door, green
Mileage: 97,015
Date purchased by HB Auto: September 6, 2000
Purchase price: $900
NADA value on August 1, 2002: $1,725
HB Auto's estimate of value prior to incident: $3,200
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,300
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates that HB Auto purchased Vehicle #72 at auction

---

[35] Again, various exhibits admitted into evidence list the VIN for Vehicle #71 as beginning with the number 4, but the title indicates it begins with the number 1.

[36] Again, various exhibits admitted into evidence list the VIN for Vehicle #72 as beginning with the number 4, but the title indicates it begins with the number 1.

as a red light in the salvage line. Spears's report lists forklift damage to the left rear door, left front door, and left rear suspension. It also notes that the paint is faded, the interior is depreciated, and the tires are dry-rotted. Twigg's report indicates no damage and no forklift damage. The photo in evidence shows the damage to the door.

After reviewing the evidence, the Court finds that Vehicle #72 had a value of $1,725

prior to being moved to the Lower Lot. In addition, the Court finds that Brokers has

demonstrated that this vehicle was damaged by the move to the Lower Lot, reducing its value to

$1,000.

**Vehicle #73:**

> Description: 1995 Dodge Neon, VIN 1B3ES47C2SD143326, 4-door
> Mileage: 152,755
> Date purchased by HB Auto: August 22, 2001
> Purchase price: $325
> NADA value on August 1, 2002: $1,775
> HB Auto's estimate of value prior to incident: $2,600
> HB Auto's estimate of value after incident: $600
> Spears's estimate of value after incident: $600
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale indicates HB Auto purchased Vehicle #73 at auction as a red light in the salvage line with "miles over." The odometer disclosure certifies that the mileage stated is in excess of the vehicle's mechanical limits. Spears's report lists forklift damage to the floor boards, rockers, left door, and fender. It also notes that the paint is faded and peeling and the tires and interior are dry-rotted. Twigg's report lists collision damage to left front and no forklift damage.

After reviewing the evidence, the Court finds that Vehicle #73 had a value of $1,775

prior to being moved to the Lower Lot by Brokers. This vehicle had mileage in excess of the

vehicle's mechanical limits, but a value of $1,775 includes an adjustment for mileage. In

addition, the Court finds that HB Auto has demonstrated that this vehicle was damaged by the

move to the Lower Lot, despite Twigg's opinion that there was no forklift damage, and its value

was reduced to $600. Twigg did not examine underneath this vehicle, and whether the damage

on the left side of the vehicle is attributed to forklift damage or collision damage, the damage is

consistent with the testimony of the Brokers's employees regarding the type of damage inflicted.

**Vehicle #74:**

Description: 1992 Hyundai Scope, VIN KMHVE22J9NU105902, 2-door, red
Mileage: 116,856
Date purchased by HB Auto: October 6, 1999
Purchase price: $175
NADA value on August 1, 2002: $1,325
HB Auto's estimate of value prior to incident: $2,800
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The disclosure statement on the title certifies that the odometer reading is not the actual mileage. Spears's expert report lists forklift damage to the floor boards, rockers, and right rear suspension. It also notes that the paint is faded, the tires and interior are dry-rotted, and the windshield is cracked. Twigg's expert report lists "bad paint" and no forklift damage. Twigg testified that since the odometer was not the actual mileage on Vehicle #74, he would look at the overall condition if he were determining value. Hossein Ahmadi confirmed in testimony at trial that this vehicle sat on the lot for approximately two and a half years.

After reviewing the evidence, the Court finds that Vehicle #74 had a value of $1,193 prior to being moved to the Lower Lot by Brokers. While the NADA value, based upon an average condition, was $1,325, this vehicle was not in average condition because it had been sitting on the lot for approximately two and a half years. The evidence in this case establishes that this vehicle's condition would have deteriorated as a result of this sitting. In addition, the Court finds that HB Auto has demonstrated that this vehicle was damaged by the move to the Lower Lot, reducing its value to $800, despite Twigg's opinion that there was no forklift damage.

**Vehicle #75:**

Description: 1995 Mazda MP2, VIN JM3LV5227S0714325, van
Mileage: 62,750
Date purchased by HB Auto: August 16, 2000
Purchase price: $4,470

NADA value on August 1, 2002: $7,150
HB Auto's estimate of value prior to incident: $5,500
HB Auto's estimate of value after incident: $2,000
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence:  The bill of sale indicates HB Auto purchased the vehicle at auction as a
red light and the anti-lock light was illuminated.  Spears's expert report indicates forklift
damage to the rocker panel and floorboard.  It also notes that the driver's mirror is
missing, the turn signal is missing, the tires are dry-rotted, the interior depreciated, and
the paint is faded and peeling.  Twigg's report indicates that the vehicle has forklift
damage including a "right front bad collision," rear bumper, and left tail light damage.
Spears testified that he disagreed with HB Auto's post-incident value of $2,000 and
confirmed he felt the value was $800.  Twigg also testified regarding Vehicle #75, stating
that an anti-lock light can cost $2,000 to fix, but that if it was fixed, "it has nothing to do
with the value."

After reviewing the evidence, the Court finds that Vehicle #75 had a value of $5,500

prior to being moved to the Lower Lot.  When purchased by HB Auto, the vehicle did not have

any conditions that would result in a permanent reduction to its value.  The vehicle had been

sitting on the Property for some time, but a value of $5,500, which is 76.9% of the NADA value,

is well within the parameters set forth by the experts.  There is no dispute that this vehicle was

damaged by a forklift.

**Vehicle #76:**

Description: 1997 Plymouth Neon, VIN 1P3ES47C3VD254504, 4-door
Mileage: 113,376
Date purchased by HB Auto: August 22, 2001
Purchase price: $750
NADA value on August 1, 2002: $3,725
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $400
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates the vehicle was sold to HB Auto at auction as
damaged and disabled with "miles over."  The damage disclosure statement does not
indicate that this vehicle had been damaged such that repairs exceeded 25% of the fair
market value.  Spears's report indicates Vehicle #76 has forklift damage to the floor
boards and rocker panels.  It also notes that the back glass is "busted,"  the windshield is

107

cracked, the interior is rotten, the tires are dry-rotted, and the paint is faded.  Twigg's report indicates the vehicle has forklift damage with the back glass broken.

The Court finds that Vehicle #76 had a value of $3,000 prior to being damaged by Brokers.  Also, the Court notes that the experts do not dispute that this vehicle had forklift damage.

**Vehicle #77:**

> Description: 1998 Kia Sephia, VIN KNAFB1211W5720657, 4-door, black
> Mileage: 58,949
> Date purchased by HB Auto: July 25, 2001
> Purchase price: $845
> NADA value on August 1, 2002: $4,625
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $850
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale indicates Vehicle #77 was sold to HB Auto at auction as a red light with frame damage.  Twigg's expert report indicates the vehicle has forklift damage to the left quarter panel and that the left rear door glass is broken.  Spears's expert report lists forklift damage to the floor boards and rocker panel.  It also notes that miscellaneous internal parts are missing, glass is broken, the paint is deteriorated, and the tires are dry-rotted.  The photos show damage to the left side, right side, and back of the vehicle, and missing interior parts.

The Court finds that Vehicle #77 had a value of $2,500 prior to being damaged by Brokers.  While the vehicle has frame damage, a condition that reduced the value even after HB Auto repaired it, this value is only 54% of the NADA value and well below the guidelines for valuation set forth by the experts for a vehicle with a history of frame damage.  Also, the Court notes that the experts do not dispute that this vehicle had forklift damage.  Lastly, there is evidence of an intervening criminal act after Brokers moved Vehicle #77 to the Lower Lot: it is missing various internal parts.  As a result, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower

Lot.  Therefore, the Court will not award damages for injury to Vehicle #77 subsequent to it being moved to the Lower Lot.

**Vehicle #78:**

> Description: 1994 Dodge Spirit, VIN 3B3AA4639RT215937
> Mileage: 173,474
> Date purchased by HB Auto: October 22, 1997
> Purchase price: unknown
> NADA value on August 1, 2002: $1,275
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $200
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: Spears's report lists forklift damage to the floor boards, rockers, right quarter, both doors, and fender.  It also notes that the paint is faded, the interior and tires are dry-rotted, the windshield is cracked, and miscellaneous parts of the vehicle are missing.  Twigg's report states "rough vehicle" and no forklift damage.  Hossein Ahmadi confirmed in testimony at trial that this vehicle had been sitting on the Property since 1997 before it was moved to the Lower Lot.

After reviewing the evidence, the Court finds that Vehicle #78 had a value of $1,084 prior to being moved to the Lower Lot by Brokers.  The NADA value at the time was $1,275 based upon an average condition, but this vehicle had been sitting on the Property for approximately four  years.  The evidence in this case establishes that this vehicle's condition would have deteriorated as a result of this sitting and it would not have been in average condition.  Also, the evidence shows that this vehicle has been vandalized; therefore, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot.  Consequently, the Court will not award damages for injury to Vehicle #78 subsequent to it being moved to the Lower Lot.

**Vehicle #79:**

> Description: 1996 Mazda 626, VIN 1YVGE22C9T5573239, black
> Mileage: 105,608

Date purchased by HB Auto: March 6, 2002
Purchase price: $600
NADA value on August 1, 2002: $4,225
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates Vehicle #79 was sold to HB Auto at auction as damaged and disabled with over 100,000 miles. The damage disclosure statement certifies that this vehicle had not been damaged such that repairs exceeded 25% of the fair market value, and it was not a salvage, flood, theft, or reconstructed vehicle. Spears's expert report lists forklift damage to the floor board, rockers, right fender, right front door, and suspension. It also notes that the tires are dry-rotted, the paint is faded, and the interior is deteriorated. Twigg's expert report indicates the vehicle has forklift damage with the right fender damaged. At trial, Hossein Ahmadi testified that he did not know when the vehicle was moved to the Lower Lot and that it was purchased during the time period that he and his brother were not repairing vehicles because their father was undergoing medical treatment. Photos show the damage on the right side.

For the purposes of valuation, the Court will assume that the vehicle was not prepared for resale prior to being moved to the Lower Lot, and accordingly, that it was in less than average condition. The Court finds that Vehicle #79 had a value of $3,000 immediately before the incident. This value is 71% of the NADA value and is low enough to account for the vehicle's less than average condition. There is no dispute among the experts that this vehicle sustained forklift damage.

**Vehicle #: 80**

Description: 1996 Chevrolet Cavalier, VIN 4G1JF3246TB103430
Date purchased by HB Auto: July 11, 2003

Vehicle #80 must be excluded from the list of vehicles damaged by Brokers's negligence. This vehicle was purchased in 2003, which was after HB Auto relocated to its new place of business, and therefore, after the incident. Accordingly, HB Auto is not entitled to any damages attributable to Vehicle #80.

**Vehicle #81:**

> Description: 1995 Chevrolet Beretta, VIN 1G1LV1545SY322016, 2-door, red
> Mileage: 162,127
> Date purchased by HB Auto: August 8, 2001
> Purchase price: $370
> NADA value on August 1, 2002: $1,900
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $1,300
> Spears's estimate of value after incident: $400
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale indicates this vehicle was sold to HB Auto at auction in
> the salvage line. The disclosure on the back of the title indicates that the mileage stated
> is in excess of the odometer's mechanical limits. Twigg's report lists no damage and no
> forklift damage. Spears's report lists forklift damage to the floor boards and rockers, as
> well as that the paint is faded and tires and interior are dry-rotted. Spears testified at trial
> that he believed his $400 after incident value was accurate.

After reviewing the evidence, the Court finds that Vehicle #81 had a value of $1,900

prior to being moved to the Lower Lot by Brokers. The vehicle had mileage in excess of the

vehicle's mechanical limits, but this value includes an adjustment for mileage. In addition, the

Court finds that HB Auto has demonstrated that this vehicle was damaged by the move to the

Lower Lot, reducing its value to $1,300.

**Vehicle #82:**

> Description: 1993 Nissan Altima, VIN 1N4BU31F4PC102529, 4-door
> Mileage: 150,954
> Date purchased by HB Auto: June 6, 2000
> Purchase price: $750
> NADA value on August 1, 2002: $2,550
> HB Auto's estimate of value prior to incident: $2,800
> HB Auto's estimate of value after incident: $500
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale indicates HB Auto purchased Vehicle #82 at auction as a
> red light in the salvage line with "miles over." Twigg's expert report lists damage to the
> right fender and bumper cover, with a hard collision to right rear, and no forklift damage.
> Spears's report lists forklift damage to the rocker panel and exhaust. It also notes that the
> windshield is cracked, the paint is faded, chipping, and rusting, the door glass is

111

"busted," the interior is dry-rotted, and the vehicle has various dings and dents.

After reviewing the evidence, the Court finds that Vehicle #82 had a value of $2,295 prior to being moved to the Lower Lot by Brokers.  This vehicle had been sitting on the lot for almost two  years prior to the incident.  The evidence in this case establishes that this vehicle's condition would have deteriorated as a result of this sitting and it would not have been in average condition.  The Court finds that HB Auto has also established that this vehicle sustained forklift and collision damage as a result of actions taken by Brokers, resulting in a reduction in the value to $500 immediately after the incident.

**Vehicle #83:**

> Description: 1992 Nissan Stanza, VIN JN1FU21P9NX906526, 4-door, black
> Mileage: 100,070
> Date purchased by HB Auto: February 23, 2000
> Purchase price: $200
> NADA value on August 1, 2002: $3,050
> HB Auto's estimate of value prior to incident: $1,900
> HB Auto's estimate of value after incident: $500
> Spears's estimate of value after incident: $400
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale indicates HB Auto purchased Vehicle #83 at auction as a red light in the salvage line.  Twigg's expert report stated the vehicle has "bad paint" and no forklift damage.  Spears's report lists forklift damage to the right rear door, rocker panel, and exhaust.  It also notes that the paint is faded and the tires and interior are dry-rotted.  Hassan Ahmadi testified that Vehicle #83 was in good condition prior to the incident.

The Court finds that Vehicle #83 had a value of $1,900 prior to being damaged by Brokers.  The vehicle had been sitting on the lot for more than two years.  This value is low enough (only 62.3% of the NADA value) to account for the resulting deterioration and is well within the parameters of a reasonable value as set forth by the experts in this case.  Lastly, the Court finds that HB Auto has demonstrated that this vehicle was damaged by Brokers during the

112

move to the Lower Lot.

**Vehicle #84:**

> Description: 1993 Nissan Maxima, VIN JN1EJ01F5PT417017
> Mileage: 125,459
> Date purchased by HB Auto: June 23, 1999
> Purchase price: $2,700
> NADA value on August 1, 2002: $4,925
> HB Auto's estimate of value prior to incident: $4,800
> HB Auto's estimate of value after incident: $1,900
> Spears's estimate of value after incident: $600
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates the vehicle was sold to HB Auto at auction with over 100,000 miles and "noisy lifters." Spears's report indicates forklift damage to the floor boards and rocker panel, and that the paint is faded and peeling, the interior and tires are dry-rotted, and the moon roof is "busted." Twigg's report notes "bad paint" and no forklift damage. Spears testified that he disagreed with HB Auto's after incident value for Vehicle #84. Twigg testified that he did not agree with Spears's after incident value of $600 because he did not see how the rocker panel and floorboard damage could reduce the overall value of the vehicle that much. He testified that he felt there was wreck damage on this vehicle, but later corrected himself stating that this vehicle did not have wreck damage. He also testified that "noisy lifters" could be caused by "an engine that is sludged up and the oil's not going to the filters" or "bad engine wear." Twigg described that a quick fix for this problem would be "if somebody stuck lifters in it" but in his opinion that would not be a proper repair. Hassan Ahmadi testified that the noisy lifters were repaired on this vehicle by some contract workers who did that work for $50-$60. He also read deposition testimony into the record in which he stated that a reference to "noisy lifters" meant "lifters making a little bit of noise," that he did not know what lifters were. He testified that did not know why it would be important to tell people about noisy lifters on a vehicle.

The Court finds that Vehicle #84 had a value of $4,433, or 90% of the NADA value, prior to being damaged by Brokers. The vehicle had been sitting on the Property for almost three years before being moved to the Lower Lot, and it has been established that a vehicle that sits parked for an extended period of time will deteriorate. Accordingly, this vehicle was in below average condition before it was ever moved by Brokers. Also, the fact that the vehicle sat for so long reflects poorly on its value. Nevertheless, the Court notes that HB Auto invested

much more than average purchasing this vehicle, and the Court finds it credible, given how much HB Auto paid for it and Hassan Ahmadi's testimony, that the "noisy lifters" were repaired.

The Court also finds that HB Auto has demonstrated that this vehicle was damaged by Brokers during the move to the Lower Lot.  Brokers challenged Spears's after incident value during the trial, and the Court agrees that Spears's estimate for Vehicle #84 appears too low.  As the Court has already stated, however, HB Auto was in a much better position to provide an accurate post-incident value, which it estimated at $1,900.

**Vehicle #85:**

> Description: 1993 Nissan Maxima, VIN JN1HJ01F4PT070809, 4-door
> Mileage: 198,583
> Date purchased by HB Auto: June 13, 2001
> Purchase price: $500
> NADA value on August 1, 2002: $4,175
> HB Auto's estimate of value prior to incident: $4,000
> HB Auto's estimate of value after incident: $1,400
> Spears's estimate of value after incident: $600
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: The bill of sale indicates Vehicle #85 was sold to HB Auto at auction in the salvage line with "miles over."  Spears's expert report lists forklift damage to the floorboards, rocker panels, and left fender.  It also notes that the paint is faded and aged, the interior is deteriorated, the windows are "busted," and the tires are dry-rotted. Twigg's report does not include any remarks about Vehicle #85.  Hassan Ahmadi testified that he did not remember anything specific about repairing this vehicle.

After reviewing the evidence, the Court finds that Vehicle #85 had a value of $4,000 prior to being moved to the Lower Lot.  HB Auto has also established that the vehicle was significantly damaged by Brokers when it was moved to the Lower Lot, reducing the value to $1,400.

**Vehicle #86:**

> Description: 1996 Oldsmobile Ciera, VIN 1G3AJ55M0T6355603, white
> Mileage: 133,448

114

Date purchased by HB Auto: May 3, 2000
Purchase price: $800
NADA value on August 1, 2002: $3,225
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $2,000
Spears's estimate of value after incident: $600
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates HB Auto purchased Vehicle #86 at auction as a red light in the salvage line with the engine "locked up" and true mileage unknown. The damage disclosure statement does not indicate that the vehicle had been damaged with repairs in excess of 25% of the value. Twigg's report indicates the vehicle has roof damage and forklift damage. Spears's report indicates forklift damage to floor boards, rocker panel, right front door, and right front bumper. It also notes that the paint is faded, the tires are dry-rotted, and the interior is deteriorated. Hassan Ahmadi testified that HB Auto repaired Vehicle #86 by installing a new fuel injection computer. The roof is visible on the photo, but no damage to it is visible.

The Court finds that Vehicle #86 had a value of $2,500 prior to being damaged by Brokers. The vehicle had been sitting on the lot for approximate two years; however, this value is low enough (only 77.5% of the NADA value) to account for the resulting below average condition.

**Vehicle #87:**

Description: 1997 Oldsmobile Cutlass, VIN 1G3WH52M5VF321424, 4-door
Mileage: 53,979
Date purchased by HB Auto: July 26, 2000
Purchase price: $3,915
NADA value on August 1, 2002: $8,225
HB Auto's estimate of value prior to incident: $4,500
HB Auto's estimate of value after incident: $2,500
Spears's estimate of value after incident: $2,000
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: The bill of sale indicates HB Auto purchased Vehicle #87 at auction as a red light, with the true mileage unknown and the speedometer not working. The damage disclosure statement does not indicate that the vehicle had been damaged with repairs in excess of 25% of the value. Spears's expert report indicates forklift damage to the left side, rocker panel, and floor board. It also notes that the windshield is cracked, the tires are dry-rotted, the paint is chipped and faded, and the interior is depreciated. Twigg's expert report lists no damage and no forklift damage.

The Court finds that Vehicle #87 had a value of $4,500 prior to being damaged by Brokers. The vehicle had been sitting on the lot for approximately twenty months prior to the incident. Notwithstanding, this value is low enough (only 54.7% of the NADA value) to account for the resulting below average condition and the mileage issues. The Court also finds that HB Auto established that Brokers damaged this vehicle with a forklift.

**Vehicle #88:**

> <u>Description</u>: 1996 Oldsmobile Achieva, VIN 1G3NL52M1TM301383, 4-door, white
> <u>Mileage</u>: 99,160
> <u>Date purchased by HB Auto</u>: March 7, 2001
> <u>Purchase price</u>: $900
> <u>NADA value on August 1, 2002</u>: $3,700
> <u>HB Auto's estimate of value prior to incident</u>: $2,500
> <u>HB Auto's estimate of value after incident</u>: $1,000
> <u>Spears's estimate of value after incident</u>: $300
> <u>Spears's estimate of present value (as of August 1, 2007)</u>: $50
> <u>Other evidence</u>: The bill of sale indicates HB Auto purchased Vehicle #88 at auction in the salvage line with the announced condition of "water in oil." Spears's expert report lists forklift damage to the right front hubcap and wheel. It also notes that the paint is faded and peeling, the interior is rotten, and the tires are dry-rotted. Twigg's report indicates no damage and no forklift damage.

The Court finds that Vehicle #88 had a value of $2,500 prior to being damaged by Brokers. This value is well within the parameter set forth by the experts. When purchased by HB Auto, the vehicle did not have any conditions which would permanently impact the value, and this value is only 67.6% of the NADA value. The Court also finds that HB Auto established that Brokers damaged this vehicle with a forklift.

**Vehicle #89**

> <u>Description</u>: 1995 Oldsmobile Achieva, VIN 1G3NL55D9SM322850, 4-door
> <u>Mileage</u>: 87,909
> <u>Date purchased by HB Auto</u>: March 24, 1999
> <u>NADA value on August 1, 2002</u>: $3,800
> <u>HB Auto's estimate of value prior to incident</u>: $4,000

116

HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,000
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: Spears's expert report indicates the rocker and floor board were damaged by a forklift, and the paint is faded and tires and interior are dry-rotted. Twigg's expert report lists bad paint, no damage, and no forklift damage.

After reviewing the evidence, the Court finds that Vehicle #89 had a value of $3,230 prior to being moved to the Lower Lot by Brokers. This vehicle had been sitting on the Property for about three years with no explanation as to why. This vehicle's condition would have deteriorated as a result; therefore, the Court finds that the vehicle had a value less than the NADA value for a similar vehicle in average condition. Also, the Court finds that HB Auto has established that Brokers damaged this vehicle with a forklift, reducing the value to $1,000.

**Vehicle #90**

Description: 1994 Oldsmobile Cutlass, VIN 1G3WH15M8RD308544, 2-door, blue
Mileage: 113,557
Date purchased by HB Auto: August 2, 2000
Purchase price: $1,250
NADA value on August 1, 2002: $3,750
HB Auto's estimate of value prior to incident: $2,900
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The bill of sale indicates HB Auto purchased Vehicle #90 at auction as a green light, as is, with over 100,000 miles. Twigg's expert report lists no damage and no forklift damage. Spears's expert report indicates forklift damage to the rocker, floor boards, left door, and left fender. It also notes that the paint is faded and the tires and interior are dry-rotted. The photo shows the damage to the left side of the vehicle, including vertical indentations.

The Court finds that Vehicle #90 had a value of $2,900 prior to being damaged by Brokers. HB Auto has also established that Brokers damaged this vehicle with a forklift. The photo clearly shows that this vehicle was damaged. Twigg's report, which indicates that the vehicle had no damage of any kind, is clearly inaccurate.

117

**Vehicle #91**

Description: 1998 Ford Mustang, VIN 1FAFP4049WF173267, red
Mileage: 280
Date purchased by HB Auto: December 11, 1998
Purchase price: $1,250
NADA value on August 1, 2002: $11,700
HB Auto's estimate of value prior to incident: $10,000
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $2,300
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence:  Vehicle #91 was purchased by HB Auto as a salvage vehicle as defined by N.C. Gen. Stat. § 20-4.01(33)(d).  HB Auto submitted documentation into evidence that the vehicle was reconstructed and inspected by Inspector Beck.  An unbranded title was issued on April 19, 2000.  At trial, the Court heard extensive testimony regarding this vehicle.  Billy Hunt testified that he was going to purchase Vehicle #91 for his daughter and described it as "brand new."  Hunt testified that unlike any of the other vehicles he moved, he rolled this vehicle to the Lower Lot himself so it would not be damaged on the way down to the lot.  He testified that shortly after it was moved to the Lower Lot, numerous parts were stolen off of it.  Twigg's report lists damage to the left door, trunk lid, left front 3/4 missing, rear glass broken, and no forklift damage.  Spears's report lists forklift damage to floor boards, rocker, and right rear quarter panel, and indicates that the vehicle is missing numerous miscellaneous parts, has "busted back glass," and has dry-rotted interior and tires.  At trial, Spears testified that despite Hunt's testimony, he did see damage on Vehicle #91 that was "clearly from a forklift."  Twigg testified that there was a clamp on this vehicle that indicated to him that someone was doing frame work on the vehicle.  The police report dated May 3, 2002 documents the theft of various parts from this vehicle.

Through both documentary evidence and the testimony of Billy Hunt, HB Auto has established that Vehicle #91 had been completely repaired and restored prior to being moved to the Lower Lot, and that it was in good condition, ready to be sold.  Brokers, however, has established that this vehicle was not damaged when moved to the Lower Lot.  Unfortunately, it was severely vandalized shortly thereafter.  Hunt's testimony in this regard was very credible.  He clearly remembered this specific vehicle, the care he took in moving it, and the subsequent theft and vandalism.  As a result, HB Auto has not shown that it incurred any damages when Brokers moved Vehicle #91 to the Lower Lot.  The Court notes that it finds Spears's report and

118

testimony that he did find evidence of forklift damage on Vehicle #91 credible even in light of Hunt's testimony. There is evidence that some vehicles were repositioned with a forklift after they were parked in the Lower Lot. Spears's finding is consistent with this evidence. Notwithstanding, because this vehicle was virtually destroyed by an intervening criminal act, the Court cannot determine with reasonable certainty the amount of damage, if any, proximately caused by Brokers after this vehicle was moved to the Lower Lot. As a result, the Court will not award any damages for injury to Vehicle #91.

**Vehicle #92**

> Description: 1991 Pontiac Firebird, VIN 1G2FS23T3ML231375, green
> Mileage: 127,240
> Date purchased by HB Auto: July 21, 1998
> Purchase price: unknown
> NADA value on August 1, 2002: $4,450
> HB Auto's estimate of value prior to incident: $3,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $3,000
> Spears's estimate of present value (as of August 1, 2007): $200
> Other evidence: Twigg's expert report lists Vehicle #92 as a "rough vehicle" with no forklift damage. Spears's expert report indicates forklift damage to the left quarter, door and fender, floor boards, and rockers. It also notes that the paint is faded, peeling, and rusting, the interior and tires are dry-rotted, and miscellaneous parts are missing. The photos show the damage to the left side and peeling paint.

The Court finds that Vehicle #92 had a value of $3,500 prior to being damaged by Brokers. The vehicle had been sitting on the lot for an extended period of time; however, this value is low enough (only 78.6% of the NADA value) to account for the resulting below average condition. The Court also finds that HB Auto established that Brokers damaged this vehicle with a forklift, reducing the value to $1,000.

**Vehicle #93**

> Description: 1998 Ford Windstar, VIN 2FMZA5141WBC10287, van

Mileage: 98,226
Date purchased by HB Auto: October 3, 2001
Purchase price: $1,705
NADA value on August 1, 2002: $7,175
HB Auto's estimate of value prior to incident: $5,500
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $2,500
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The bill of sale indicates that HB Auto purchased this vehicle at auction as a red light, damaged and disabled with the "engine locked up." The damage disclosure statement on the title indicates that the vehicle has not been damaged such that it needed repairs costing more than 25% of the fair market value and it is not a flood, reconstruction, or salvage vehicle. Spears's expert report indicates the vehicle has forklift damage to the floor boards, rockers, exhaust, right front door, fender, rear, sliding door and quarter. It also notes that the paint is faded and peeling, the glass is "busted," the airbags are missing, and the tires and interior are dry-rotted. Twigg's report lists damage to the right fender and door, "w/s evidence of partial repair," and no forklift damage. The photo shows a long vertical dent on the right door along with other damage.

The Court finds that, prior to being damaged by Brokers, Vehicle #93 had a value of $5,500, which is equal to HB Auto's estimate of the value. This value is well within the parameters set forth by the experts. This vehicle had no conditions or history which would permanently reduce its value. The Court also finds that HB Auto established that Brokers damaged this vehicle with a forklift. The Court notes that HB Auto's estimate of value after incident reduces the value of Vehicle #93 to less than 20% of the starting value. This figure is consistent with the significant damage (documented by Spears and visible in the photo) that this vehicle sustained.

There is evidence of an intervening criminal act after Brokers moved Vehicle #93 to the Lower Lot: the airbags are missing and a window is broken. The Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot. Therefore, the Court will not award damages for injury to Vehicle #93

subsequent to it being moved to the Lower Lot.

**Vehicle #94**

> Description: 1996 Mitsubishi Eclipse, VIN 4A3AK54F9PTE246835, 2-door
> Mileage: 76,223
> Date purchased by HB Auto: October 31, 2001
> NADA value on August 1, 2002: $9,375
> HB Auto's estimate of value prior to incident: $5,000
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: $2,200
> Spears's estimate of present value (as of August 1, 2007): $300
> Other evidence:  The damage disclosure statement on the title indicates that when
> purchased by HB Auto, the vehicle had not been damaged such that it needed repairs
> costing more than 25% of the fair market value and it was not a flood, reconstruction or
> salvage vehicle.  Spears's expert report indicates the vehicle has forklift damage to the
> floor boards, rockers, right door, quarter, and rear bumper.  It also notes that the paint is
> faded, the right door glass is "busted," miscellaneous interior and exterior parts are
> missing, and the tires and interior are dry-rotted.  Twigg's report lists damage to the front
> bumper.  It also indicates that the lamps, radio, and airbags are missing, and the vehicle
> has no forklift damage.  The photos show various damage and that parts have been ripped
> out of this vehicle.

The Court finds that prior to being damaged by Brokers Vehicle #94 had a value of

$5,000, which is equal to HB Auto's estimate of the value.  This value is only 53.3% of the

NADA value and is well below the parameters set forth by the experts, particularly since this

vehicle was accompanied with a disclosure that it had not been damaged in excess of 25% of the

fair market value and it was not a flood, reconstruction or salvage vehicle.  There is evidence,

however, of an intervening criminal act after Brokers moved Vehicle #94 to the Lower Lot:

numerous parts have been stolen.  This unforeseeable intervening act relieves Brokers of liability

for subsequent damage by breaching the causal connection between its own negligence and the

subsequent injury.  Therefore, the Court will not award damages for injury to Vehicle #94

subsequent to it being moved to the Lower Lot.

**Vehicle #95**

Description: 1997 Hyundai Tiburan, VIN KMHJG34F6VU033807[37]
Mileage: 100,803
Date purchased by HB Auto: September 4, 2002
Purchase price: $450
NADA value on August 1, 2002: $4,225
HB Auto's estimate of value prior to incident: $3,800
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $900
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction as a
red light and damaged and disabled with miles over.  The damage disclosure statement on
the title indicates that, when purchased by HB Auto, the vehicle had not been damaged
such that it needed repairs costing more than 25% of the fair market value and it was not
a flood, reconstruction or salvage vehicle.  It also discloses that the mileage stated is in
excess of the mechanical limits.  Spears's expert report indicates the vehicle has forklift
damage to the floor boards and rocker panels, and that the vehicle has broken windows
and headlamps, the tires and interior are dry-rotted, the paint is faded, and the tail lamps
are broken.  Twigg's report indicates the vehicle has forklift damage to the left fender
and lamps are broken.

The Court finds that Vehicle #95 had a value of $3,800 prior to being damaged by

Brokers.  It was purchased after the Ahmadis return to work, and would have been repaired and

prepared for sale, and none of the conditions with which it was sold to HB Auto would

permanently impact the value, other than the high mileage.  That high mileage is accounted for

in the NADA figure above, and this value is only 89.9% of that figure.  The Court once again

notes that Chris Leonard testified that Brokers employees moved vehicles for several months

after the Ahmadis returned to work on days that the Ahmadis were not present.  While HB Auto

was in the process of establishing a new location for its business when it purchased Vehicle #95,

it did not move the business until October 2002.  The experts do not dispute that this vehicle was

damaged with a forklift.

**Vehicle #96**

---

[37] The Court notes that the chart in evidence contain a typographical error, listing the VIN
as KMHJG34FSVU033807.  The VIN stated above is that which is listed on the vehicle's title.

122

Description: 1987 Volkswagen Cabriolet, VIN WVWCA015XHK000513, convertible
Mileage: 141,876
Date purchased by HB Auto: May 24, 2000
Purchase price: $740
NADA value on August 1, 2002: $2,775
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction as red light with miles over. Twigg's expert report notes that the top and interior are in poor condition, the vehicle has "bad paint," and it has no forklift damage. Spears's expert report indicates forklift damage to the floor boards and rocker panels, and it notes that the convertible top, interior, and tires are dry-rotted, the paint is faded, and some molding is missing.

The Court finds that Vehicle #96 had a value of $2,500 prior to being damaged by Brokers. The vehicle had been sitting on the lot for about two years; however, it had no announced conditions when purchased other than high mileage. The Court also finds that HB Auto established that Brokers damaged this vehicle with a forklift, despite Twigg's report to the contrary.

**Vehicle #97**

Description: 1989 Audi, VIN WAUGC0440KN005348
Mileage: 136,954
Date purchased by HB Auto: August 23, 2001
NADA value on August 1, 2002: $5,500
HB Auto's estimate of value prior to incident: $2,100
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: Twigg's report indicates damage to the left door glass and that the vehicle has forklift damage. Spears's report indicates the vehicle has forklift damage to the floorboards, rockers, right rear door, and right front fender. It also notes that the paint is faded, some glass is broken, and the interior and tires are dry-rotted. The photo shows damage to the left back window.[38]

---

[38] The Court notes that in the binder of photos submitted into evidence, the photo on the 27th page is incorrectly labeled as though it was Vehicle #97, but it is actually Vehicle #62, also

The Court finds that Vehicle #97 had a value of $2,100 prior to being damaged by

Brokers.  The experts do not dispute that this vehicle has forklift damage.

**Vehicle #98**

> <u>Description</u>: 1995 Mazda Protégé LX, VIN JM1BA141XS0134922, 4-door, green
> <u>Mileage</u>: 115,376
> <u>Date purchased by HB Auto</u>: March 6, 2002
> <u>Purchase price</u>: $1,255
> <u>NADA value on August 1, 2002</u>: $2,475
> <u>HB Auto's estimate of value prior to incident</u>: $3,100
> <u>HB Auto's estimate of value after incident</u>: $600
> <u>Spears's estimate of value after incident</u>: $600
> <u>Spears's estimate of present value (as of August 1, 2007)</u>: $50
> <u>Other evidence</u>: The bill of sale indicates HB Auto purchased this vehicle at auction as a
> red light with announced conditions including "sst," over 100,000 miles, and bad CV
> joints.  The damage disclosure statement on the title indicates that the vehicle had not
> been damaged such that it needed repairs costing more than 25% of the fair market value
> and it is not a flood, theft, reconstruction, or salvage vehicle.  Twigg's report indicates
> that the vehicle's right rear door glass is broken and it has forklift damage.  Spears's
> report lists forklift damage to the rocker panel and floor boards, and that the vehicle has
> broken glass, miscellaneous external parts missing, a rotten interior, faded paint, and dry-
> rotted tires.  Hossein Ahmadi confirmed at trial that the vehicle was purchased on March
> 6, 2000, that it had high mileage, and that he did not have any evidence that HB Auto had
> repaired the vehicle.  He further testified that he could fix the problem with the CV joint
> with a $49 part plus labor and that he did not know what notation "sst" meant.

Vehicle #98 was purchased during the time period that the Ahmadis were caring for their

parents and not working at HB Auto.  HB Auto concedes that it was not repairing vehicles at this

time, and HB Auto could not provide any affirmative evidence of repair.  Therefore, the Court

will value the vehicle based upon a finding that it was not repaired prior to being moved to the

Lower Lot.  The evidence reflects that Vehicle #98 had several announced conditions requiring

repair when HB Auto purchased it.  The Court has no evidence regarding how much it would

cost to repair the "bad CV joints" or even what "sst" is or if it is repairable.  Accordingly, the

---

an 1989 Audi.

Court finds that Vehicle #98 had a value of $1,255 immediately before the incident, which is

equal to the purchase price.  The Court notes that there is no dispute among the experts that this

vehicle sustained forklift damage.

**Vehicle #99**

> Description: 1994 Mazda 626, VIN 1YVGE22D8R5100739
> Mileage: 103,386
> Date purchased by HB Auto: December 12, 2001
> Purchase price: $200
> NADA value on August 1, 2002: $4,800
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction in
> the salvage line with "miles over."  The odometer disclosure certifies that the mileage
> stated is in excess of the vehicle's mechanical limits.  The damage disclosure statement
> on the title indicates that when HB Auto purchased it, the vehicle had not been damaged
> such that it needed repairs costing more than 25% of the fair market value and it was not
> a flood, theft, reconstruction, or salvage vehicle.  Spears's report lists forklift damage to
> the rocker panel, floor board, and right rear door.  The report also noted that the paint is
> "faded/clear peeling," tires dry-rotted, and interior rotted.  Twigg's report lists both no
> damage and no forklift damage.  The photo shows the damage to the right side of the
> vehicle.

The Court finds that prior to being damaged by Brokers Vehicle #99 had a value of

$2,500, which is equal to HB Auto's estimate of the value.  In addition, the Court finds that HB

Auto has established that Brokers damaged this vehicle, despite Twigg's report to the contrary.

**Vehicle #100**

> Description: 1996 Mazda 626, VIN 1YVGE22C4T5528323, 4-door, gold
> Mileage: 92,369
> Date purchased by HB Auto: September 19, 2001
> Purchase price: $1,575
> NADA value on August 1, 2002: $6,050
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: $900

Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction as a red light in the salvage line with a bad transmission. Twigg's expert report notes that the right mirror and door glass are broken and the vehicle has forklift damage. Spears's expert report lists forklift damage to the floor boards, rockers, right front door, fender, rear door, and quarter glass. The report also notes that the paint is faded, the tires and interior are dry-rotted, and the airbags are missing. The photos show the damage to the right side of the vehicle and missing interior parts.

After reviewing the evidence, the Court finds that prior to being damaged by Brokers Vehicle #100 had a value of $3,000, which is equal to HB Auto's estimate of the value. The evidence shows that in the ordinary course of its business, HB Auto promptly repaired vehicles (except for those purchased during the time that the Ahmadis' parents were visiting), thus the bad transmission on this vehicle would have been repaired. The Court also notes that this value is only 49.6% of the NADA value. Twigg and Spears agree that this vehicle was damaged by a forklift.

The combination of a broken window and missing airbags suggests the occurrence of an intervening criminal act after Brokers moved Vehicle #100 to the Lower Lot, especially given that HB Auto did not remove parts from the vehicles for its own use. This unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury. Therefore, the Court will not award damages for injury to Vehicle #100 subsequent to it being moved to the Lower Lot.

**Vehicle #101**

Description: 1994 Mazda 626, VIN 1YVGE22C9R5145700, 4-door, white
Mileage: 100,360
Date purchased by HB Auto: September 19, 2001
Purchase price: $550
NADA value on August 1, 2002: $7,500
HB Auto's estimate of value prior to incident: $3,200
HB Auto's estimate of value after incident: $1,200

126

Spears's estimate of value after incident: $1,200
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale discloses that when HB Auto purchased Vehicle #101 at auction, it had a salvage history, over 100,000 miles, and a bad transmission. The damage disclosure statement on the title indicates that the vehicle had not been damaged such that it needed repairs costing more than 25% of the fair market value and it is not a flood, reconstruction, or salvage vehicle. Spears's report lists forklift damage to the rocker panel and right front fender. The report also notes that the paint is faded and peeling, the interior and tires are dry-rotted, and the windshield is cracked. Twigg's report lists right fender damage by a forklift.

Vehicle #101 was sold to HB Auto with a salvage history, therefore, even if rebuilt, its value was 30% to 40% less than the NADA value according to the expert testimony. After reviewing the evidence, the Court finds that, prior to being damaged by Brokers, Vehicle #101 had a value of $3,200, which is equal to HB Auto's estimate of the value. This amount is only 42.7% of the NADA value, and therefore, well within the standards for a vehicle with a salvage history. Twigg and Spears agree that this vehicle was damaged by a forklift.

**Vehicle #102**

Description: 1995 Mitsubishi Gallant, VIN 4A3AJ56G8SE082839
Mileage: 144,683
Date purchased by HB Auto: March 28, 2001
Purchase price: $1,500
NADA value on August 1, 2002: $2,475
HB Auto's estimate of value prior to incident: $2,900
HB Auto's estimate of value after incident: $1,800
Spears's estimate of value after incident: $1,800
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction "as is" with miles over 100,000 and the notation "ccd." Twigg's report indicates that vehicle has forklift damage, the front bumper and grille are damaged, and it has bad paint and is rusted. Spears's report lists forklift damage to the floor boards and rocker panels, and that the paint is faded, peeling, and rusting, tires and interior dry-rotted, the airbags are missing, and the windshield broken.

Based upon the evidence presented, the Court concludes that Vehicle #102 had a value of $2,475 immediately prior to being damaged by Brokers. This value is equal to the NADA value

which reflects the vehicle's high mileage.  Both experts agree that this vehicle shows signs of

forklift damage.  There is evidence of theft and possibly other vandalism, however, therefore the

Court will not award damages for injury to Vehicle #102 subsequent to it being moved to the

Lower Lot.

**Vehicle #103**

> Description: 1997 Mitsubishi Gallant, VIN 4A3AJ56G5VE122783, 4-door, black
> Mileage: 79,163
> Date purchased by HB Auto: July 11, 2001
> Purchase price: $2,250
> NADA value on August 1, 2002: $7,500
> HB Auto's estimate of value prior to incident: $3,600
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: $3,000
> Spears's estimate of present value (as of August 1, 2007): $150
> Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction as a
> red light, damaged and disabled with a "bad engine."  Spears's expert report indicates the
> vehicle has forklift damage on the front bumper, floorboards, and left rocker, and that the
> paint is chipped and rusted, tires dry-rotted, interior depreciated, and dash cracked.
> Twigg's expert report indicates the vehicle is rusted and has no forklift damage.  The
> photo in evidence shows damage to the right front bumper.

Based upon the evidence presented, the Court concludes that Vehicle #103 had a value of

$3,600 immediately prior to being damaged by Brokers.  Also, the Court finds that HB Auto has

established that Brokers damaged the vehicle while moving it to the Lower Lot.

**Vehicle #104**

> Description: 1994 Chevrolet Lumina, VIN 2G1WP14X8R9130090, 2-door
> Mileage: 73,410
> Date purchased by HB Auto: January 9, 2002
> Purchase price: $400
> NADA value on August 1, 2002: $5,198
> HB Auto's estimate of value prior to incident: $3,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $500
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: HB Auto purchased this vehicle at auction as damaged and disabled.

128

Twigg's report indicates the front bumper is primed, the right rear door is damaged, and the vehicle has no forklift damage. Spears's report indicates forklift damage to the floorboard, rocker, left door, and left quarter. The report also notes that the tires and interior are dry-rotted and the paint is faded and peeling. The photos show damage to the left side of the vehicle, including vertical lines and dents.

Having considered the evidence, the Court finds that the value of Vehicle #104 was $3,500 immediately prior to being damaged by Brokers. This value, only 67.3% of the NADA value, is well within the parameters set forth by the experts. Also, HB Auto has established that the vehicle has forklift damage, despite Twigg's report to the contrary. The damage is clearly visible on the photo, yet Twigg's report doesn't even note this damage, whether caused by a forklift or not.

**Vehicle #105**

Description: 1996 Chevrolet Corsica, VIN 1G1LD55M1TY200653[39]
Mileage: 100,347
Date purchased by HB Auto: April 4, 2001
NADA value on August 1, 2002: $2,500
HB Auto's estimate of value prior to incident: $2,000
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $400
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The damage disclosure statement on the back of the title does not indicate whether this vehicle had been damaged such that the repairs exceeded 25% of the value. Twigg's expert report indicates Vehicle #105 has no damage and no forklift damage. Spears's report indicates the vehicle has forklift damage to the floorboards, rockers, and left front door, and it notes that the paint is faded and peeling, the interior is rotten, and the tires are dry-rotted.

The Court finds that Vehicle #105 had a value of $2,000 prior to being damaged by Brokers, which is equal to HB Auto's estimate of the value. In addition, the Court finds that HB Auto has established that Brokers damaged this vehicle, reducing the value to $500.

---

[39] The various charts in evidence list the VIN for Vehicle #105 as 1G1LD55M1TY2000653, but the title indicates the VIN is 1G1LD55M1TY200653.

**Vehicle #106**

> Description: 1993 Chevrolet Blazer, VIN 1GNCS13WXP2194992, 4-door, black
> Mileage: 148,398
> Date purchased by HB Auto: July 25, 2001
> Purchase price: $850
> NADA value on August 1, 2002: $3,650
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: $1,000
> Spears's estimate of present value (as of August 1, 2007): $150
> Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction as damaged and disabled with miles over and "engine bad." Spears's report lists forklift damage to the frame rail, transmission, exhaust, and left rear door, and it indicates the paint is faded, the tires are dry-rotted, the windshield is cracked, and the interior is depreciated. Twigg's report indicates the vehicle has forklift damage, with the left rear door and tail gate damaged.

The Court finds that prior to being damaged by Brokers Vehicle #106 had a value of

$3,000, which is equal to HB Auto's estimate of the value. When purchased by HB Auto, the

vehicle had no conditions that would permanently impact the vehicle's value other than high

mileage, and this value is only 82.2% of the NADA value, which incorporates a mileage

deduction. Both Twigg and Spears agree that this vehicle was damaged by a forklift.

**Vehicle #107**

> Description: 1997 Doge Neon, VIN 3B3ES47Y0VT601455, blue
> Mileage: 95,293
> Date purchased by HB Auto: April 18, 2001
> Purchase price: $750
> NADA value on August 1, 2002: $3,825
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $600
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction in the salvage line as a red light with no announced conditions. Twigg's report indicates Vehicle #107 has forklift damage, with the hood and left door damaged. Spears's expert report lists forklift damage to the rocker panel and floor board, and it also notes that miscellaneous parts are missing from the vehicle both inside and out, the tires are dry-

130

rotted, and the paint is faded. The photos show that parts have been taken out of this vehicle and there is damage on the left side.

Based upon the evidence presented, the Court concludes that Vehicle #107 had a value of $2,500 immediately prior to being damaged by Brokers. This value is only 65.4% of the NADA value, which is well within the parameters set forth by the experts given that it had no announced conditions when purchased by HB Auto. Both experts agree that this vehicle shows signs of forklift damage. There is evidence of an intervening criminal act, including theft and vandalism, after Brokers moved Vehicle #107 to the Lower Lot. As a result, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot. Therefore, the Court will not award damages for injury to Vehicle #107 subsequent to it being moved to the Lower Lot.

## Vehicle #108

Description: 1996 Dodge Stratus, VIN 1B3EJ56H3TN108733, 4-door, green
Mileage: 83,191
Date purchased by HB Auto: July 25, 2001
Purchase price: $800
NADA value on August 1, 2002: $4,550
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $1,800
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction as damaged and disabled with the notation "no brakes."[40] Twigg testified that once the brakes were fixed, it would not impact the overall value of the vehicle. Spears's report lists forklift damage to the rocker panel, floor boards, and suspension. The report also lists faded and peeling paint, broken glass, dry-rotted tires, a rotten interior, miscellaneous dents and dings, and a missing airbag. Twigg's report indicates damage to the rear bumper cover, the left door glass, and the left fender, and also notes that the door is primed. Twigg's report does not list "NFLD." Twigg testified that he should have indicated no forklift damage on his report and his failure to do so was an oversight. He

---

[40] The handwriting on the bill of sale is very difficult to read. At trial, after study, the parties seemed to agree that the rather illegible words read "no brakes."

also testified that he believed the apparent wreck damage on the vehicle could have preceded the move to the Lower Lot because there is the primer on the exterior and the door looks like it has been partially repaired.  He testified that Vehicle #108 was a "repairable" car with no major damage.  He conceded that the damage to the bumper did not appear to have been caused by the forks on the forklift, but could have been caused when being moved by a forklift.

After reviewing the evidence, the Court finds that the value of Vehicle #108 was $3,000 immediately prior to being moved to the Lower Lot.  Unlike most of the vehicles, the evidence establishes that this vehicle was in the process of being repaired when it was moved.  Hossein Ahmadi did testify that he tried to repair some of the vehicles with minor damage.  Given the fact that this vehicle remained in the Lower Lot, however, the Court finds it unlikely that Vehicle #108 was one of those vehicles.  Regardless, HB Auto's value of $3,000, only 65.4% of the NADA value, certainly reflects that of a vehicle that is in below average condition, yet repairable.

Lastly, there is evidence of an intervening criminal act because interior parts are missing from the vehicle.  As a result, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot.  Therefore, the Court will not award damages for injury to Vehicle #108 subsequent to it being moved to the Lower Lot.

**Vehicle #109**

> Description: 1997 Dodge Stratus, VIN 1B3EJ46X5VN562468
> Mileage: 87,922
> Date purchased by HB Auto: February 7, 2001
> Purchase price: $1,150
> NADA value on August 1, 2002: $4,950
> HB Auto's estimate of value prior to incident: $4,500
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $50

132

Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction in the salvage line with no announced conditions.  Twigg's report indicates the vehicle has forklift damage, with the left parking light missing and the left tail light broken.  Spears's report lists forklift damage to the rocker panel and floor board, and that the vehicle has broken glass, a rotten interior, two missing wheels, missing miscellaneous body parts, and dry-rotted tires.

After reviewing the evidence, the Court finds that the value of Vehicle #109 was $4,500 immediately prior to being moved to the Lower Lot.  The experts do not dispute that this vehicle had forklift damage.  Interior and exterior parts have been stolen from this vehicle, constituting an intervening criminal act which severs the causal connection between Brokers's negligence and the subsequent injury.  Therefore, the Court will not award damages for injury to Vehicle #109 subsequent to it being moved to the Lower Lot.

**Vehicle #110**

Description: 1988 Honda Prelude, VIN JHMBA4121JC027722, 2-door
Mileage: 139,021
Date purchased by HB Auto: February 14, 1998
NADA value on August 1, 2002: $2,450
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $300
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence:  Twigg's expert report indicates the vehicle is in poor condition but has no forklift damage.  Spears's expert report lists forklift damage to the floor boards, the rocker panel, and the right door, and it notes that the paint is faded and the tires and interior are dry-rotted.

Vehicle #110 was owned by HB Auto for more than four years prior to being moved to the Lower Lot by Brokers.  HB Auto has not offered any explanation as to why it did not sell the vehicle.  It has been clearly established that a vehicle that sits for an extreme amount of time will deteriorate.  Therefore, the Court finds that Vehicle #110 was in below average condition prior to being moved and had a value of $1,960.  In addition, the Court finds that HB Auto has

established that Brokers damaged this vehicle when it moved the vehicle to the Lower Lot,

reducing its value to $800.

## Vehicle #111

Description:1987 Porsche, VIN WP0AB094XHN475819
Mileage: unknown
Date purchased by HB Auto: September 25, 1999
NADA value on August 1, 2002: $6,050
HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $2,000
Spears's estimate of value after incident: $2,000
Spears's estimate of present value (as of August 1, 2007): $300
Other evidence:  Spears's expert report lists forklift damage to the floor boards and
rocker panels, and it notes that the paint is faded, the tires are dry-rotted, and the interior
is rotten.  Twigg's expert report lists no damage and no forklift damage.

Vehicle #111 had a value of $3,500 immediately before being moved to the Lower Lot.

The Court has no evidence as to the condition of this vehicle when it was acquired or even the

mileage. This vehicle had been sitting on HB Auto's lot for more than two years, with no

explanation.  This fact reflects poorly on the vehicle's value in and of itself and is evidence that

the vehicle's condition would have been deteriorating even prior to the move.  HB Auto's

original value reflects that this vehicle was in below average condition, worth only 57.9% of the

NADA value, and is credible.

## Vehicle #112

Description: 1991 Pontiac Firebird, VIN 1G2FS23T4ML225679, red
Mileage: 156,833
Date purchased by HB Auto: July 24, 1999
NADA value on August 1, 2002: $3,675
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $3,000
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: Twigg gave no opinion regarding Vehicle #112 in his report.  Spears's
expert report indicates there is forklift damage to the right door and fender, the left door

134

and fender, and the "rubber nose." The report also notes that the paint is faded and the tires and interior dry-rotted. A photo of the left side shows the damage to the side of the vehicle.

After reviewing the evidence, the Court concludes that Vehicle #112 had a value of $3,000 immediately prior to being damaged by Brokers. The vehicle had been owned by HB Auto and was sitting on the Property for approximately two and a half years. HB Auto provided no explanation for this fact. Based upon the undisputed testimony that vehicles generally deteriorate if parked for an extended period of time, the Court finds that this vehicle was in below average condition. Accordingly, HB Auto's estimate, which is approximately 20% less than the NADA value is a credible and competent value. The Court notes that Brokers presented no evidence to dispute Spears's opinion or HB Auto's opinion regarding the damage to this vehicle. Unlike most of the vehicles, this is no evidence of damage to the frame or underside of Vehicle #112, but as it sustained other extensive body damage, the Court finds its value was reduced to $1,000 immediately after the incident.

**Vehicle #113**

Description: 1988 Toyota Celica, VIN JT5ST62K9J7206181, convertible
Mileage: 144,106
Date purchased by HB Auto: March 5, 2002
NADA value on August 1, 2002: $3,600
HB Auto's estimate of value prior to incident: $3,800
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,200
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The damage disclosure statement on the back of the title certifies that when HB Auto purchased the vehicle, it had not been damaged such that repairs exceeded 25% of the fair market retail value, and that the vehicle was not a flood, reconstructed, or salvage vehicle. Twigg's expert report contains no information or opinion regarding this vehicle. Spears's expert report indicates Vehicle #113 has forklift damage to the rocker panel and floor boards, and that the paint is faded, the interior and convertible top are rotten, the tires are dry-rotted, and the sheet metal is rusting.

After reviewing the evidence, the Court finds that Vehicle #113 was in average condition and had a value of $3,600. Brokers presented no evidence to contradict both Spears's and HB Auto's opinion regarding forklift damage.

**Vehicle #114**

> Description: 1992 Mazda 929, VIN JM1HD461XN0120121, 4-door
> Mileage: 100,510
> Date purchased by HB Auto: September 14, 1999
> Purchase price: unknown
> NADA value on August 1, 2002: $4,350
> HB Auto's estimate of value prior to incident: $4,900
> HB Auto's estimate of value after incident: $2,000
> Spears's estimate of value after incident: $1,100
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: Spears's expert report indicates Vehicle #114 has forklift damage to the floor boards, rocker panel, left door, rear door, quarter, and the left door glass, which is broken. It also notes that the airbags are gone, the paint is faded, the interior is rotten, and the tires are dry-rotted. Twigg's expert report lists "bad paint," no damage, and no forklift damage. A photo of the left side of the vehicle shows the damage on the side of the vehicle.

Vehicle #114 had been sitting on HB Auto's lot for more than two years prior to being moved to the Lower Lot, and HB Auto has offered no explanation for this fact. Therefore, the Court will defer to the general testimony in this case that a vehicle's condition will deteriorate when sitting, unused, for extended periods of time. Based upon a review of the evidence, the Court finds that Vehicle #114 had a value of $3,915 immediately prior to the incident. The Court also finds that HB Auto has established that Brokers's damaged this vehicle. While Twigg noted no damage whatsoever on this vehicle, his assessment was clearly inaccurate. The fact that the vehicle has been damaged is plainly evident on the photo in evidence.

Lastly, there is evidence of an intervening criminal act because interior parts are missing. As a result, the Court cannot determine with reasonable certainty the amount of damage

proximately caused by Brokers once Vehicle #114 was moved to the Lower Lot and, as such, will not award damages.

**Vehicle #115**

> Description: 1992 Honda Civic, VIN 2HGEH2453NH526241, 2-door
> Mileage: 197,702
> Date purchased by HB Auto: July 24, 2000
> Purchase price: unknown
> NADA value on August 1, 2002: $3,450
> HB Auto's estimate of value prior to incident: $2,800
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $850
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: Twigg's report indicates Vehicle #115 has forklift damage, withe damage to the windshield, right quarter, front bumper, and side lamps.  It also states that the odometer is missing.  Spears's report lists forklift damage to the rocker panel and floor boards, and it indicates that the paint is faded, the interior is depreciated, miscellaneous interior and exterior parts are missing, glass is broken, and the tires are dry-rotted.  The photos show that the vehicle has been severely vandalized.

The Court finds that Vehicle #115 had a value of $2,800 immediately prior to the incident.  The vehicle had been sitting for an extended period of time, but this value is only 81.2% of the NADA value and is credible.  There is no dispute that this vehicle shows signs of forklift damage.  This vehicle has also been severely vandalized.  Due to these intervening acts, the Court will not award damages for injuries incurred after this vehicle was parked in the Lower Lot.

**Vehicle #116**

> Description: 1987 Nissan Maxima, VIN JN1HU11S7HT201176, 4-door
> Mileage: 181,130
> Date purchased by HB Auto: July 20, 1999
> NADA value on August 1, 2002: $2,125
> HB Auto's estimate of value prior to incident: $2,100
> HB Auto's estimate of value after incident: $600
> Spears's estimate of value after incident: $1,000
> Spears's estimate of present value (as of August 1, 2007): $25

Other evidence: Twigg's report indicates Vehicle #116 has forklift damage with the right mirror broken. Spears's report lists forklift damage to the right rear and front doors, and the fender, and that the paint is faded, tires and interior dry-rotted. The photos show the damage to the right side.

HB Auto has offered no explanation for why Vehicle #116 sat for almost three years prior to the incident rather than being sold. Therefore, the Court finds that the vehicle was in below average condition, with a value of $1,912. Twigg and Spears agree that this vehicle has forklift damage. The Court recognizes that, unlike the vast majority of the vehicles, Vehicle #116 did not sustain damage to its underside when Brokers moved it to the Lower Lot. Nevertheless, HB Auto has shown that the vehicle sustained significant damage to its right side when it was moved, reducing its value to $600.

**Vehicle #117**

Description: 1991 Infiniti G-20, VIN JNKCP01P2MT216004
Mileage: 132,572
Date purchased by HB Auto: July 25, 2000
Purchase price: unknown
NADA value on August 1, 2002: $3,725
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $1,400
Spears's estimate of value after incident: $900
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Spears's expert report indicates Vehicle #117 has forklift damage on the rocker panel and floor boards, and also that the interior is rotten, the tires are dry-rotted, the paint is faded, and glass is broken. Twigg's expert report indicates the vehicle is in poor condition, with no damage and no forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #117 had a value of $3,000 immediately prior to being moved to the Lower Lot. While HB Auto has offered no explanation for why the vehicle sat on the lot for over a year, this value reflects a large enough discount from the NADA value (approximately 20% less) to account for any prior deterioration. HB Auto has also established forklift damage.

**Vehicle #118**

Description: 1995 Hyundai Sonata, VIN KMHCF31T8SU094268, 4-door
Mileage: 87,910
Date purchased by HB Auto: September 23, 1998
NADA value on August 1, 2002: $2,875
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $1,500
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The damage disclosure statement does not indicate whether the vehicle had been damaged such that repairs were in excess of 25% of the value. Twigg's report indicates the vehicle has forklift damage with the front bumper cover damaged. Spears's report lists forklift damage to the floor boards and rocker panels, and also that the paint is faded, peeling, and rusted, the tires and interior are dry-rotted, the front bumper is damaged, and the driver's door glass is broken.

Vehicle #118 was only three years old when HB Auto purchased it, but it then sat on the lot for approximately three and half years. This fact reflects poorly on the value, as HB Auto has offered no explanation for it. HB Auto originally gave the vehicle a very high value, which is evidence that the vehicle was in generally good condition. Nevertheless, the undisputed testimony in this case is that a vehicle deteriorates when it sits unused for long periods of time. After consideration of the evidence, the Court finds that the value was $2,444. The Court notes that Twigg and Spears agree that this vehicle was damaged with a forklift.

**Vehicle #119**

Description: 1996 Hyundai Elantra, VIN KMHJF24MXTU247563, green
Mileage: 91,779
Date purchased by HB Auto: November 15, 2000
Purchase price: $400
NADA value on August 1, 2002: $2,575
HB Auto's estimate of value prior to incident: $1,900
HB Auto's estimate of value after incident: $300
Spears's estimate of value after incident: $600
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale reflects that Vehicle #119 was sold to HB Auto at auction in the salvage line with no other announced conditions. The damage disclosure

139

statement does not indicate that the vehicle was damaged such that the repairs exceeded 25% of the retail value. Twigg's report indicates the vehicle has forklift damage with minor damage to the left rear door and bad paint. Spears's report lists forklift damage to the floor boards, rocker panel, suspension, and left front and rear doors. It also notes that the paint is faded and peeling, the tires and interior are dry-rotted, and the airbags are missing.

After reviewing the evidence, the Court finds that immediately prior to the incident, Vehicle #119 had a value of $1,900, which is equal to HB Auto's estimate of the value. This value is also only 73.8% of the NADA value and falls within the parameters set forth by the experts in this case. Both Twigg and Spears agree that this vehicle has forklift damage, and while the reduction in value is more substantial than the majority of vehicles, Spear's report establishes that the damage was extensive.

There is also evidence of an intervening criminal act, as the airbags have been stolen. Therefore, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers after the vehicle was parked in Lower Lot and will not award any damages for injury that may have been incurred during that time period.

**Vehicle #120**

> Description: 1995 Hyundai Elantra, VIN KMHJF33M5SU847137
> Mileage: 86,521
> Date purchased by HB Auto: March 24, 1999
> NADA value on August 1, 2002: $2,700
> HB Auto's estimate of value prior to incident: $2,000
> HB Auto's estimate of value after incident: $500
> Spears's estimate of value after incident: $900
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: Twigg's expert report lists "bad paint" and no forklift damage. Spears's report lists forklift damage to the floor boards, rockers, left front and rear doors, and the fender. It also notes that the paint is faded and peeling, and the tires and interior are dry-rotted.

After reviewing the evidence, the Court finds that immediately prior to the incident

Vehicle #120 had a value of $2,000, which is equal to HB Auto's estimate of the value. This vehicle had been owned by HB Auto for three years prior to the incident; however, this value is only 74.1% of the NADA value and is low enough to reflect the attendant deterioration.

**Vehicle #121**

> Description: 1994 Hyundai Elantra, VIN KMHJF22R6RU710645, red
> Mileage: 108,212
> Date purchased by HB Auto: January 24, 2001
> Purchase price: $125
> NADA value on August 1, 2002: $1,600
> HB Auto's estimate of value prior to incident: $2,000
> HB Auto's estimate of value after incident: $200
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale indicates HB Auto purchased Vehicle #121 at auction as a red light and damaged and disabled, with "miles over." Spears's expert report indicates the vehicle has forklift damage to the floor boards, rockers, right rear quarter, top, windshield, right rear door, and front fender. It also notes that the paint is faded and the tires and interior are dry-rotted. Twigg's report contains no notes regarding this vehicle. The photos show that this vehicle was severely damaged on multiple sides including vertical dents and lines on the door.

After reviewing the evidence, the Court finds that Vehicle #121 had a value of $1,600 immediately prior to the incident, which is equal to the NADA value for the vehicle with appropriate mileage deductions. The Court notes that HB Auto's estimate of the value of the vehicle immediately after the incident is unusually low (only $200); however, the evidence supports this value. HB Auto has established that Brokers severely damaged this vehicle. Its appearance matches the testimony given by the Brokers's employees regarding vehicles that were flipped or dropped during the move.

**Vehicle #122**

> Description: 1995 Hyundai Elantra, VIN KMHJF23M7SU947931, 4-door, blue
> Mileage: 114,726
> Date purchased by HB Auto: July 26, 2000

Purchase price: $275
NADA value on August 1, 2002: $2,575
HB Auto's estimate of value prior to incident: $2,000
HB Auto's estimate of value after incident: $300
Spears's estimate of value after incident: $1,200
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence:  The bill of sale indicates HB Auto purchased Vehicle #122 at auction as a red light in the salvage line with miles over.  Spears's expert report indicates the vehicle has forklift damage to the right doors and glass and the rocker panel, and that the paint is faded, and tires and interior dry-rotted.  Twigg's expert report contains no notes on this vehicle.  The photo shows the damage to the glass and door.

Based upon the evidence presented, the Court finds that Vehicle #122 had a value of $2,000 immediately before the incident, which is equal to HB Auto's estimate of value.  The vehicle did not have any known conditions at the time of purchase that would continue to impact its value even after repairs.  HB Auto's original value is only 77.7% of the NADA value and is low enough to reflect that the vehicle had been sitting on the Property for a period of time.  Lastly, HB Auto has established that Brokers damaged this vehicle during the move and the damage was extensive, supporting a post-incident value of $300.

**Vehicle #123**

Description: 1995 Hyundai Accent, VIN KMHVF14N6SU165445, 4-door red
Mileage: 139,712
Date purchased by HB Auto: August 22, 2001
Purchase price: $125
NADA value on August 1, 2002: $1,485
HB Auto's estimate of value prior to incident: $1,400
HB Auto's estimate of value after incident: $200
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates that when HB Auto purchased Vehicle #123, the seat covers were missing and it had more than 100,000 miles.  Spears's report lists forklift damage to the right front door, the fender, the quarter, the floorboards, and the rocker panel.  The report also indicates that the paint is faded and the tires and interior are dry-rotted.  Twigg's report lists "bad paint" and no forklift damage.  Twigg testified that once the seat covers were replaced on Vehicle #123, the fact that they were once missing would not have an impact on the overall value of the vehicle.  The photos show

142

the damage to the right door and quarter.

The Court finds that the value of Vehicle #123 immediately prior to being damaged by Brokers was $1,400.  HB Auto purchased the vehicle for only $125, but the vehicle was missing seat covers.  HB Auto replaced the seat covers, a fact which is evidenced by the expert reports, neither of which note missing seat covers.  The Ahamdis's testified that HB Auto promptly repaired vehicles and readied them for sale in the ordinary course of their business.  This vehicle did not have any conditions that would impact its value after repair, other than mileage.  The $1,400 value is less than the applicable NADA value for this vehicle with appropriate mileage deductions taken.  In addition, HB Auto has established that this vehicle was damaged with a forklift.  Damage to the right side of the vehicle is clearly apparent in the photos.  HB Auto's estimate of value after the incident is very low at $200, nevertheless, as this vehicle was only worth $1,400 at the outset and the damage documented by Spears is extensive, the court finds this figure is credible.

**Vehicle #124**

Description: 1996 Pontiac Grand Am, VIN 1G2NE12T3TM547169, 2-door, white
Mileage: 81,073
Date purchased by HB Auto: September 20, 2000
Purchase price: $1,250
NADA value on August 1, 2002: $4,875
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,200
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates that HB Auto purchased the vehicle at auction in the salvage line with a "bad engine."  The damage disclosure statement does not indicate that the vehicle was damaged such that the repairs exceeded 25% of the retail value.  Twigg's expert report lists hood and right fender damage and no forklift damage.  Spears's expert report indicates the vehicle has forklift damage to the floor boards and rocker panel, and that it is missing interior parts, the paint is faded, the interior rotten, and tires dry-rotted.  The photos show a long vertical dent on the right side and interior

143

parts missing.

After reviewing the evidence, the Court finds that Vehicle #124 had a value of $3,000 immediately prior to the incident, which is equal to HB Auto's estimate of the value. HB Auto has also established that this vehicle has forklift damage. There is evidence, however, of an intervening criminal act, as interior parts have been stolen. Therefore, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers after the vehicle was parked in Lower Lot and will not award any damages for injury that may have been incurred during that time period.

**Vehicle #125**

> Description: 1994 Hyundai Elantra, VIN KMHJF32M4RU524080
> Mileage: 139,641
> Date purchased by HB Auto: April 7, 1999
> NADA value on August 1, 2002: $1,600
> HB Auto's estimate of value prior to incident: $2,000
> HB Auto's estimate of value after incident: $400
> Spears's estimate of value after incident: $400
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: Spears's expert report lists forklift damage to the left rear quarter and door, the floor boards, and the rockers. The report also notes that the paint is faded and tires and interior are dry-rotted. Twigg's expert report indicates that Vehicle #125 has forklift damage with left quarter panel damage and that it has "bad paint."

After reviewing the evidence, the Court finds that Vehicle #125 had a value of $1,360 prior to being moved to the Lower Lot by Brokers. This vehicle had been sitting on the Property for approximately three years and would not have been in average condition. The Court notes that the experts agree that this vehicle sustained forklift damage.

**Vehicle #126**

> Description: 1995 Mitsubishi Gallant, VIN 4A3AJ46G4SE128340, 4-door
> Mileage: 89,246
> Date purchased by HB Auto: October 6, 1999

144

Purchase price: $1,425
NADA value on August 1, 2002: $4,075
HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $1,000
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: Twigg's expert report states Vehicle #126 is rusty with no forklift damage. Spears's expert report lists forklift damage to the left rocker, left side, right rocker, and floor board. The report also indicates that the tires and interior are dry-rotted, the paint is chipped and faded, and the rear spoiler and stereo have been stolen.

Based upon the evidence presented, the Court finds that Vehicle #126 had a value of $3,500 immediately prior to being moved to the Lower Lot. HB Auto has offered no explanation as to why the vehicle sat on the lot for so long, however this value incorporates a large enough discount from the NADA value to account for any prior deterioration. The Court also finds that HB Auto has established forklift damage.

Lastly, Spears's report plainly notes that parts have been stolen off of this vehicle. This unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury. Therefore, the Court will not award damages for injury to Vehicle #125 subsequent to it being moved to the Lower Lot.

**Vehicle #127**

Description: 1995 Mazda Protégé, VIN JM1BA1419S0176028, green
Mileage: 120,968
Date purchased by HB Auto: February 21, 2001
Purchase price: $750
NADA value on August 1, 2002: $2,475
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $600
Spears's estimate of present value (as of August 1, 2007): $75
Other evidence: The bill of sale indicates Vehicle #127 was sold to HB Auto at auction as a red light in the salvage line with "miles over." Spears's report notes forklift damage to

the undercarriage, the suspension, and the right front.  It also states that the paint is faded and rusted and the tires and interior are dry-rotted.  Twigg's report lists "bad paint" and no forklift damage.  The photo of the right side shows the damage on the right front.

Based upon the evidence presented, the Court finds that Vehicle #127 had a value of $2,475 immediately before the incident.  The vehicle did not have any known conditions at the time of purchase that would continue to impact its value even after repairs other than high mileage, and this value includes an appropriate mileage reduction.

**Vehicle #128**

> Description: 1992 Eagle Summit, VIN JE3CV50W4NZ020765, van
> Mileage: 102,414
> Date purchased by HB Auto: April 5, 2000
> Purchase price: $425
> NADA value on August 1, 2002: $3,100
> HB Auto's estimate of value prior to incident: $2,000
> HB Auto's estimate of value after incident: $200
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates HB Auto purchased Vehicle #128 at auction in the salvage line and that it has a salvage history with "miles over."  Twigg's expert report lists no damage, "bad paint," and no forklift damage.  Spears's expert report lists forklift damage to the floor boards, rockers, left front door and quarter.  It also indicates that the paint is faded, the tires and interior are dry-rotted, and the vehicle is missing miscellaneous parts.

The Court finds that Vehicle #128 had a value of $2,000 prior to being damaged by Brokers.  As a vehicle with a salvage history, its value was 30% to 40% less than the NADA value.  At 64.5% of the NADA value, this value is within the parameters set forth by the experts in this case.  The Court also finds that this vehicle sustained forklift damage when Brokers moved it to the Lower Lot, and this damage is sufficiently extensive to warrant such a low post-incident value.

The fact that miscellaneous parts are missing from this vehicle is evidence of theft.  This

unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching

the causal connection between its own negligence and the subsequent injury.  Therefore, the

Court will not award damages for injury to Vehicle #127 subsequent to it being moved to the

Lower Lot.

**Vehicle #129**

> Description: 1992 Mitsubishi Diamante, VIN JA3XC47S8NY002008, white
> Mileage: 186,130
> Date purchased by HB Auto: June 27, 2000
> NADA value on August 1, 2002: $2,800
> HB Auto's estimate of value prior to incident: $3,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $1,500
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The damage disclosure statement certifies that the vehicle had not been
> involved in a collision or other occurrence to the extent that the cost to repair exceeded
> 25% of the fair market retail value when HB Auto purchased it.  Twigg's report contains
> no information or opinion regarding this vehicle.  Spears's report indicates that the
> vehicle has forklift damage to the floor boards, rockers, left fender and door, and it states
> that the paint is faded, the tires and interior are dry-rotted, and miscellaneous parts are
> missing.  From the photos it appears that the right front panel was torn or fell off.

Based upon the evidence presented, the Court finds that Vehicle #129 had a value of

$2,800 immediately before the incident.  This vehicle was accompanied by an affirmative

disclosure that it had not been damaged in excess of 25% of its value, though such a disclosure

was not required.  Although the mileage is high, the $2,800 value takes into account the high

mileage.  Lastly, HB Auto has established that this vehicle was damaged by Brokers, and the

evidence supports HB Auto's estimate of the value after the incident.

**Vehicle #130**

> Description: 1995 Ford Contour, VIN 1FALP6536SK146575
> Mileage: 164,650
> Date purchased by HB Auto: November 13, 2002

147

Vehicle #130 must be excluded from the list of vehicles damaged by Brokers's negligence. This vehicle was purchased in November 2002 and is outside the scope of the present action. Accordingly, HB Auto is not entitled to any damages attributable to Vehicle #130.

**Vehicle #131**

> Description: 1995 Ford Contour, VIN 1FALP65L8SK138851, 4-door, red
> Mileage: 149,053
> Date purchased by HB Auto: May 31, 2000
> Purchase price: $2,110
> NADA value on August 1, 2002: $1,725
> HB Auto's estimate of value prior to incident: $4,000
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The bill of sale indicates Vehicle #131 was sold to HB Auto as is, with "miles over." Spears's report lists forklift damage to the floor board and rocker panel, and it notes that the vehicle is missing miscellaneous body parts, the interior is depreciated, the paint is faded, and the tires are dry-rotted. Twigg's report lists no damage, "bad paint," and no forklift damage.

The Court finds that Vehicle #131 had a value of $1,725 immediately prior to being moved to the Lower Lot. HB Auto owned this vehicle for almost two years before it was moved, but the purchase price (relative to the NADA value) is evidence that it was very good condition when it was purchased. The Court also finds that HB Auto has established forklift damage; however, there is evidence that parts were stolen out of the vehicle. Thus, the Court will not award damages for injury to Vehicle #131 subsequent to it being moved to the Lower Lot, as it cannot determine with reasonable certainty what amount is attributable to Brokers.

**Vehicle #132**

> Description: 1996 Mitsubishi Gallant, VIN 4A3AJ46G9TE382983
> Mileage: 112,286
> Date purchased by HB Auto: April 12, 2000

148

Purchase price: $1,650
NADA value on August 1, 2002: $4,225
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,100
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates that Vehicle #132 was sold to HB Auto at auction as a red light with more than 100,000 miles and frame damage, and it includes a notation that the "engine smokes." Twigg's expert report lists "bad paint," no damage, and no forklift damage. Spears's expert report lists forklift damage to the floorboards and rocker panel, and it indicates that the paint is faded and peeling and the tires are dry-rotted. Hassan Ahmadi testified that he did not remember the repairs that this particular vehicle required to remedy the smoking engine, but he described generally how such an engine might be repaired.

HB Auto purchased Vehicle #132 with frame damage, therefore, the vehicle's value should be reduced by approximately 10% of the NADA value pursuant to the expert opinions in this case. The vehicle was purchased with an engine that smoked. Even once the engine was repaired, the evidence indicates that the vehicle was, at best, in average condition before it sat on the Property for approximately two years. Taking into account both the frame damage and the deterioration from sitting, the Court finds Vehicle #132 had a value of $3,380 immediately prior to being moved to the Lower Lot.

## Vehicle #133

Description: 1993 Nissan Maxima, VIN JN1EJ01F1PT407195
Mileage: 67,771
Date purchased by HB Auto: June 17, 1998
NADA value on August 1, 2002: $6,930
HB Auto's estimate of value prior to incident: $4,000
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Twigg's expert report indicates Vehicle #133 has forklift damage with the grille and left lamps missing, and left mirror broken. Spears's expert report notes forklift damage to the floor boards and rocker panel, and also that the paint is faded and peeling, miscellaneous interior and exterior parts are missing, and the tires are dry-rotted.

149

Vehicle #133 had been sitting on HB Auto's lot for approximately four years prior to being moved, with no explanation. This fact reflects poorly on the vehicle's value. Notwithstanding, HB Auto's value for the vehicle includes a 40% discount from the applicable NADA value, which is sufficient to account for the vehicle's deterioration prior to the incident. After considering all of the evidence, the Court finds HB Auto's estimate is the most credible and competent evidence of value immediately before it was damaged by Brokers. Vehicle #133 had a value of $4,000 immediately before the incident.

Also, HB Auto has established that this vehicle sustained damage when Brokers moved it reducing the value to $800; however, there is evidence of a subsequent criminal act. This unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury. Therefore, the Court will not award damages for injury to Vehicle #133 subsequent to it being moved to the Lower Lot.

**Vehicle #134**

Description: 1995 Mazda 626, VIN 1YVGE22C2S5358574, green
Mileage: 86,627
Date purchased by HB Auto: July 12, 2000
Purchase price: $1,050
NADA value on August 1, 2002: $4,525
HB Auto's estimate of value prior to incident: $3,800
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $600
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The bill of sale indicates that HB Auto purchased the vehicle at auction and it contains the following regarding announced conditions: "U/DMG, R AP CS/DMG, POSS A PILL L/S FT CLIP, ENG LT." Spears's report lists forklift damage to the right door and fender, the left rocker, and the floor boards, and also that the paint is faded and the tires are dry-rotted. Twigg's report lists no damage and no forklift damage. Hassan Ahmadi testified that he did not remember anything specific about repairs to this particular vehicle.

The bill of sale for Vehicle #134 is particularly cryptic. The vehicle appears to have had the engine light on and unibody damage, as well as some other issues when HB Auto purchased it. According to the evidence in this case, unibody damage warrants a reduction in value by 10% of the NADA value. HB Auto's value of $3,800 is 84% of the NADA value and falls within the parameters set forth by the experts.

**Vehicle #135**

> Description: 1989 Ford Aerostar, VIN 1FMCA11U1KZA15389
> Mileage: unknown
> Date purchased by HB Auto: July 1, 1999
> Purchase price: unknown
> NADA value on August 1, 2002: $2,275
> HB Auto's estimate of value prior to incident: $2,000
> HB Auto's estimate of value after incident: $400
> Spears's estimate of value after incident: $400
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: Spears's expert report indicates that Vehicle #135 had forklift damage to the rocker panel and drive shaft, and it notes that the paint is faded, the interior and tires are dry-rotted, and miscellaneous exterior parts are missing. Twigg's report contains no opinion or information regarding this vehicle. Twigg testified that he did not examine Vehicle #135, but based upon the photo, the vehicle appeared to have sustained front end collision damage, with the bumper bars folded back, headlights gone, and the grille gone. He testified that this damage was not consistent with forklift damage and that the vehicle looked as though it had gone into a "ditch." The photo shows the damage to the front end, which is covered with mud, grass, and debris.[41]

Based upon the evidence presented, the Court finds that Vehicle #135 had a value of $2,000 immediately before the incident, which is equal to HB Auto's estimate of value. This vehicle was purchased almost three years before it was moved to the Lower Lot; however, this value is low enough to address the attendant deterioration. HB Auto has also established that Brokers damaged this vehicle. Twigg speculated that the vehicle went into a ditch, which is

---

[41] In Defendant's Exhibit #1 (the binder with photos) the label on this photo erroneously includes the VIN for Vehicle #134.

indeed, precisely what happened to some of the vehicles.

**Vehicle #136**

Description: 1992 Hyundai Sonata, VIN 2HMBF32T4NB060688
Mileage: 102,896
Date purchased by HB Auto: March 24, 1999
NADA value on August 1, 2002: $2,000
HB Auto's estimate of value prior to incident: $1,900
HB Auto's estimate of value after incident: $600
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence:  Spears's expert report lists forklift damage to the rockers and floor boards, and it notes that the paint is faded and the tires and interior are dry-rotted. Twigg's expert report indicates Vehicle #136 has no damage and no forklift damage. The photo shows damage to the left front of the vehicle, with mud and grass on the damaged area.

The Court finds that Vehicle #136 had a value of $1,700 immediately prior to being

moved to the Lower Lot.  This vehicle had been sitting for three years prior to being moved and

would have been in a deteriorating condition as a result.  In addition, HB Auto has established

that this vehicle was damaged by Brokers. While Twigg's report indicates that this vehicle had

no damage whatsoever, damage is plainly apparent on the photo.

**Vehicle #137**

Description: 2001 Honda Civic, VIN 1HGEM21981L041013, 2-door
Mileage: 142
Date purchased by HB Auto: June 13, 2001
Purchase price: $2,550
NADA value on August 1, 2002: $11,875
HB Auto's estimate of value prior to incident: $10,000
HB Auto's estimate of value after incident: $3,000
Spears's estimate of value after incident: $1,200
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The bill of sale indicates Vehicle #137 was sold to HB Auto at auction in the salvage line with the notation "parts only scrap title."  The vehicle has a scrap certificate of title issued by the state of Michigan.  The report of initial inspection by the NC Department of Transportation, dated July 5, 2001, indicates that the damaged areas included the bumper/grille, radiator support, and missing left headlamp and airbags.  A

152

final inspection was never completed.  Twigg's report lists "bad paint," the front bumper and grille missing, and no forklift damage.  Spears's report lists forklift damage to the rocker panel and exhaust, as well as that the paint is faded and "clear peeling," the airbags, wheels, and tires are gone, the interior is deteriorated, and miscellaneous body parts are missing.  Hassan Ahmadi testified at trial that he could tell that HB Auto did repair this vehicle because he could see it on the photo.  He conceded that the affidavit of rebuilder was not signed.  The photos that are labeled as Vehicle #137 show a 4-door vehicle.

HB Auto is not entitled to any damages attributable to Vehicle #137.  The evidence reflects that this vehicle, which was purchased with a "scrap title," was not reconstructed.  First, the affidavit of rebuilder is not signed and there was no final inspection.  Also, Hassan Ahmadi's testimony that, despite the lack of a new title, the vehicle was in fact repaired, was based upon his examination of photos he was shown at trial.  He reasoned that the initial inspection report for Vehicle #137 listed damage to the bumper and grille, and it was evident from the photo that those parts had been repaired or replaced.  After reviewing the evidence, it is apparent to the Court that the photos in evidence labeled as Vehicle #137 are incorrectly identified.  These photos show a 4-door vehicle whereas Vehicle #137 is a 2-door vehicle.  Furthermore, both expert reports list missing exterior parts, and there are no exterior parts missing on the photos.  The Court also notes that some of the parts that are missing are identical to those that were missing or damaged on the initial inspection report, such as the airbags, front bumper, and grille.  The only competent evidence the Court has, therefore, of this vehicle's value immediately prior to the incident is the purchase price of $2,550.  If the Court were to use that figure as the value, based upon HB Auto's estimate of the value after the incident, the value would not have declined, resulting in no damages.  Finally, the wheels and tires are now missing from the vehicle, which is evidence that it was the target of a criminal act after it was parked in the Lower Lot.  HB Auto has not fulfilled its burden of providing the Court with evidence sufficient to

calculate what amount of damages, if any, to which HB Auto might be entitled for injury to this

vehicle.                                    **Vehicle #138**


Description: 1999 Chevrolet Cavalier, VIN 1G1JC5245X7287323, red, 4-door
Mileage: 36,324
Date purchased by HB Auto: June 13, 2001
Purchase price: $1,250
NADA value on August 1, 2002: $7,925
HB Auto's estimate of value prior to incident: $4,000
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $600
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: Vehicle #138 was purchased by HB Auto as a salvage vehicle as defined
by N.C. Gen. Stat. § 20-4.01(33)(d). The report of initial inspection by the NC
Department of Transportation, dated July 5, 2001, indicates that the damaged areas
included the bumper/grille, hood, windshield, the airbags, the right headlamp, the dash
and the VIN plate. The affidavit of rebuilder certifies that HB Auto replaced the right
front fender, hood, windshield, bumper front, and right head lamp, and partially repainted
the vehicle. Notwithstanding, there is no documentation of a final inspection and a new
title was not issued. Spears's report lists forklift damage to the floor boards, rocker
panel, right front door, and right fender. It also notes that miscellaneous interior and
exterior parts are missing, the tires are dry-rotted, the interior is rotten, glass is broken,
and the paint is faded. Twigg's report indicates the vehicle has forklift damage, with the
right door mirror broken and front lamps missing. Twigg testified that Vehicle #138 did
not appear to have wreck damage, but based upon a photo of the interior, it looked like
the airbags had been unplugged, which in his opinion is not characteristic of theft. He
testified that the broken mirror could be from forklift damage. Twigg testified that he
disagrees with Spears assessment that the underside damage on Vehicle #138 could
reduce the value from $7,925 to $600, but that he had not looked under this vehicle and
that he felt he did not have to look under it in order to disagree with Spears. Later that
same day, Twigg testified that Vehicle #138 was one of the vehicles he returned to
examine underneath. He testified that the fuel tank was damaged by a forklift. In
Defendant's Exhibit 1, only one photo is identified as a photo of this vehicle and it is a
photo of the exterior.

After a careful review of the evidence related to Vehicle #138, the Court finds that for the

purpose of calculating damages, the vehicle had a value of $1,250 immediately prior to being

moved to the Lower Lot. While it is possible that the vehicle may have been worth more than

that amount since it appears that HB Auto did make some repairs, HB Auto has not sufficiently

established as such with reasonable certainty. Since a final inspection was not completed, the Court will assume that something remained problematic with the vehicle. HB Auto estimated the value of the vehicle at approximately 50% of the NADA value; however, the Court received no evidence on the standard for valuing a salvage vehicle that had not been completely repaired and retitled. A new, unbranded title was never issued for the vehicle, and Inspector Beck testified that there is no guarantee that a salvage vehicle that is inspected and repaired will be issued a clean title.

Brokers unsuccessfully attempted to attack Spears' credibility through Twigg's testimony that the vehicle's value could not have dropped from $7,925 to $600, but Spears did not value the vehicle at $7,925. The only values Spears assigned to any of the vehicles was (1) an estimate of the value immediately after the incident based upon only forklift damage, and (2) an ending value. Furthermore, Twigg's own testimony on Vehicle #138 is confusing and inconsistent as to whether he did or did not look under this vehicle.

Lastly, there is evidence of an intervening criminal act. According to Spears's report, interior parts are missing. As a result, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once Vehicle #139 was moved to the Lower Lot and will not award damages as such.

**Vehicle #139**

      Description: 1996 Suzuki Esteem, VIN JS2GB31S8T5104047
      Mileage: 66,774
      Date purchased by HB Auto: April 27, 2000
      Purchase price: unknown
      NADA value on August 1, 2002: $3,950
      HB Auto's estimate of value prior to incident: $2,900
      HB Auto's estimate of value after incident: $900
      Spears's estimate of value after incident: $375

Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: HB Auto purchased this vehicle with a North Carolina salvage title
pursuant to N.C. Gen. Stat. § 20-4.01(33)(d). The damage disclosure statement certifies
the vehicle was damaged to the extent that damages exceeded 25% of its value and
identifies the "left 3/4 front" as the part damaged. An initial examination was performed
by the DMV on July 5, 2001, and the corresponding report reflects damage to the
windshield and left front. The affidavit of rebuilder dated November 4, 2001 certifies
that the left fender and windshield were repaired and the vehicle was completely
repainted. Spears's report indicates that a forklift "scratched lightly/drivers side," and
that the tires and interior are dry-rotted, the windshield is cracked, the paint is faded and
rusted, and the airbag and stereo were stolen. Twigg's report lists "bad paint," no
damage, and no forklift damage. On the photo, the left front of the vehicle appears
undamaged.

Like Vehicle #138, HB Auto purchased Vehicle #139 with a salvage title, yet a new,

clean title has not been issued. The vehicle clearly does not have a value equal to the NADA

value, the evidence does not support HB Auto's original estimate of the value, and the purchase

price is unknown. As stated previously, the Court has no basis from which to value a vehicle

with a salvage title. As the Court cannot determine a starting value, the Court finds that HB

Auto has not met its burden of proving the amount of damages attributable to this vehicle with

reasonable certainty.

**Vehicle #140**

Description: 1998 Chevrolet S-10, VIN 1GCCS1446WK229094, truck
Mileage: 38,998
Date purchased by HB Auto: October 17, 2001
Purchase price: $1,700
NADA value on August 1, 2002: $8,125
HB Auto's estimate of value prior to incident: $5,000
HB Auto's estimate of value after incident: $2,000
Spears's estimate of value after incident: $2,000
Spears's estimate of present value (as of August 1, 2007): $300
Other evidence: The bill of sale indicates HB Auto purchased this vehicle at auction as a
red light, damaged and disabled, with flood and water damage and a salvage title, as
defined by N.C. Gen. Stat. § 20-4.01(33)(d). The DMV's report of initial examination
dated November 5, 2001 documents that the vehicle had water damage. An affidavit of
rebuilder was not completed, and the vehicle was not retitled. Hossein Ahmadi testified

that he discovered Vehicle #140 was vandalized on March 15, 2002. The bumper, grille, and turn signal assembly had been stolen, and a police report was filed. He testified that HB Auto did not repair the vehicle after it was vandalized. The photos show that these parts remain missing. Twigg's report indicates the vehicle has forklift damage with the tail gate damaged and the bumpers missing. Spears's report lists forklift damage to the drive shaft and rocker panel, and it indicates that miscellaneous parts are missing, the tires are dry-rotted, and the paint is faded.

HB Auto has not met its burden of proving the amount of damages attributable to Vehicle #140 with reasonable certainty. HB Auto argued at trial that the Court should calculate the starting value of this vehicle by deducting $700, the amount of damage from vandalism listed on the March 15, 2002 police report, from the NADA value. The police report, however, was not admitted into evidence, and there was no testimony about the value of the stolen parts. Moreover, Vehicle #140 still has a salvage title, hence the NADA value of an average vehicle is not applicable. The only other evidence of the vehicle's starting value is HB Auto's original estimate of value and the purchase price. The fact that this vehicle was vandalized just prior to being moved to the Lower Lot throws these values into question. Even if the Court were to find that the purchase price of $1,700 was the pre-incident value, then the vehicle sustained no measurable damage during the incident, inasmuch as Spears and HB Auto both estimated the post-incident value to be $2,000.

## Vehicle #141

Description: 1994 Dodge Stealth, VIN JB3AM64J0RY030274, 2-door, red
Mileage: 110,789
Date purchased by HB Auto: July 11, 2001
Purchase price: $2,600
NADA value on August 1, 2002: $7,200
HB Auto's estimate of value prior to incident: $5,000
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $3,500
Spears's estimate of present value (as of August 1, 2007): $400
Other evidence: The damage disclosure statement on the back of the title certifies that the

vehicle had not been damaged such that repairs exceeded 25% of the value when HB Auto purchased it. Spears's expert report lists forklift damage to the quarter, floor boards, and rocker panel. The report also notes that the paint is faded, the tires and interior are dryrotted, and the vehicle has various dents and dings. Twigg's expert report lists both no damage and no forklift damage.

Based upon the evidence presented, the Court finds that immediately before the incident Vehicle #141 had a value of $5,000, which is equal to HB Auto's estimate of value. There is little evidence of the vehicle's condition at the time of purchase; however, the title affirmatively discloses that the vehicle had not been damaged such that repairs exceeded 25% of the value. HB Auto's own value for Vehicle #141 is 64.9% of the NADA value and is well within the range of reasonableness as set forth by the experts.

**Vehicle #142**

> <u>Description</u>: 1991 Ford Aerostar, VIN 1FMCA11U6MZA89359, van
> <u>Mileage</u>: 96,802
> <u>Date purchased by HB Auto</u>: May 3, 2000
> <u>Purchase price</u>: $750
> <u>NADA value on August 1, 2002</u>: $3,425
> <u>HB Auto's estimate of value prior to incident</u>: $2,200
> <u>HB Auto's estimate of value after incident</u>: $500
> <u>Spears's estimate of value after incident</u>: $800
> <u>Spears's estimate of present value (as of August 1, 2007)</u>: $50
> <u>Other evidence</u>: The bill of sale indicates that HB Auto purchased the vehicle at auction as a red light in the salvage line with no announced conditions. Twigg's expert report lists both no damage and no forklift damage. Spears's expert report lists forklift damage to the floor board, rockers, right front door and fender, and the drive shaft. The report also indicates that glass is broken, the paint is faded, and the tires and interior are dry-rotted. The photo in evidence shows the driver's glass is broken.

The Court finds that Vehicle #142 had a value of $2,200 immediately before the incident, which is equal to HB Auto's estimate of value. The vehicle would have been in a deteriorating condition as it had been sitting on the Property for two years prior to being moved to the Lower Lot, but this value is well below NADA value (only 64.2% of the NADA value) and well within

the parameters of a reasonable value as set forth by the experts in this case. The Court further notes that HB Auto has established Brokers damaged this vehicle with a forklift.

**Vehicle #143**

> Description: 1995 Nissan, VIN 1N6SD11S7SC457051, truck
> Mileage: 41,761
> Date purchased by HB Auto: October 7, 1998
> NADA value on August 1, 2002: $4,500
> HB Auto's estimate of value prior to incident: $5,000
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The damage disclosure statement does not indicate whether the vehicle ever had damage in excess of 25% of the value. Twigg's expert report states "rough vehicle" and indicates no forklift damage. Spears's report list forklift damage to the drive shaft, exhaust, left fender, door and bedside. It also notes that the tires are dry-rotted, the paint is faded and rusting, the interior is rotten, and various front end parts are missing.

After reviewing the evidence, the Court finds that Vehicle #143 had a value of $3,825 immediately prior to being moved to the Lower Lot. The vehicle had been sitting for more than three years and would have deteriorated accordingly. While HB Auto has established forklift damage, the Court also finds that there is evidence of a criminal act, since parts of this vehicle are missing. As the Court cannot determine with any degree of certainty the amount of damages attributable to Brokers subsequent to the move, the Court will not award damages for any drop in value after it was moved to the Lower Lot.

**Vehicle #144**

> Description: 1995 Ford Contour, VIN 1FALP6533SK172292
> Mileage: 88,486
> Date purchased by HB Auto: October 30, 2002

Vehicle #144 must be excluded from the list of vehicles damaged by Brokers's negligence. This vehicle was purchased on October 30, 2002, a time that is outside the scope of

the present action. It was purchased after HB Auto had relocated to its new location.

Accordingly, HB Auto is not entitled to any damages attributable to Vehicle #144.

**Vehicle #145**

> Description: 1998 Saturn, VIN 1G8ZK5272WZ253165
> Mileage: 95,225
> Date purchased by HB Auto: August 21, 2002
> Purchase price: $1,850
> NADA value on August 1, 2002: $7,375
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $1,800
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: The bill of sale indicates HB Auto purchased the vehicle as a red light
> and damaged and disabled. The damage disclosure statement on the title indicates that
> when HB Auto purchased it, the vehicle had not been damaged such that it needed repairs
> costing more than 25% of the fair market value and it is not a flood, reconstruction or
> salvage vehicle. Spears's expert report indicates the vehicle has forklift damage to the
> rocker panel, and also that the paint and interior are deteriorated and the tires are dry-
> rotted. Twigg's report lists both no damage and no forklift damage.

After reviewing the evidence presented, the Court finds that Vehicle ##145 had a value

of $3,000 immediately before the incident, which is equal to HB Auto's estimate of value.

While HB Auto's general practice was to promptly prepare vehicles for sale, Vehicle #145 was

purchased very shortly before it was moved to the Lower Lot. Notwithstanding, this value is

only 40.7% of the NADA value and is credible even if HB Auto did not have time to completely

repair and detail the vehicle.

**Vehicle #146**

> Description: 1995 Chrysler Sebring, VIN 4C3AU42NXVE061801
> Mileage: 98,650
> Date purchased by HB Auto: December 28, 2001
> Purchase price: $995
> NADA value on August 1, 2002: $5,275
> HB Auto's estimate of value prior to incident: $4,900
> HB Auto's estimate of value after incident: $1,500

Spears's estimate of value after incident: $1,800
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The bill of sale indicates HB Auto purchased Vehicle #146 with frame damage. The accompanying damage disclosure statement indicates the vehicle had not been damaged such that repairs costing in excess of 25% of the value were required, and it was not a flood, salvage, theft, or reconstructed vehicle. Spears's report lists forklift damage to the floor boards, rocker panels, left rear suspension, left door, and left quarter. The report also states that the paint is faded and peeling, the tires are dry-rotted, the interior is depreciated, and miscellaneous interior and exterior parts are missing. Twigg's report indicates that the vehicle has both no damage and no forklift damage, as well as a missing grille. The photos show damage to the left side of the vehicle and many missing interior parts.

The Court finds that Vehicle #146 had a value of $4,747 immediately prior to being moved to the Lower Lot. This vehicle had frame damage, which impairs its value by 10% of the NADA value. HB Auto has established that this vehicle was significantly damaged by Brokers. While Twigg's report indicates that this vehicle has no damage other than a missing grille, more extensive damage is plainly apparent on the photo. There is evidence that parts have been stolen from the interior of this vehicle; therefore, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot. The Court will not award damages for injury to Vehicle #146 subsequent to it being moved to the Lower Lot.

**Vehicle #147**

Description: 1995 Hyundai Elantra, VIN KMHJF23M7SU946469, 4-door, red
Mileage: 49,859
Date purchased by HB Auto: October 20, 1999
NADA value on August 1, 2002: $3,425
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $400
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: Twigg's report indicates Vehicle #147 has forklift damage with the front bumper cover damaged and the right door mirror broken. Spears's report lists forklift damage to the front bumper, right front door, door molding (which is cut), and

floor boards.  The report states that the paint is faded, chipping and peeling, the interior and all the tires are dry-rotted, and "engine seized up."  The photos show the damage to the front bumper and right side.

The Court finds that Vehicle #147 had a value of $2,500 prior to being damaged by Brokers.  The vehicle had been sitting on the lot for more than two years, nevertheless, this value is low enough (only 73% of the NADA value) to account for the resulting deterioration and is within the parameters of a reasonable value as set forth by the experts in this case.  The experts agree that this vehicle was damaged by a forklift, and the evidence supports a post-incident value of $800.

**Vehicle #148**

Description: 1988 BMW 740i, VIN WBAGB4317J3210029
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $7,700
HB Auto's estimate of value prior to incident: $4,000
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $3,000
Spears's estimate of present value (as of August 1, 2007): $400
Other evidence:  HB Auto repossessed Vehicle #148 as the first lienholder.  Its lien is dated June 4, 1998, but the date of repossession is unknown.  Twigg's expert report indicates the vehicle has forklift damage with the right fender, door, and quarter panel damaged.  Spears's expert report indicates the vehicle has forklift damage to the right front door and right rear door, and it also notes that the left quarter panel is damaged, the paint is faded, the interior and tires are dry-rotted, and the windshield is cracked.

The Court finds that Vehicle #148 had a value of $4,000 immediately prior to the incident. It is not known how long the vehicle had been sitting on the lot; however, this value is low enough, only 51.9% of the NADA value, to account for the deterioration and is within the parameters of a reasonable value as set forth by the experts in this case.  The experts agree that this vehicle was damaged by a forklift.

162

**Vehicle #149**

> Description: 1996 Ford Aerostar, VIN 1FMDA11UXTZB59643
> Mileage: unknown
> Date purchased by HB Auto: June 14, 2000
> Purchase price: $1,650
> NADA value on August 1, 2002: unknown
> HB Auto's estimate of value prior to incident: $4,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: no opinion
> Spears's estimate of present value (as of August 1, 2007): no opinion
> Other evidence: The evidence reflects that HB Auto sold this vehicle sometime prior to when the experts examined the vehicles.

The Court finds that HB Auto is not entitled to any damages attributable to Vehicle #149.

Neither Twigg nor Spears rendered an opinion on the condition of this vehicle, and there is no photo or specific testimony related to this vehicle. HB Auto has not carried its burden of proving that it is entitled to any damages for this vehicle.

**Vehicle #150**

> Description: 1996 Dodge Avenger, VIN 4B3AU42Y3TE270057, 2-door, green
> Mileage: 88,635
> Date purchased by HB Auto: April 17, 2002
> Purchase price: $1,900
> NADA value on August 1, 2002: $5,725
> HB Auto's estimate of value prior to incident: $4,000
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $1,800
> Spears's estimate of present value (as of August 1, 2007): $200
> Other evidence: The bill of sale indicates that HB Auto purchased Vehicle #150 at auction in the salvage line with no announced conditions. The damage disclosure statement indicates the vehicle had not been damaged such that repairs costing in excess of 25% of the value were required, and it was not a flood, salvage, theft, or reconstructed vehicle. Hassan Ahmadi confirmed in testimony that his brother bought this vehicle on April 17, 2002. Hossein Ahmadi testified that the vehicle was in average condition when he purchased it, it had good mileage, and it was bought in the salvage line but was not a salvage vehicle. Spears's report lists forklift damage to the left fender and quarter, the floor boards, and the rockers. The report also notes that the paint is faded and peeling, the tires are dry-rotted, and the interior is depreciated. Twigg's report lists "bad paint," no damage, and no forklift damage. Damage to the left quarter is visible on the photos.

This vehicle was purchased when Hossein and Hassan Ahmadi were tending to their parents in the United States. Thus, the vehicle would not have been repaired or prepared for sale prior to being moved to the Lower Lot by Brokers. HB Auto's original estimate of value of $4,000 is credible and within the parameters set forth by the experts considering the vehicle had no adverse announced conditions when it was purchased just prior to the move.

**Vehicle #151**

> Description: 1986 Mercedes Benz, VIN WDBDA24D0GF160702
> Mileage: 80,591
> Date purchased by HB Auto: February 3, 1998
> Purchase price: $2,215
> NADA value on August 1, 2002: $4,625
> HB Auto's estimate of value prior to incident: $4,000
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $75
> Other evidence: Hassan Ahmadi testified that he specifically remembered the condition of Vehicle #151 prior to it being moved to the Lower Lot and stated "there wasn't anything wrong with that vehicle." Twigg's report contains no information or opinion about this vehicle. Spears's report lists forklift damage to the right quarter panel, front bumper, front right light (which is cracked), rocker panel, floor boards, and exhaust. The report also states that the paint is faded, the dash is cracked, the tires and interior are dry-rotted, and the engine is "seized up."

The Court finds that Vehicle #151 had a value of $4,000 immediately prior to the incident. The vehicle had been sitting on the Property for about four years, and this value reflects the resulting deterioration. The Court also finds that HB Auto has established that Brokers damaged the vehicle with a forklift.

**Vehicle #152**

> Description: 1994 Eagle Talon, VIN 4E3CF34B9RE013654
> Mileage: 93,365
> Date purchased by HB Auto: September 10, 1997
> NADA value on August 1, 2002: $3,800
> HB Auto's estimate of value prior to incident: $3,500

HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: Twigg's expert report indicates Vehicle #152 has "bad paint," no damage, and no forklift damage. Spears's expert report indicates the vehicle has forklift damage in the form of light front end damage. The vehicle also has faded paint and dry-rotted interior and tires. The photo shows the poor condition of the paint.

Based upon the evidence presented, the Court finds that Vehicle #152 had a value of $3,230 immediately before the incident. The NADA value at that time was $3,800, but the vehicle had been sitting on the lot for an extended period: approximately three and a half years. This fact reflects poorly on the value of the vehicle, and therefore the evidence supports a finding that the vehicle was in less than average condition. In addition, after a careful review, the Court finds that the evidence does not support HB Auto's estimate of the value of the vehicle after the incident. Unlike almost every other vehicle, Spears's report does not indicate that this vehicle sustained any type of frame or underside damage from the move, as it only sustained "light" front end damage. Since the Court is unable to calculate the value of the vehicle immediately after the incident with reasonable certainty, the Court will assume the vehicle's value was the same immediately after the incident.

**Vehicle #153**

Description: 1993 Mazda Protégé, VIN JM1BG2245P0568058, 4-door
Mileage: 147,043
Date purchased by HB Auto: September 11, 2002
Purchase price: $245
NADA value on August 1, 2002: $1,700
HB Auto's estimate of value prior to incident: $2,200
HB Auto's estimate of value after incident: $600
Spears's estimate of value after incident: $200
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates that HB Auto purchased the vehicle at auction as a red light with more than 100,000 miles. The damage disclosure statement indicates the vehicle had not been damaged such that repairs costing in excess of 25% of the value

were required, and it was not a flood, salvage, theft, or reconstructed vehicle. Twigg's report contains no information or opinion about Vehicle #153. Spears's report lists forklift damage to the right front fender, windshield, and quarter panel, and it also notes that the paint is faded, the tires are dry-rotted, the engine is "seized up," and the interior is depreciated. Damage to the front fender and quarter panel is visible on the photos.

The Court finds that Vehicle #153 had a value of $1,700 immediately prior to being damaged by Brokers. This value is equal to the NADA value and incorporates a deduction for high mileage. The vehicle was purchased with no other announced conditions and accompanied by a completed damage disclosure statement. Also, HB Auto has established forklift damage, which is plainly visible on the photos and matches Spears's description.

## Vehicle #154

> Description: 1994 Ford Aerostar, VIN 1FMCA11U8RZA47895, van
> Mileage: 81,966
> Date purchased by HB Auto: April 8, 1998
> Purchase price: $900
> NADA value on August 1, 2002: $4,830
> HB Auto's estimate of value prior to incident: $4,500
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $1,100
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: Twigg's expert report lists that the front bumper is missing and the vehicle has no forklift damage. Spears's expert report lists forklift damage to the rocker panel, floor boards, running boards, and right rear door. The report also states that the front bumper is torn off, the paint is faded, and the tires and interior are dry-rotted.

HB Auto owned Vehicle #154 for approximately four years before Brokers moved it to the Lower Lot. This fact reflects poorly on its value, as the undisputed testimony in this case is that a vehicle that sits unused for an extended period of time will deteriorate. After reviewing the evidence, the Court finds that Vehicle #154 had a value of $4,100 immediately prior to being damaged by Brokers. The Court notes that there was a significant drop in this vehicle's value after the incident; however, Spears's report establishes this vehicle sustained extensive damage

166

from a forklift.

**Vehicle #155**

> Description: 1995 Nissan 200-SX, VIN JN1AS44D3SW022564, 2-door
> Mileage: 85,824
> Date purchased by HB Auto: July 27, 2000
> NADA value on August 1, 2002: $4,650
> HB Auto's estimate of value prior to incident: $5,800
> HB Auto's estimate of value after incident: $2,200
> Spears's estimate of value after incident: $2,000
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: Spears's report lists forklift damage to the rocker panel and floor boards,
> and also notes that the paint is faded, the interior is depreciated, and the tires are dry-
> rotted.  Twigg's report lists both no damage and no forklift damage.

The Court finds that Vehicle #155 had a value of $4,185 immediately prior to the

incident.  There is almost no information available about the condition of this vehicle when HB

Auto purchased it, but given the fact that the vehicle sat parked for almost two years, the Court

finds that it was in less than average condition by the time Brokers damaged it.  This finding is

supported by the testimony in this case that a vehicle will deteriorate if it sits for an extended

period of time.  Lastly, the Court notes that HB Auto has established that Brokers damaged this

vehicle when it moved it to the Lower Lot, reducing its value to $2,200.

**Vehicle #156**

> Description: 1995 Dodge Intrepid, VIN 2B3HD46F0SH665684, 4-door
> Mileage: 119,134
> Date purchased by HB Auto: July 3, 2001
> Purchase price: unknown
> NADA value on August 1, 2002: $ 2,575
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: The damage disclosure statement on the back of the title indicates HB
> Auto purchased the vehicle, and it had not been damaged such that repairs exceeded 25%
> of the value.  Twigg's report indicates the vehicle has forklift damage, "bad paint," and

the left headlight missing. Spears's report lists forklift damage to the rocker panel, floor boards, left rear quarter, and left rear door. It also notes that the interior is rotten, the paint is faded, the tires are dry-rotted, and miscellaneous interior parts are missing.

Based upon the evidence, the Court finds that Vehicle #156 had a value of $2,575 immediately prior to being moved to the Lower Lot by Brokers. Twigg and Spears agree that this vehicle sustained forklift damage. There is evidence that this vehicle was the target of theft after it was moved to the Lower Lot. As with other vehicles that were the subject of an intervening criminal act, the Court will not award damages for injury to this vehicle subsequent to it being moved to the Lower Lot.

**Vehicle #157**

> Description: 1995 Pontiac Grand Am, VIN 1G2NE55D3SM581865, 4-door
> Mileage: 179,928
> Date purchased by HB Auto: December 12, 2001
> Purchase price: $350
> NADA value on August 1, 2002: $2,325
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $500
> Spears's estimate of value after incident: $300
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The bill of sale from Greensboro Auto Auction indicates that HB Auto purchased the vehicle in the salvage line with "miles over" and that it has a salvage history. The damage disclosure statement indicates the vehicle had not been damaged such that repairs costing in excess of 25% of the value were required, and it was not a flood, salvage, theft, or reconstructed vehicle. This inconsistency was addressed during Twigg's testimony at trial, and Twigg could not state whether there was an error on the bill of sale. Spears's report indicates the vehicle has forklift damage to the passenger side doors and mirror, and it notes that the interior and tires are dry-rotted and the paint is faded and peeling. Twigg's report lists both no damage and no forklift damage.

Because Greensboro Auto Auction indicated that Vehicle #157 had a salvage history, the Court will value it as such. Therefore, based upon the evidence regarding the value of vehicles with salvage history, the Court finds that it had a value of $1,511 immediately prior to the incident. The Court also finds that HB Auto has established that Brokers damaged this vehicle

with a forklift, reducing its value to $500.

**Vehicles #158 and #159**

> #158
> Description: 1998 Plymouth Breeze, VIN 1P3EJ46C3WN158534
> Mileage: 94,223
> Date purchased by HB Auto: November 27, 2002
>
> #159
> Description: 1995 Mitsubishi Gallant, VIN 4A3AJ56G3SE015002
> Mileage: 120,917
> Date purchased by HB Auto: November 13, 2002

Vehicles #158 and #159 must be excluded from the list of vehicles damaged by Brokers's

negligence.  These vehicles were purchased after HB Auto had relocated to its new location and

would not have been damaged as a result of the events that are the subject of this Complaint.

**Vehicle #160**

> Description: 1995 Mazda 626, VIN 1YVGE22C0S5335830, 4-door
> Mileage: 135,876
> Date purchased by HB Auto: March 20, 2002
> Purchase price: $795
> NADA value on August 1, 2002: $2,400
> HB Auto's estimate of value prior to incident: $3,500
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $2,500
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: The handwritten bill of sale signed by an agent for HB Auto indicates
> Vehicle #160 was sold to HB Auto at auction as damaged and disabled with "miles
> over."  In contrast, an unsigned, typed bill of sale indicates the vehicle was repossessed
> and a "total loss."  Hassan Ahmadi confirmed in testimony at trial that HB Auto
> purchased Vehicle #160 on March 20, 2002.  Hossein Ahmadi testified that neither he
> nor his brother signed the bill of sale, and that an agent bought the vehicle on HB Auto's
> behalf.  He confirmed in testimony that the title history indicates that the windshield was
> damaged, and it indicates "total loss per AIA."  He testified that if the vehicle was
> totaled, it had been repaired before HB Auto purchased it on March 20, 2002.  He
> testified that usually if he purchases a vehicle that was a total loss, even after the vehicle
> was repaired "it's going to be less than average."  Twigg's expert report indicates both no
> damage and no forklift damage.  Spears's expert report indicates that there is no visible
> forklift damage.  The report notes that miscellaneous interior and exterior parts are

169

missing, the paint is faded, and the tires are dry-rotted.  The photos in evidence show many missing parts; however, the windshield is intact.

Brokers elicited extensive testimony regarding the history of Vehicle #160, and while it is clear that the vehicle does have a history of 25% damage and it was repaired, the essential fact remains that this vehicle was not damaged with a forklift.  In addition, this vehicle was, unfortunately, vandalized.  The Court concludes that for this particular vehicle, as was the case for Vehicle #42, HB Auto's estimate of the value of the vehicle after the incident must include damages from vandalism.  Therefore, the Court cannot, with any reasonable certainty, ascertain what amount of damages, if any, are attributable to Brokers.  As a result, no damages will be awarded for injury to this vehicle.

**Vehicle #161**

> Description: 1991 Dodge Caravan, VIN 2B4GK4534MR281120, van
> Mileage: 202,124
> Date purchased by HB Auto: October 25, 2001
> Purchase price: unknown
> NADA value on August 1, 2002: $2,275
> HB Auto's estimate of value prior to incident: $2,000
> HB Auto's estimate of value after incident: $400
> Spears's estimate of value after incident: $600
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: The damage disclosure statement on the title certifies that when HB Auto purchased the vehicle, it had not been damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle.  Spears's report lists forklift damage to the rocker panel, floor boards, left fender, and left quarter panel.  The report notes that the paint is faded, peeling, and rusting, miscellaneous exterior parts are missing, and the tires and interior are dry-rotted.  Twigg's expert report states "poor condition" and indicates no forklift damage.

The Court finds that Vehicle #161 had a value of $2,000 immediately prior to being damaged by Brokers.  This value is less than 88% of the NADA value, which incorporates a deduction for high mileage, and is within the parameters set forth by the experts.  The vehicle

170

was purchased with a completed damage disclosure statement.  Also, HB Auto has established

forklift damage to an extent that supports its estimate of damages.

**Vehicle #162**

> <u>Description</u>: 1998 Chevrolet S-10, VIN 1GCCS1947WK244521, truck
> <u>Mileage</u>: 124,364
> <u>Date purchased by HB Auto</u>: September 18, 2002
> <u>NADA value on August 1, 2002</u>: unknown
> <u>HB Auto's estimate of value prior to incident</u>: $4,800
> <u>HB Auto's estimate of value after incident</u>: $1,200
> <u>Spears's estimate of value after incident</u>: no opinion
> <u>Spears's estimate of present value (as of August 1, 2007)</u>: no opinion
> <u>Other evidence</u>: HB Auto sold Vehicle #162 on October 24, 2005 for $2,815.

HB Auto has not established that it is entitled to any damages for this vehicle.  Neither

Twigg nor Spears was able to examine this vehicle.  There are no photos and no specific

testimony about any possible damages.

**Vehicle #163**

> <u>Description</u>: 1996 Hyundai Accent, VIN KMHVF14N3TU241169
> <u>Mileage</u>: 121,463
> <u>Date purchased by HB Auto</u>:  October 1, 2002

Vehicle #163 must be excluded from the list of vehicles damaged by Brokers's

negligence.  It was purchased when HB Auto was relocating to its new location and would not

have been damaged as a result of the events that are the subject of this Complaint.

**Vehicle #164**

> <u>Description</u>: 1992 Buick Roadmaster, VIN 1G4BN5374NR465055, 4-door
> <u>Mileage</u>: 97,672
> <u>Date purchased by HB Auto</u>: September 11, 2002
> <u>Purchase price</u>: unknown
> <u>NADA value on August 1, 2002</u>: $5,300
> <u>HB Auto's estimate of value prior to incident</u>: $3,800
> <u>HB Auto's estimate of value after incident</u>: $1,500
> <u>Spears's estimate of value after incident</u>: $1,500

Spears's estimate of present value (as of August 1, 2007): $500
Other evidence: The damage disclosure statement on the back of the title indicates when HB Auto purchased Vehicle #164, and it had not been damaged such that repairs were in excess of 25% of the value. Spears's expert report indicates the vehicle has forklift damage to the left door molding and quarter panel, and it notes that the tires and interior are dry-rotted and the paint is faded. Twigg's expert report lists no damage and no forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #164 had a value of $3,800 immediately before the incident, which is equal to HB Auto's estimate of value. This value is only 71.7% of the NADA value at that time. This vehicle did not have any conditions that would permanently impact its value, and this value is within the parameters set forth by the experts in this case. HB Auto has also established that this vehicle was damaged on the left side by Brokers, reducing the value to $1,500.

## Vehicle #165

Description: 1997 Chevrolet Lumina, VIN 2G1WL52M4V1165245, 4-door, blue
Mileage: 89,379
Date purchased by HB Auto: November 5, 2001
Purchase price: unknown
NADA value on August 1, 2002: $5,325
HB Auto's estimate of value prior to incident: $3,800
HB Auto's estimate of value after incident: $2,000
Spears's estimate of value after incident: $2,200
Spears's estimate of present value (as of August 1, 2007): $150
Other evidence: Twigg's report lists no damage and no forklift damage. Spears's report lists forklift damage to one frame rail, the gas tank (which is caved in), the floor boards, and the left front door frame. The report also notes that the glass is cracked, the dash is cracked and peeling, the tires are dry-rotted, and the paint is faded.

HB Auto has established that Vehicle #165 had a value of $3,800 immediately prior to the incident, and that Brokers damaged the vehicle when it moved the vehicle to the Lower Lot.

## Vehicle #166

Description: 1990 Ford Taurus, VIN 1FACP50U1LA244379, white
Mileage: 92,455

Date purchased by HB Auto: May 31, 2000
Purchase price: $50
NADA value on August 1, 2002: $1,950
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $300
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates that HB Auto purchased Vehicle #166 at auction as a red light in the salvage line with no other announced conditions. Twigg's report indicates this vehicle has forklift damage with the roof damaged. Spears's report lists forklift damage to the floor boards, rockers, right door, right fender, right quarter, and right rear suspension. It also notes that the paint is faded, and the tires and interior are dry-rotted.

Based upon the evidence presented, the Court finds that Vehicle #166 had a value of $1,755 immediately prior to being moved to the Lower Lot. This vehicle had been sitting on the HB Auto lot for approximately two years prior to the incident, which would have reduced its value by causing deterioration. Therefore, the Court finds that it was in below average condition.

## Vehicle #167

Description: 1997 Ford Escort, VIN 1FALP13P4VW331150, 4-door
Mileage: 122,123
Date purchased by HB Auto: September 20, 2000
Purchase price: $1,050
NADA value on August 1, 2002: $1,925
HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates that HB Auto purchased Vehicle #167 at auction in the salvage line with "miles over." Spears's report indicates the vehicle has forklift damage to the floor boards, driver's side mirror, and fender. The report also notes that the paint is faded, the interior and tires are dry-rotted, and glass is broken and cracked. Twigg's report indicates the vehicle has forklift damage with the left mirror and door glass broken and the right rear door vent glass broken. The broken glass is visible on the photos.

Based upon the evidence presented, the Court finds that Vehicle #167 had a value of

173

$1,733 immediately prior to being moved to the Lower Lot. This vehicle had been sitting on the Property for approximately two years prior to the incident, and the resulting deterioration would have reduced its value. Therefore, the Court finds that the vehicle was in below average condition. The experts agree that the vehicle sustained forklift damage.

**Vehicle #168**

> Description: 1995 Hyundai Sonata, VIN KMHCF24F1SU358110[42]
> Mileage: 90,125
> Date purchased by HB Auto: November 14, 2002

Vehicle #168 must be excluded from the list of vehicles damaged by Brokers's negligence. It was purchased after HB Auto had relocated to its new location and would not have been damaged as a result of the events that are the subject of this Complaint.

**Vehicle #169**

> Description: 1992 Nissan Sentra, VIN 1N4EB31P0RC720137
> Mileage: unknown
> Date purchased by HB Auto: unknown
> Purchase price: unknown
> NADA value on August 1, 2002: $2,675
> HB Auto's estimate of value prior to incident: $2,600
> HB Auto's estimate of value after incident: $500
> Spears's estimate of value after incident: $600
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence: Neither the title nor the bill of sale for Vehicle #169 is in evidence. Twigg's report lists damage to the left fender and front door, right fender, and no forklift damage. Spears's report lists forklift damage to the left side, rear bumper, and quarter, and it notes that the paint is faded, the windshield is cracked, and the tires are dry-rotted.

The Court will not award any damages for injury to Vehicle #169 as it does not have enough evidence to establish HB Auto is entitled to damages or information to determine the vehicle's value immediately before Brokers moved it to the Lower Lot. The vehicle's mileage is

---

[42] The various charts in evidence list the VIN for Vehicle #168 as KMHCF24F1SI358110, but the title indicates the VIN is KMHCF24F1SU358110.

unknown, therefore, the NADA value cannot properly reflect any applicable mileage

adjustments.  The date of purchase is unknown, so the Court cannot determine whether the value

should be adjusted for deterioration or whether HB Auto even owned the vehicle at the time of

the incident.  There is neither a copy of the title nor a bill of sale in evidence, so the Court has no

source of information regarding announced conditions, a damage disclosure statement, or

salvage history.  Lastly, there was no testimony specific to this vehicle.  As a result, HB Auto

has not established that it is entitled to damages or the amount of any damages with reasonable

certainty.

**Vehicle #170**

> Description: 1985 Mazda RX-7, VIN JM1FB3327F0874129,[43] 2-door
> Mileage: unknown
> Date purchased by HB Auto: July 2, 1993
> Purchase price: unknown
> NADA value on August 1, 2002: $1,975
> HB Auto's estimate of value prior to incident: $4,000
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $500
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: When HB Auto purchased Vehicle #170, it had a salvage title.  HB Auto
> reconstructed the vehicle and the DMV completed a final inspection in October 1993.
> Hassan Ahmadi testified that after it was reconstructed, the vehicle sat on the lot such
> that the NADA value dropped from $5,900 to $1,975.  Hossein Ahmadi testified that HB
> Auto was keeping the vehicle because the Mazda RX-7 was a discontinued model and
> some people would "pay arm and leg" for it.  Spears's report lists forklift damage to the
> rocker panel and floor board.  It also notes that the paint is faded and rusting and the
> interior and tires are dry-rotted.  Twigg's report lists "bad paint," rust, no damage, and no
> forklift damage.

Similar to Vehicle #40, HB Auto held onto Vehicle #170 because the vehicle had value

as a discontinued model.  Therefore, while the vehicle had been sitting on the lot for many years,

---

[43]  The various charts in evidence list the VIN for Vehicle #170 as JB1FB3327F0874129,
but the title indicates the VIN is JM1FB3327F0874129.

Hossein Ahmadi provided a knowledgeable and credible explanation for this fact. Nevertheless, Vehicle #170 was a salvage vehicle, and the evidence establishes that a rebuilt salvage vehicle has a value 30% to 40% less than the average NADA value. After reviewing the evidence, the Court finds that the vehicle had a value of $1,375 immediately before the incident and that HB Auto has established Brokers caused forklift damage which reduced the value to $1,000.

**Vehicle #171**

> Description: 1984 Mercedes 380-SE, VIN 12603212001868
> Mileage: unknown
> Date purchased by HB Auto: unknown
> Purchase price: unknown
> NADA value on August 1, 2002: $5,950
> HB Auto's estimate of value prior to incident: $6,000
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: Neither the title nor the bill of sale for Vehicle #171 is in evidence. Twigg's expert report indicates Vehicle #171 is a "rough vehicle" which is rusted with no forklift damage. Spears's expert report indicates the vehicle has forklift damage to the floor boards and rocker panels. The report also notes that the paint is faded and peeling, the interior and tires are dry-rotted, and the tail light and parking lamp are broken.

As with Vehicle #169, the Court will not award any damages for injury to Vehicle #171. The vehicle's mileage is unknown, therefore, the NADA value cannot properly reflect any applicable mileage adjustments. The date of purchase is unknown, so the Court cannot determine whether the value should be adjusted for deterioration or whether HB Auto owned the vehicle at the time of the incident. There is neither a copy of the title nor a bill of sale in evidence, so the Court has no source of information regarding announced conditions, a damage disclosure statement, or salvage history. Additionally, there was no testimony specific to this vehicle. As a result, HB Auto has not established that it is entitled to damages or the amount of any such damages to which it would be entitled with reasonable certainty.

**Vehicle #172**

Description: 1985 Mercedes 500-SL, VIN WDBBA48D7CA054449
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $7,325
HB Auto's estimate of value prior to incident: $16,000
HB Auto's estimate of value after incident: $4,500
Spears's estimate of value after incident: $3,000
Spears's estimate of present value (as of August 1, 2007): $500
Other evidence:  Neither the title nor the bill of sale for Vehicle #172 is in evidence. Twigg's report lists "bad paint" and no forklift damage.  Spears's report lists forklift damage to the floor board and rocker panel, and it notes that the paint is faded, cracking, and peeling, the interior and tires are dry-rotted, and glass is broken.  Twigg testified that Vehicle #172 appeared from the photo as if it was partially repaired because parts of it had been primed.  He also testified that the vehicle appeared in very poor condition.

Again, as with the previous vehicle, the Court will not award any damages for injury to Vehicle #172 as it does not have enough information to determine the vehicle's value immediately before Brokers moved it to the Lower Lot.  The vehicle's mileage is unknown, therefore, the NADA value cannot properly reflect any applicable mileage adjustments.  The date of purchase is unknown, so the Court cannot determine whether the value should be adjusted for deterioration or whether HB Auto even owned the vehicle at the time of the incident.  There is neither a copy of the title nor a bill of sale in evidence, so the Court has no source of information regarding announced conditions, damage disclosure, or salvage history.  There was testimony specific to this vehicle: Twigg testified that it appears in very poor condition and partially repaired.  This testimony places the pre-incident value even further into doubt.  The Court concludes that HB Auto has not established that it is entitled to damages or the amount of damages, if any, with reasonable certainty.

**Vehicle #173**

Description: 1994 Nissan 300-ZX, VIN JN1RZ24DXSX591411,[44] 2-door
Mileage: 47,799
Date purchased by HB Auto: sometime after April 14, 2000
Purchase price: unknown
NADA value on August 1, 2002: $13,775
HB Auto's estimate of value prior to incident: $6,500
HB Auto's estimate of value after incident: $3,000
Spears's estimate of value after incident: $2,500
Spears's estimate of present value (as of August 1, 2007): $150
Other evidence: HB Auto purchased Vehicle #173 as a salvage vehicle. The title history
discloses that the vehicle was signed over the State Farm Insurance on March 8, 2000
with 47,799 miles on it. A salvage title was issued to State Farm Insurance on April 14,
2000. Hassan Ahmadi testified that because the vehicle was more than six years old, the
DMV did not require an inspection, and the title will always indicate that the vehicle is a
salvage rebuild. He testified that he repaired this vehicle such that it was worth the
NADA value. Twigg's report lists no damage and no forklift damage. Spears's report
indicates the vehicle has forklift damage to the rocker panel and suspension. The report
also notes that the tires and interior are dry-rotted, the paint is deteriorated, the stereo was
stolen, and seats/other miscellaneous parts were stolen. From the photos, it is evident
that the vehicle has been vandalized.

Based upon the evidence presented, the Court finds that Vehicle #173 had a value of

$6,500 immediately before the incident, which is equal to HB Auto's estimate of value. This

value is only 47.2% of the NADA value at that time; therefore, low enough to account for the

fact it was a repaired salvage vehicle. There is evidence of an unanticipated intervening act:

numerous parts were stolen out of this vehicle. As a result, the Court cannot determine with

reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was

moved to the Lower Lot. Consequently, the Court will not award damages for injury subsequent

to it being moved to the Lower Lot.

**Vehicle #174**

Description: 1989 Toyota Corolla, VIN JT2AE92EXJ3136633
Mileage: 194,482

---

[44] This is the VIN as it appears on the title. Numerous variations of the VIN appear in
other documents in evidence.

Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $2,450
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Neither the title nor the bill of sale for Vehicle #174 is in evidence. Spears testified that he felt he needed the pre-incident condition of this vehicle and also noted such on his report. Spears testified that he did not need that information for his analysis, but that he had some question as to whether Vehicle #174 was a "running, driving car." Spears's report notes forklift damage to the floor boards and rocker panel, and it indicates that the paint is faded, the tires are dry-rotted, the windshield is cracked, the interior is rotten, and miscellaneous interior parts are missing. Twigg's report lists no forklift damage and damage to the left door and quarter panel.

The Court does not have enough information about Vehicle #174 to determine its value immediately before Brokers moved it to the Lower Lot. The date of purchase is unknown, so the Court cannot determine whether the value should be adjusted for deterioration. Furthermore, there is neither a copy of the title nor a bill of sale in evidence, so the Court has no source of information regarding announced conditions, a damage disclosure statement, or salvage history or whether HB Auto even owned the vehicle at the time of the incident. Spears also testified that he had questions regarding whether the vehicle was ready for sale prior to being moved to the Lower Lot. The Court finds that there is credible evidence that Vehicle #174 was not in average condition and not one of the "good" cars, as described by the employees, that were primarily moved. There is also evidence that this vehicle was vandalized, so not only can the Court not determine the starting value, the Court cannot determine what amount of damage is attributable to Brokers's conduct. In sum, HB Auto has not established the amount of damages with reasonable certainty.

**Vehicle #175**

179

<u>Description</u>: 1993 Hyundai Sonata, VIN 2HMBF22F7P8085656
<u>Mileage</u>: 82,857
<u>Date purchased by HB Auto</u>: unknown
<u>Purchase price</u>: unknown
<u>NADA value on August 1, 2002</u>: $2,375
<u>HB Auto's estimate of value prior to incident</u>: $2,500
<u>HB Auto's estimate of value after incident</u>: $500
<u>Spears's estimate of value after incident</u>: $450
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $25
<u>Other evidence</u>:  Neither the title nor the bill of sale for the vehicle is in evidence.
Twigg's expert report contains nothing regarding Vehicle #175.  Spears's expert report
indicates forklift damage to the left front door, floor boards, and rockers, and it notes that
the paint is faded and the tires and interior are dry-rotted.

For the same reasons stated for Vehicle #169, the Court finds that HB Auto has not

established the amount of damages for Vehicle #175 with reasonable certainty.

**Vehicle #176**

<u>Description</u>: 1986 Nissan Maxima, VIN JN1HU11S0GX824307, 4-door
<u>Mileage</u>: 274,484
<u>Date purchased by HB Auto</u>: October 11, 2001
<u>NADA value on August 1, 2002</u>: $2,300
<u>HB Auto's estimate of value prior to incident</u>: $1,900
<u>HB Auto's estimate of value after incident</u>: $200
<u>Spears's estimate of value after incident</u>: $400
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $25
<u>Other evidence</u>: The title for Vehicle #176 states it is a salvage rebuilt with water/flood
damage.  Twigg's report lists "bad paint," no damage, and no forklift damage.  Spears's
report indicates forklift damage to the right rear door and front fender, and it indicates
that the tires and interior are dry-rotted, the paint is faded and peeling, and glass is
broken.

Pursuant to the evidence in this case, a salvage history reduces the value by 30% to 40%

of the NADA value, and the flood history reduces the value similarly.  After considering the

evidence, the Court finds thatVehicle #176 had a value of $900 prior to being moved to the

Lower  Lot.  Further, HB Auto has established Brokers caused damages to the vehicle in the

amount of $700 when moving it to the Lower Lot, reducing its value to $200.

**Vehicle #177**

> Description: 1991 Infiniti Q-45, VIN JNKNG01C3MM102965, 4-door
> Mileage: 84,711
> Date purchased by HB Auto: July 28, 1999
> Purchase price: unknown
> NADA value on August 1, 2002: $7,250
> HB Auto's estimate of value prior to incident: $5,900
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $3,500
> Spears's estimate of present value (as of August 1, 2007): $400
> Other evidence: The damage disclosure statement does not indicate whether the vehicle
> had been damaged in excess of 25% of the value when HB Auto purchased it. Spears's
> report lists forklift damage to the floor board, rocker panel, and suspension, and the
> report notes that the paint is faded and cracking, the tires are dry-rotted, and the interior
> is deteriorated. Twigg's report states nothing about this vehicle.

After reviewing the evidence presented, the Court finds that Vehicle #177 had a value of

$5,900 immediately prior to the incident, which is equal to HB Auto's estimate. Forklift damage

has also been established, reducing the value to $1,000.

**Vehicle #178**

> Description: 1996 Dodge Intrepid, VIN 1B3HD46FXTF136102, blue-green
> Mileage: 128,371
> Date purchased by HB Auto: unknown
> Purchase price: unknown
> NADA value on August 1, 2002: $5,650
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $500
> Spears's estimate of value after incident: $1,400
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence: Neither the title nor the bill of sale for Vehicle #178 is in evidence.
> Spears's expert report lists forklift damage to the rockers, floorboards, and the complete
> left side. His report also indicates that the paint is faded, peeling, and rusted, the tires are
> dry-rotted, and the interior is deteriorated. Twigg's expert report indicates the vehicle
> has forklift damage to the left front door and quarter panel. The photos in evidence
> reveal vertical dents on the left side.

HB Auto has not presented sufficient evidence to establish that it is entitled to damages

for Vehicle #178 for the same reasons set forth for Vehicle #169.

181

**Vehicle #179**

Description: 1996 Hyundai Accent, VIN KMHVF14N9TU242536, 4-door
Mileage: 95,979
Date purchased by HB Auto: June 12, 2002
Purchase price: unknown
NADA value on August 1, 2002: $3,175
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $400
Spears's estimate of value after incident: $600
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Twigg's report indicates the vehicle has forklift damage to the left fender and "bad paint." Spears's report lists forklift damage to the rocker panel, a dent on driver's side fender, and scratches from a forklift. It also notes that the tires are dry-rotted, the paint is faded, peeling, and rusted, the driver's seat was stolen, and the windshield is cracked. The damage on the side of the vehicle and the cracked windshield are visible on the photo.

Based upon the evidence presented, the Court finds that Vehicle #179 had a value of $2,500 immediately before the incident, which is equal to HB Auto's original estimate of value. This value is 78.7% of the NADA value and falls within the parameters set forth by the experts in this case. There is evidence of an intervening criminal act after Brokers moved the vehicle to the Lower Lot, as a seat was stolen. Given this evidence of vandalism, the Court cannot determine with reasonable certainty the amount of damage proximately caused by Brokers once this vehicle was moved to the Lower Lot. Therefore, the Court will not award damages for injury subsequent to it being moved to the Lower Lot.

**Vehicle #180**

Description: 1997 Oldsmobile Achieva, VIN 1G3NL52T7VM324516, 4-door
Mileage: 68,701
Date purchased by HB Auto: June, 29, 2000
NADA value on August 1, 2002: $5,300
HB Auto's estimate of value prior to incident: $4,900
HB Auto's estimate of value after incident: $400
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $50

<u>Other evidence</u>: The damage disclosure statement certifies that when HB Auto purchased this vehicle, it had been damaged such that repairs exceeded 25% of the value. The damaged parts are identified as "motor locked up & front." Twigg's report notes "front collision" and no forklift damage. Spears's report lists forklift damage to the floor boards, rockers, and right fender and quarter. His report also states that the paint is faded and the tires and interior are dry-rotted.

After careful review of the evidence, the Court finds that HB Auto did not establish the amount of damages sustained by Vehicle #180 with reasonable certainty. This vehicle was purchased as a 25% damaged vehicle. The evidence in this case establishes that while HB Auto generally repaired vehicles promptly, an exception to this practice was totaled and/or salvage vehicles. For many of these vehicles, HB Auto presented evidence of repair through documentation, photos, or the expert reports. According to the damage disclosure statement for this vehicle, however, the front was damaged. Twigg's report indicates the vehicle shows signs of a front collision. In light of this, absent affirmative proof of repair, the Court cannot find that this vehicle was in "ready for sale" condition and cannot find that either the NADA value or HB Auto's value, which is very close to the NADA value, is credible. As the Court has no basis upon which to determine the starting value with reasonable certainty, no damages shall be awarded.

**Vehicle #181**

<u>Description</u>: 1996 Chevrolet Corsica, VIN 1G1LD5547TY155072, blue
<u>Mileage</u>: 118,445
<u>Date purchased by HB Auto</u>: June 20, 2001
<u>Purchase price</u>: unknown
<u>NADA value on August 1, 2002</u>: $3,725
<u>HB Auto's estimate of value prior to incident</u>: $2,000
<u>HB Auto's estimate of value after incident</u>: $200
<u>Spears's estimate of value after incident</u>: $500
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $25
<u>Other evidence</u>:  Spears's expert report lists forklift damage to the left front door, fender and rear door, the floor boards, and rockers. It notes that the paint is peeling and faded

and the tires and interior are dry-rotted. Twigg's expert report lists "bad paint," no damage, and no forklift damage. Twigg testified, based upon a photo, that the roof was a "total hunk of rust." Twigg elaborated that the roof's condition should not have been caused only by sitting, but it must have been in bad shape prior. He testified that his report should have listed the damage to the fender. Twigg also testified that the damage to the left side of the vehicle, consisting of a straight line from the front of the lamp to the door, looks as if something had been dragged along the side of the vehicle or as if the vehicle had "run down the side of something."

The Court finds that immediately prior to being damaged by Brokers, the value of Vehicle #181 was $2,000, which is equal to HB Auto's estimate. Twigg testified that the rust on the roof reveals the vehicle was in bad shape before being parked in the Lower Lot, and this value, which is only 53.7% of the NADA value, is consistent with that opinion.

The parties dispute whether there is forklift damage on Vehicle #181. Twigg's report on this vehicle, however, is clearly not accurate. Damage to the exterior of the vehicle is readily apparent on the photos in evidence, yet Twigg's report indicates no damage, forklift or otherwise. Further, Twigg's testimony at trial is consistent with the description by Brokers's employees of the incident that forklifts not only picked up vehicles, but ran into vehicles, dropped vehicles, etc. While the Court recognizes that HB Auto's estimate of the post-incident value is much lower than most, both in dollars and as a percentage of the starting value, the evidence reflects that this vehicle sustained damage more significant than most. The Court concludes that the evidence supports the post-incident value of $200, as originally estimated by HB Auto.

**Vehicle #182**

Description: 1994 Pontiac Sunfire, VIN 1G2JB54H9R7546087, blue
Mileage: 156,219
Date purchased by HB Auto: May 15, 2002

<u>NADA value on August 1, 2002</u>: $3,525
<u>HB Auto's estimate of value prior to incident</u>: $1,600
<u>HB Auto's estimate of value after incident</u>: $200
<u>Spears's estimate of value after incident</u>: $1,000
<u>Spears's estimate of present value (as of August 1, 2007)</u>: $100
<u>Other evidence</u>:  The damage disclosure statement certifies that Vehicle #182 had not been damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle when HB Auto purchased it.  Spears's report lists forklift damage to the floor boards and rockers, and his report notes that the interior is depreciated, the tires are dry-rotted, and the paint is faded.  Twigg's report states the vehicle has no damage and no forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #182 had a value of $1,600 immediately before the incident, which is equal to HB Auto's estimate of value.  This value is only 45.4% of the NADA value at that time, and the vehicle was accompanied by a damage disclosure statement.  HB Auto's own value falls within the parameters set forth by the experts in this case and the Court finds it credible.  The Court does not, however, find that the evidence supports HB Auto's estimate of the value of $200 after the incident.  The damage noted on Spears's report is not unusual for the vehicles in this case, yet HB Auto's estimate is extremely low relative to the other vehicles, both in dollar amount and as a percentage of the total value.  As stated previously, according to HB Auto's original estimates, only 13 out of the 235 vehicles were reduced to a value of less than $300 immediately after the incident, and Vehicle #182 is the only one out of those 13 that sustained no damage aside from damage to the rocker panels and floorboards.  Therefore, for this particular vehicle, the Court finds the vehicle had a value of $1,000 immediately after the incident.

**Vehicle #183**

<u>Description</u>: 1996 Ford Contour, VIN 3FALP65L7TM113899, 4-door, green
<u>Mileage</u>: 187,556
<u>Date purchased by HB Auto</u>: April 17, 2002
<u>Purchase price</u>: unknown

185

NADA value on August 1, 2002: $4,425
HB Auto's estimate of value prior to incident: $2,900
HB Auto's estimate of value after incident: $400
Spears's estimate of value after incident: $1,100
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The damage disclosure statement certifies that when HB Auto purchased the vehicle, it had not been damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle. Twigg's report indicates the vehicle has forklift damage to the right rear door. Spears's report lists forklift damage to the rocker panels, floor boards, suspension, and the right rear door. It also notes that the interior is rotten, the paint is faded, the tires are dry-rotted, and the windshield is cracked.

Based upon the evidence presented, the Court finds that immediately before the incident Vehicle #183 had a value of $2,900, which is equal to HB Auto's estimate of value. This value is only 65.5% of the NADA value at that time, and the vehicle was accompanied by a damage disclosure statement. HB Auto's original value falls within the parameters set forth by the experts in this case and the Court finds it credible. The Court also finds that the evidence supports HB Auto's estimate of a value of $400 after the incident, as both experts agree the vehicle sustained significant forklift damage.

**Vehicle #184**

Description: 1996 Pontiac Grand Am, VIN 1G2NE52T7TC714582
Mileage: 81,430
Date purchased by HB Auto: March 20, 2002
Purchase price: unknown
NADA value on August 1, 2002: $5,050
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $900
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The damage disclosure statement certifies Vehicle #184 had not been damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle when HB Auto purchased it. Twigg's report states that the vehicle has no damage and no forklift damage. Spears's expert report indicates the vehicle has forklift damage to the exhaust, floor board, and rocker panel, and it states that the interior is rotten, the paint is cracking and peeling, and the tires are dry-rotted.

186

The Court finds that Vehicle #184 had a value of $3,900 immediately before the incident, which is equal to HB Auto's estimate of value. This value is only 77.2% of the NADA value at that time, and the vehicle was accompanied by a damage disclosure statement. The vehicle was purchased during the time period that the Ahmadi's were unable to complete repairs. This value is low enough to be credible notwithstanding. Lastly, the Court also finds that HB Auto has established the vehicle sustained forklift damage, despite Twigg's report to the contrary.

**Vehicle #185**

Description: 1989 Toyota Camry, VIN JT2SV24E3K3334240, red
Mileage: 204,038
Date purchased by HB Auto: December 5, 2001
NADA value on August 1, 2002: $2,675
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $300
Spears's estimate of value after incident: $700
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The damage disclosure statement certifies the vehicle had not been damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle. Twigg's expert report indicates the vehicle has no damage and no forklift damage. Spears's expert report indicates the vehicle has forklift damage to the floor boards, rockers, and left front fender. His report also states that the paint is faded, and the tires and interior are dry-rotted. Damage to the left front fender is visible on the photo.

After reviewing the evidence presented, the Court finds that Vehicle #185 had a value of $2,500 immediately before the incident, which is HB Auto's estimate of value. Unlike the majority of the vehicles, its value is very close to the NADA value, but the Court has considered the fact that the vehicle did not have any conditions at the time of purchase that would permanently impact its value and the vehicle had not been sitting on the lot for an extended period of time. The evidence also supports HB Auto's estimate of the value of $300 after the incident, as both the vehicle's underside and the fender sustained damage.

**Vehicle #186**

> <u>Description</u>: 1994 Dodge Ram, VIN 2B4HB15X2RK164254
> <u>Mileage</u>: 109,241
> <u>Date purchased by HB Auto</u>: May 23, 2001
> <u>NADA value on August 1, 2002</u>: $8,000
> <u>HB Auto's estimate of value prior to incident</u>: $3,900
> <u>HB Auto's estimate of value after incident</u>: $500
> <u>Spears's estimate of value after incident</u>: $2,000
> <u>Spears's estimate of present value (as of August 1, 2007)</u>: $200
> <u>Other evidence</u>:  Spears's expert report indicates the vehicle has forklift damage to the ground effects, drive shaft, and right front door.  His report states that the paint is faded, peeling, and rusting, and the interior and tires are dry-rotted.  Twigg's report states "rough vehicle" and  no forklift damage.

After reviewing the evidence, the Court finds that the value of Vehicle #186 immediately prior to being moved to the Lower Lot was $3,900 and that HB Auto has established forklift damage, reducing the value to $500.

**Vehicle #187**

> <u>Description</u>: 1997 Dodge Caravan, VIN 2B4FP25B4VR236964
> <u>Mileage</u>: 126,890
> <u>Date purchased by HB Auto</u>: October 3, 2001
> <u>Purchase price</u>: unknown
> <u>NADA value on August 1, 2002</u>: unknown
> <u>HB Auto's estimate of value prior to incident</u>: $1,600
> <u>HB Auto's estimate of value after incident</u>: $300
> <u>Spears's estimate of value after incident</u>: no opinion
> <u>Spears's estimate of present value (as of August 1, 2007)</u>: no opinion
> <u>Other evidence</u>: The evidence reflects that HB Auto sold this vehicle sometime prior to when the experts examined the vehicles.

HB Auto has not established that it is entitled to any damages for this vehicle.  Neither Twigg nor Spears were able to examine this vehicle.  Additionally, there are no photos, and there was no specific testimony about any possible damages.

**Vehicle #188**

> <u>Description</u>: 1989 Chevrolet Camero, VIN 1G1FP21EXKL118224, red

188

Mileage: 39,684
Date purchased by HB Auto: February 25, 2002
NADA value on August 1, 2002: $3,125
HB Auto's estimate of value prior to incident: $2,900
HB Auto's estimate of value after incident: $300
Spears's estimate of value after incident: $1,600
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: The damage disclosure statement certifies the vehicle had not been damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle when HB Auto purchased it. Spears's report indicates the vehicle had forklift damage to the floorboards, drive shaft, exhaust, left door and fender, and right front fender. It also notes that the paint is faded and the tires and interior are dry-rotted. Twigg's report lists left door damage and no forklift damage. Twigg testified, based upon the photos, that he believed Vehicle #188 was damaged prior to the incident because it appeared as if someone used a screwdriver and hammer to pry the door open. He testified that he did not believe a thief would take the time to pry the door open, but would break the glass instead. On the photos, damage on both sides of the vehicle is visible.

Based upon the evidence presented, the Court finds that Vehicle #188 had a value of $2,900 immediately prior to being moved to the Lower Lot. The Court does not follow the logic of Twigg's contention that because some of the damage may have been caused by a screwdriver and hammer, it must have occurred prior to the incident. Furthermore, Spears's conclusion that the damage was caused by a forklift is more credible, inasmuch as Spears's opinion is based upon examining the vehicle in person, rather than looking at a photo. The Court also finds that HB Auto established extensive forklift damage as set forth on Spears's report.

**Vehicle #189**

Description: 1996 Ford Escort, VIN 1FASP14J1TW129868, 4-door
Mileage: 111,987
Date purchased by HB Auto: November 21, 2001
NADA value on August 1, 2002: $3,850
HB Auto's estimate of value prior to incident: $2,800
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The damage disclosure statement certifies the vehicle had not been

damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle when HB Auto purchased it. Twigg's report lists no damage, "bad paint," and no forklift damage. Spears's lists forklift damage to the floor boards, rockers, right door, and right fender. His report states that the paint is faded and peeling and interior and tires are dry-rotted.

Based upon the evidence presented, the Court finds that Vehicle #189 had a value of $2,800 immediately prior to being moved to the Lower Lot. The vehicle had no conditions that would permanently impact its value, other than high mileage, and this value is almost 30% less than the NADA value, after being adjusted for mileage.

## Vehicle #190

Description: 1996 Ford Escort, VIN 1FASP11J8TW179638, 2-door
Mileage: 112,646
Date purchased by HB Auto: September 12, 2001
NADA value on August 1, 2002: $2,550
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $400
Spears's estimate of value after incident: $300
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The damage disclosure statement on the back of the title indicates the stated mileage is in excess of the mechanical limits. Spears's expert report indicates the vehicle has forklift damage to the floor boards, rockers, and rear door, and it notes that the paint is faded and interior and tires are dry-rotted. Twigg's expert report states both no damage and no forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #190 had a value of $2,500 immediately prior to being moved to the Lower Lot.

## Vehicle #191

Description: 1995 Mazda Protégé, VIN JM1BA1410S0145069
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $3,600
HB Auto's estimate of value prior to incident: $4,000
HB Auto's estimate of value after incident: $900
Spears's estimate of value after incident: $1,000

190

Spears's estimate of present value (as of August 1, 2007): $50
Other evidence:  Neither the title nor the bill of sale for Vehicle #191 is in evidence.
Twigg's report indicates the vehicle has some type of forklift damage, "bad paint," and
no damage.  Spears's report indicates forklift damage to the rockers, floor boards, and
right front and rear doors.  The report notes that the paint is faded and peeling, the
interior is depreciated, the tires are dry-rotted, and glass is broken.

HB Auto has not presented sufficient evidence to establish that it is entitled to damages

for Vehicle #191.  There is neither a copy of the title, a bill of sale, nor specific testimony

regarding this vehicle in evidence so the Court cannot determine whether HB Auto owned the

vehicle at the time of the incident.  Also, the Court has no source of information regarding

announced conditions, a damage disclosure statement, or salvage history.  The date of purchase

is unknown, so the Court cannot determine whether the value should be adjusted for

deterioration.

**Vehicle #192**

Description: 1993 Mitsubishi Mirage, VIN JA3CA21AXPU037801
Mileage: 127,723
Date purchased by HB Auto: June 14, 2000
Purchase price: unknown
NADA value on August 1, 2002: $2,425
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $400
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: The damage disclosure statement on the back of the title indicates the
stated mileage is in excess of the mechanical limits.  Twigg's report indicates the vehicle
has no damage and no forklift damage.  Spears's report lists forklift damage to the rear
bumper and tail lights, and it notes that the windshield is broken, the roof molding is
damaged, and the paint is faded and rusted.

HB Auto owned Vehicle #192 for approximately two years prior to the time that Brokers

moved it to the Lower Lot.  As a result, its condition would have been somewhat deteriorated

prior to the move.  After consideration, the Court finds that Vehicle #192 had a value of $2,183

191

immediately prior to the incident.

**Vehicle #193**

> Description: 1999 Ford Ranger X-Cab, VIN 1FTYR14V5XPC04864
> Mileage: 15,384
> Date purchased by HB Auto: November 29, 2000
> Purchase price: unknown
> NADA value on August 1, 2002: unknown
> HB Auto's estimate of value prior to incident: $9,000
> HB Auto's estimate of value after incident: $2,000
> Spears's estimate of value after incident: no opinion
> Spears's estimate of present value (as of August 1, 2007): no opinion
> Other evidence:  The vehicle was sold prior to being examined by either expert.

HB Auto has not established that it is entitled to any damages for Vehicle #193.  Neither

Twigg nor Spears were able to examine this vehicle and there was no testimony about any

possible damages to this vehicle.

**Vehicle #194**

> Description: 1995 Mitsubishi Mirage, VIN JA3AA31C0SU005026
> Mileage: 145,006
> Date purchased by HB Auto: November 28, 2001
> NADA value on August 1, 2002: $3,400
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $400
> Spears's estimate of value after incident: $400
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The damage disclosure statement certifies that when HB Auto purchased
> the vehicle, it had not been damaged such that repairs exceeded 25% of the value, and it
> was not a flood, salvage, or reconstructed vehicle.  Spears's report lists forklift damage to
> floor boards, rockers, and right quarter, and it notes that the paint is faded, the tires are
> dry-rotted, and the interior is depreciated.  Twigg's report lists both no damage and no
> forklift damage.  At trial, Twigg testified that his report indicates that the radio and
> airbags are missing on Vehicle #194, but the report does not, in fact, indicate as such.

The Court finds that Vehicle #194 had a value of $3,000 immediately prior to being

moved to the Lower Lot.  The vehicle had no conditions that would permanently impact its

value, other than high mileage, and this value is only 88.2% of the NADA value which is

192

adjusted for mileage.

**Vehicle #195**

> Description: 1993 Mercury Sable, VIN 1MELM5343PA622432, blue
> Mileage: 36,638
> Date purchased by HB Auto: August 25, 1999
> NADA value on August 1, 2002: $4,200
> HB Auto's estimate of value prior to incident: $2,900
> HB Auto's estimate of value after incident: $200
> Spears's estimate of value after incident: $700
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence:  The damage disclosure statement on the back of the title indicates the
> stated mileage is in excess of the mechanical limits.  Twigg's report lists both no damage
> and no forklift damage.  Spears's report indicates the vehicle has forklift damage to the
> suspension, floorboard, rockers, left door, and fender.  It also notes that the paint is faded
> and the tires and interior are dry-rotted.

Based upon the evidence presented, the Court finds that Vehicle #195 had a value of

$2,900 immediately prior to being moved to the Lower Lot.  This value reflects that the vehicle

had mileage in excess of the mechanical limits and sat on the lot for approximately two and a

half years prior to the incident.  HB Auto has also established that this vehicle sustained rather

extensive damage when Brokers moved it with a forklift, thereby reducing the vehicle's value to

$200.

**Vehicle #196**

> Description: 1997 Dodge Neon, VIN 3B3ES47CXVT560109, green
> Mileage: 116,643
> Date purchased by HB Auto: May 15, 2002
> NADA value on August 1, 2002: $4,800
> HB Auto's estimate of value prior to incident: $3,000
> HB Auto's estimate of value after incident: $300
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $25
> Other evidence:  The damage disclosure statement on the back of the title indicates the
> stated mileage is in excess of the mechanical limits.  It also certifies the vehicle had not
> been damaged such that repairs exceeded 25% of the value, and it was not a flood,
> salvage, or reconstructed vehicle when HB Auto purchased it.  Twigg's report indicates

the vehicle has forklift damage to the left fender.  Spears's report lists forklift damage to the left fender, front and rear door, floor board, and rockers.  It also notes that the paint is faded, the tires are dry-rotted, and the interior is depreciated.

The Court finds that Vehicle #195 had a value of $2,900 immediately prior to being moved to the Lower Lot.  While the vehicle has mileage in excess of the mechanical limits, this value is only 62.5% of the NADA value with applicable mileage deductions.  Twigg and Spears agree that this vehicle sustained forklift damage, and Spears's report establishes that this damage was extensive.

**Vehicle #197**

> Description: 1996 Ford Contour, VIN 1FALP65L0TK161090[45]
> Mileage: 122,760
> Date purchased by HB Auto: January 9, 2002
> Purchase price: unknown
> NADA value on August 1, 2002: $4,425
> HB Auto's estimate of value prior to incident: $2,600
> HB Auto's estimate of value after incident: $400
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $200
> Other evidence: The damage disclosure statement certifies that, when purchased by HB Auto, the vehicle had not been damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle.  Twigg's report states the vehicle has no damage and no forklift damage.  Spears's report lists forklift damage to the rocker panel and floor board, and it notes that the tires are dry-rotted and the paint is faded.

After reviewing the evidence, the Court finds that Vehicle #197 had a value of $2,600 immediately prior to being moved to Lower Lot by Brokers.  This vehicle was less than five model years old and accompanied by a completed damage disclosure statement.  HB Auto has also established that Brokers damaged the vehicle with a forklift, such that the value of the vehicle dropped to $400.

---

[45]  Various exhibits in evidence list the VIN for Vehicle #197 as 1FALP6510TK161090, but the title indicates the VIN is 1FALP65L0TK161090.

**Vehicle #198**

> Description: 1994 Chevrolet Lumina, VIN 1G1WN54T8R9107225, 4-door, red
> Mileage: 140,009
> Date purchased by HB Auto: August 18, 2001
> Purchase price: unknown
> NADA value on August 1, 2002: $4,225
> HB Auto's estimate of value prior to incident: $2,100
> HB Auto's estimate of value after incident: $300
> Spears's estimate of value after incident: $800
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence:  Twigg's report states Vehicle #198 has "bad paint," no damage, and no
> forklift damage.  Spears's report lists forklift damage to the rocker panel and floor board,
> and it states that the tires and interior are dry-rotted and the paint is faded and cracking.
> No damage is visible on the photo.

The Court finds that Vehicle #198 had a value of $2,100 immediately prior to being

moved to Lower Lot by Brokers.  While there is little evidence of the vehicle's condition prior to

the incident, this value is only 49.7% of the NADA value.  HB Auto has also established that

Brokers damaged the vehicle during the move to the Lower Lot, such that the value of the

vehicle was reduced to $300.

**Vehicle #199**

> Description: 1995 Mercury Mystique, VIN 1MELM6536SK617576
> Mileage: 96,684
> Date purchased by HB Auto: October 3, 2001
> NADA value on August 1, 2002: $4,025
> HB Auto's estimate of value prior to incident: $2,600
> HB Auto's estimate of value after incident: $200
> Spears's estimate of value after incident: $1,100
> Spears's estimate of present value (as of August 1, 2007): $150
> Other evidence:  The damage disclosure statement certifies that when HB Auto
> purchased Vehicle #199, it had not been damaged such that repairs exceeded 25% of the
> value, and it was not a flood, salvage, or reconstructed vehicle.  Twigg's report only
> indicates "no damage" but does not indicate no forklift damage (or "NFLD").[46]  Spears's

---

[46] Once again, the Court notes that Twigg testified that he wrote "NFLD" meaning "no
forklift damage" if he felt there was no sign of forklift damage on the vehicle.  For some entries,
he lists simply "no damage" and for some he lists both "no damage" and "NFLD."  The

report indicates the vehicle has forklift damage to the left side, the left rear door shade which is cracked, the right rocker, and the right rear wheel which is bent. His report also documents that the gas lid and stereo have been stolen, and the tires are dry-rotted.

Based upon the evidence presented, the Court finds that immediately before the incident, Vehicle #199 had a value of $2,600, which is equal to HB Auto's estimate of value. This value is only 64.6% of the NADA value and is well within the parameters set forth by the experts, given that the vehicle has no history of 25% damage, flood, or salvage. HB Auto has also established that the vehicle sustained significant damage during the incident, reducing its value to $200. There is also evidence of the occurrence of an intervening criminal act after Brokers moved Vehicle #199 to the Lower Lot. This unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury. Therefore, the Court will not award damages for injury subsequent to it being moved to the Lower Lot.

**Vehicle #200**

Description: 1996 Kia Sephia, VIN KNAFA1255T5271064
Mileage: 110,719
Date purchased by HB Auto: September 26, 2001
Purchase price: unknown
NADA value on August 1, 2002: $2,825
HB Auto's estimate of value prior to incident: $2,000
HB Auto's estimate of value after incident: $400
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence: Twigg's report implies forklift damage, but only specifically indicates that the vehicle has no damage and it is rusted. Spears's report indicates the vehicle has forklift damage to the left rear door, front door and fender. His report also notes that the paint is faded and the interior and tires are dry-rotted. A long vertical indentation on the left side is visible on one of the photos.

Upon review of the evidence, the Court finds that Vehicle #200 had a value of $2,000

difference between the meaning of these two types of entries is unclear.

just prior to being moved to the Lower Lot by Brokers.  HB Auto has established that this

vehicle has forklift damage which reduced its value to $400.

**Vehicle #201**

> Description: 1991 Dodge Stealth, VIN JB3XD64B3MY022505, red
> Mileage: 98,832
> Date purchased by HB Auto: April 7, 1998
> NADA value on August 1, 2002: $6,625
> HB Auto's estimate of value prior to incident: $4,000
> HB Auto's estimate of value after incident: $800
> Spears's estimate of value after incident: $2,300
> Spears's estimate of present value (as of August 1, 2007): $200
> Other evidence: Twigg's expert report lists no damage and no forklift damage.  Spears's
> expert report lists forklift damage to the floor boards, rockers, and left door and quarter,
> and it states that the paint is faded, the tires and interior are dry-rotted, and the
> windshield is cracked.  The damage to the left side is visible on the photo.

The Court finds that Vehicle #201 had a value of $4,000 immediately before the incident,

which is equal to HB Auto's estimate of value.  This value is only 60.4% of the NADA value

and is well within the parameters set forth by the experts.  HB Auto has also established that

Brokers damaged the vehicle.

**Vehicle #202**

> Description: 1994 Chrysler New Yorker, VIN 2C3ED46F8RH160394
> Mileage: 108,841
> Other evidence: The title documents show that HB Auto purchased this vehicle on March
> 22, 2000.  The title was then signed over to Mendenhall Auto Auction, which then sold it
> to Belle Sloop McClintock on April 29, 2000.  HB Auto does remain in possession of this
> vehicle, as both experts were able to examine it.

HB Auto is not entitled to any damages for Vehicle #202 because the evidence shows

that HB Auto is not the titled owner of the vehicle, nor was it the titled owner at the time of the

incident.

**Vehicle #203**

Description: 1988 Chevrolet S-10, VIN 1GCDT19Z8J2217401, truck
Mileage: 150,881
Date purchased by HB Auto: September 9, 2002
NADA value on August 1, 2002: $3,450
HB Auto's estimate of value prior to incident: $3,000
HB Auto's estimate of value after incident: $700
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: The title history shows HB Auto purchased this vehicle from CarMax. Spears's report lists forklift damage to the drive shaft, right door, right bedside, and exhaust, and the report notes that the paint is faded, peeling, and rusting, and the interior and tires are dry-rotted. Twigg's report simply states "no damage."

Based upon the evidence, the Court finds that Vehicle #203 had a value of $3,000 immediately before the incident. HB Auto has also established that Brokers damaged the vehicle, reducing the value to $700.

**Vehicle #204**

Description: 1993 Hyundai Elantra, VIN KMHVF12J8PU709385, 4-door
Mileage: 82,392
Date purchased by HB Auto: September 23, 2002
NADA value on August 1, 2002: $1,875
HB Auto's estimate of value prior to incident: $1,500
HB Auto's estimate of value after incident: $200
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: Title history shows HB Auto purchased this vehicle from CarMax. Twigg's report simply states "no damage." Spears's report lists forklift damage to the right and left rocker, rear bumper, rear quarter, and floorboard, and it notes that the paint is faded, the dash is cracked, and the interior and tires are dry-rotted.

Based upon the evidence, the Court finds that Vehicle #204 had a value of $1,500 immediately before the incident. HB Auto has also established that Brokers damaged the vehicle, reducing the value to $200. While this post-incident is very low, due to the low starting value of the vehicle and the extensive damage documented on Spears's report, the Court finds it credible.

**Vehicle #205**

Description: 1996 Oldsmobile Achieva, VIN 1G3NL52T8TM331424
Mileage: 145,451
Date purchased by HB Auto: November 13, 2002

Vehicle #205 must be excluded from the list of vehicles damaged by Brokers's

negligence.  It was purchased after HB Auto relocated to its new location and would not have

been damaged through the events that are the subject of this Complaint.

**Vehicle #206**

Description: 1993 Chevrolet Blazer, VIN 1GNCT18W4P0166753
Mileage: 179,956
Date purchased by HB Auto: June 26, 2002
NADA value on August 1, 2002: $5,950
HB Auto's estimate of value prior to incident: $2,900
HB Auto's estimate of value after incident: $800
Spears's estimate of value after incident: $1,100
Spears's estimate of present value (as of August 1, 2007): $300
Other evidence:  The damage disclosure statement certifies that when HB Auto
purchased the vehicle, it had not been damaged such that repairs exceeded 25% of the
value, and it was not a flood, salvage, or reconstructed vehicle.  Twigg's report simply
indicates "no damage."  Spears's report lists forklift damage to the right door and quarter,
the drive shaft, and exhaust.  The report also indicates that the paint is faded, and the
interior and tires are dry-rotted.

The Court finds that Vehicle #206 had a value of $2,900 immediately before the incident,

which is equal to HB Auto's estimate of value.  This value is only 48.7% of the NADA value

and is well within the parameters set forth by the experts, especially given the completed damage

disclosure statement.

**Vehicle #207**

Description: 1995 Dodge Neon, VIN 1B3ES27C0SD336529
Mileage: 155,145
Date purchased by HB Auto: November 13, 2002

Vehicle #207 must be excluded from the list of vehicles damaged by Brokers's

negligence.  It was purchased after HB Auto relocated to its new location and would not have

been damaged through the events that are the subject of this Complaint.

**Vehicle #208**

> Description: 1998 Dodge Intrepid, VIN 2B3HD46R5WH122993
> Mileage: 107,095
> Other evidence: The title documents show that HB Auto purchased this vehicle on July 11, 2002.  HB Auto then sold it to Bob Hodges Auto Sales on July 24, 2002.  HB Auto remains in possession of this vehicle, as both experts were able to examine it.

HB Auto is not entitled to any damages for Vehicle #208 because the evidence shows

that, while HB Auto does have possession of the vehicle, it is not presently the titled owner, nor

was it the titled owner at the time of the incident.

**Vehicle #209**

> Description: 1987 Chevrolet Blazer, VIN 1GNCT18R5H0141260
> Mileage: 144,136
> Date purchased by HB Auto: July 31, 2002
> NADA value on August 1, 2002: $2,800
> HB Auto's estimate of value prior to incident: $1,500
> HB Auto's estimate of value after incident: $200
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: Spears's expert report lists forklift damage to the running boards and drive shaft, and it notes that the paint is faded and rusting and the interior and tires are dry-rotted.  Twigg's report contains no information related to this vehicle.

The Court finds that immediately before the incident Vehicle #209 had a value of $1,500,

which is equal to HB Auto's estimate of value.  This value is only 53.6% of the NADA value

and is well within the parameters set forth by the experts, especially given the damage disclosure

statement which discloses no negative history.  HB Auto has also established that Brokers

damaged the vehicle in the amount of $1,300 by damaging the running boards and drive shaft.

**Vehicle #210**

200

Description: 1984 Honda Civic, VIN JHMAN5528EC008381
Mileage: 194,766
Date purchased by HB Auto: November 8, 2002

Vehicle #210 must be excluded from the list of vehicles damaged by Brokers's

negligence.  It was purchased after HB Auto relocated to its new location and would not have

been damaged through the events that are the subject of this Complaint.

## Vehicle #211

Description: 1995 Oldsmobile Achieva, VIN 1G3NL15D0SM332756, 2-door
Mileage: 173,397
Date purchased by HB Auto: May 15, 2002
NADA value on August 1, 2002: $3,700
HB Auto's estimate of value prior to incident: $2,500
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $800
Spears's estimate of present value (as of August 1, 2007): $50
Other evidence:  The damage disclosure statement certifies that when HB Auto
purchased Vehicle #211, it had not been damaged such that repairs exceeded 25% of the
value, and it was not a flood, salvage, or reconstructed vehicle.  Twigg's report contains
no information pertaining to this vehicle.  Spears's report indicates the vehicle has
forklift damage to the floor boards and rockers, and it states that the paint is faded, the
tires are dry-rotted, the interior is rotten, the body is deteriorated, and the vehicle has
various dings and dents.

Based upon the evidence, the Court finds that Vehicle #211 had a value of $2,500

immediately before the incident.  This vehicle has no negative history, and this value is only

67.6% of the NADA value, which is well within the parameters set forth in this case.

## Vehicle #212

Description: 1986 Honda Civic, VIN JHMAK5434GS035850
Mileage: 148,715
Date purchased by HB Auto: November 13, 2002

Vehicle #211 must be excluded from the list of vehicles damaged by Brokers's

negligence.  It was purchased after HB Auto had relocated its business and would not have been

damaged through the events that are the subject of this Complaint.

**Vehicle #213**

> Description: 1995 Dodge Avenger, VIN 4B3AU42Y6SE149828,[47] 2-door
> Mileage: 127,947
> Date purchased by HB Auto: June 26, 2002
> NADA value on August 1, 2002: $4,875
> HB Auto's estimate of value prior to incident: $2,500
> HB Auto's estimate of value after incident: $300
> Spears's estimate of value after incident: $500
> Spears's estimate of present value (as of August 1, 2007): $50
> Other evidence: The damage disclosure statement certifies Vehicle #213 had not been damaged such that repairs exceeded 25% of the value, and it was not a flood, salvage, or reconstructed vehicle when purchased by HB Auto. Twigg's report states it is a "rough" vehicle with no forklift damage. Spears's report indicates the vehicle has forklift damage to the floor boards. It also notes that the paint is faded, tires and wheels are missing, the interior is dry-rotted, the driver's door window is "busted," and the airbags and stereo were stolen. Twigg testified, based upon the photo, that someone had sanded off some of the paint and primer but failed to apply any new primer, resulting in rust spots. He testified that, in his opinion, this fact meant that the vehicle had been in a shop at some point in time undergoing repairs, but that it did not tell a "whole lot" about the condition of the car. He testified that the damage did not appear to be wreck damage, just rough paint, and that it could cost between $300 and $400 to get a spray paint job or $1,800 for a professional paint job. Relying on Spears's report, Twigg further testified that since neither the frame rail nor the rocker was bent, just the floorboard, the damages should not be very expensive to fix and would require less than eight hours of work.

The Court will not award any damages for Vehicle #213. First, HB Auto did not

establish the value of the vehicle immediately subsequent to the injury with reasonable certainty.

HB Auto's estimated value of $300 is very low compared to the majority of the vehicles in this

case and yet Spears' report indicates the vehicle sustained less damage from the move than most

of the vehicles. Furthermore, Twigg's testimony that since only the floorboards were damaged,

the value should not have been drastically reduced, was credible. Compounding the uncertainty,

there is evidence of an intervening criminal act after Brokers moved Vehicle #213 to the Lower

---

[47] The various exhibits summarizing evidence lists this vehicle's VIN as 4BAU42Y6SE149828, but according to the title is it 4B3AU42Y6SE149828.

Lot.  This unforeseeable intervening act relieves Brokers of liability for subsequent damage by breaching the causal connection between its own negligence and the subsequent injury. Therefore, the Court will not award damages for injury to Vehicle #213 subsequent to it being moved to the Lower Lot.

**Vehicle #214**

> Description: 1997 Pontiac Grand Am, VIN 1G2WJ52K7VF307483
> Mileage: 100,508
> Date purchased by HB Auto: October 2, 2002

Vehicle #214 must be excluded from the list of vehicles damaged by Brokers's negligence.  It was purchased after HB Auto relocated to its new location and would not have been damaged through the events that are the subject of this Complaint.

**Vehicle #215**

> Description: 1996 Chrysler Sebring, VIN 3C3EL45XXTT225922
> Mileage: 94,933
> Date purchased by HB Auto: July 3, 2002
> NADA value on August 1, 2002: unknown
> HB Auto's estimate of value prior to incident: $4,400
> HB Auto's estimate of value after incident: $1,200
> Spears's estimate of value after incident: no opinion
> Spears's estimate of present value (as of August 1, 2007): no opinion
> Other evidence: The evidence reflects that HB Auto sold this vehicle sometime prior to when the experts examined the vehicles.

The Court finds that HB Auto is not entitled to any damages for Vehicle #215.  HB Auto lists the vehicle as sold, but the Court has no evidence regarding the type of damages the vehicle sustained other than being included in HB Auto's list.  There is no photo of the vehicle and neither expert could inspect it to verify damage.  The Court finds that HB Auto has not carried its burden of proving that it is entitled to any damages for this vehicle.

**Vehicle #216, #217, and  #218**

#216
Description: 1995 Pontiac Sunfire, VIN 1G2JB5247S7530456
Mileage: 145,437
Date purchased by HB Auto: November 27, 2002

#217
Description: 1997 Mitsubishi Gallant, VIN 4A3AJ56G0VE083617
Mileage: 133,810
Date purchased by HB Auto: November 20, 2002

#218
Description: 1996 Mazda 626, VIN 1YVGE22C6T5508719
Mileage: 132,872
Date purchased by HB Auto: October 2, 2002

Vehicles #216, #217, and #218 must be excluded from the list of vehicles damaged by

Brokers's negligence.  They were purchased after HB Auto had relocated to its new location and

would not have been damaged through the events that are the subject of this Complaint.

**Vehicle #219**

Description: 1998 Ford Taurus, VIN 1FAFP52UXWA242631
Mileage: unknown
Date purchased by HB Auto: unknown
NADA value on August 1, 2002: unknown
HB Auto's estimate of value prior to incident: $3,800
HB Auto's estimate of value after incident: $600
Spears's estimate of value after incident: no opinion
Spears's estimate of present value (as of August 1, 2007): no opinion
Other evidence: The evidence reflects that HB Auto sold this vehicle sometime prior to
when the experts examined the vehicles.  The title does not indicate that it was ever
transferred to HB Auto.

The Court finds that HB Auto is not entitled to any damages for Vehicle #219.  HB Auto

lists the vehicle as sold, but there is no evidence that HB Auto ever even owned the vehicle. In

addition, the Court has no evidence regarding the type of damages the vehicle sustained other

than being included in HB Auto's list.  There is no photo of the vehicle and neither expert could

204

inspect it to verify damage.  The Court finds that HB Auto has not carried its burden of proving

that it is entitled to any damages for this vehicle.

**Vehicle #220**

> <u>Description</u>: 1994 Chrysler Town & Country, VIN 1C4GH54L9RX163775, van
> <u>Mileage</u>: unknown
> <u>Date purchased by HB Auto</u>: unknown
> <u>Purchase price</u>: unknown
> <u>NADA value on August 1, 2002</u>: $6,700
> <u>HB Auto's estimate of value prior to incident</u>: $2,500
> <u>HB Auto's estimate of value after incident</u>: $800
> <u>Spears's estimate of value after incident</u>: $800
> <u>Spears's estimate of present value (as of August 1, 2007)</u>: $100
> <u>Other evidence</u>: No title or bill of sale for this vehicle is in evidence.  Twigg's report
> indicates the vehicle has no damage and the grille missing.  Spears's expert report lists
> forklift damage to floor boards, rockers, and right sliding door and front door.  It also
> notes that the tires are dry-rotted, the paint is faded, the interior is deteriorated, and
> miscellaneous exterior parts are missing.

> HB Auto has not presented sufficient evidence to establish that it is entitled to damages

for Vehicle #220 for the same reasons set forth for Vehicle #191.

**Vehicle #221**

> <u>Description</u>: 1998 Honda Passport, VIN 4S6CM58W7X4403387, burgundy
> <u>Mileage</u>: 17,036
> <u>Date purchased by HB Auto</u>: March 16, 2000
> <u>NADA value on August 1, 2002</u>: $13,525
> <u>HB Auto's estimate of value prior to incident</u>: $8,000
> <u>HB Auto's estimate of value after incident</u>: $3,500
> <u>Spears's estimate of value after incident</u>: $4,200
> <u>Spears's estimate of present value (as of August 1, 2007)</u>: $500
> <u>Other evidence</u>: This vehicle has a salvage title.  The report of initial inspection dated
> March 22, 2000 documents damage to the bumper/grille, hood, windshield, left fender,
> left door, left windows, roof, and rear quarter, and notes the vehicle rolled over.  No
> affidavit of rebuilder or final inspection was completed.  Twigg's report indicates the
> vehicle has forklift damage with the left mirror broken.  Spears's expert report lists
> forklift damage to the floorboards, rockers, exhaust, and 4x4 transfer case.  His report
> also states that miscellaneous interior parts are missing, the paint is faded, the tires are
> dry-rotted, and the interior is depreciated.  No damage is visible on the photo.

After carefully reviewing the evidence, the Court finds that it cannot award any damages for Vehicle #221. HB Auto purchased this vehicle as a salvage vehicle in need of rebuilding. It is clear that HB Auto did indeed complete many of the necessary repairs, because the hood, windshield, and front left of the vehicle appear in good condition on the photo and there is no such damage documented in either expert's report. Nevertheless, a new title was never issued, and there is no evidence regarding what repairs remained or why an unbranded title was not issued. Furthermore, there is evidence of criminal activity, as parts have been stolen. As a result of all of these facts, the Court cannot determine a starting value for the vehicle nor what amount of damages is attributable to Brokers with any reasonable certainty.

**Vehicle #222 and #223**

#222
Description: 1997 Chrysler Cirrus, VIN 1C3EJ56H3VN502190
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $6,650
HB Auto's estimate of value prior to incident: $3,800
HB Auto's estimate of value after incident: $1,200
Spears's estimate of value after incident: $1,600
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence: Neither the title nor the bill of sale for the vehicle is in evidence. Twigg's report indicates the vehicle has no damage. Spears's expert report lists forklift damage to floor boards, rockers, and left door and quarter. It also notes that the tires are dry-rotted, the paint is faded, and the interior is deteriorated.

#223
Description:1997 Infiniti J-30, VIN JNKAY2109YM401202
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $14,200
HB Auto's estimate of value prior to incident: $6,800
HB Auto's estimate of value after incident: $3,000
Spears's estimate of value after incident: $2,000

206

Spears's estimate of present value (as of August 1, 2007): $300
Other evidence:  Neither the title nor the bill of sale for Vehicle #223 is in evidence.
Twigg's report indicates the vehicle has no damage.  Spears's expert report lists forklift
damage to the left rocker, and rear bumper.  It also notes that the tires are dry-rotted, the
paint is faded, the engine was stolen, the antenna is broken, and the interior is
deteriorated.

HB Auto is not entitled to any damages for Vehicles #222 and #223 for the same reasons

set forth for Vehicle #191.

## Vehicle #224

Description: 1995 Chevrolet Lumina, VIN 1GNDU06D5ST155443, van
Mileage: 16,188
Date purchased by HB Auto: August 21, 2002
NADA value on August 1, 2002: $4,300
HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $2,500
Spears's estimate of present value (as of August 1, 2007): $200
Other evidence:  The damage disclosure statement certifies that when HB Auto
purchased the vehicle, it had not been damaged such that repairs exceeded 25% of the
value, and it was not a flood, salvage, or reconstructed vehicle.  Twigg's expert report
indicates the vehicle has no damage.  Spears's expert report lists forklift damage to the
floor boards and rockers, and it notes that the tires are dry-rotted, the paint is faded, and
the interior is deteriorated.

The Court finds that Vehicle #224 had a value of $3,500 immediately before the incident,

which is equal to HB Auto's estimate of value.  This value is about 20% less than NADA value

and is well within the parameters set forth by the experts, especially given the completed damage

disclosure statement.

## Vehicle #225 and #226

#225
Description: 1993 Nissan Pathfinder, VIN JN8HD17Y7PW303796
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $6,255

HB Auto's estimate of value prior to incident: $4,900
HB Auto's estimate of value after incident: $1,500
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $100
Other evidence: No title or bill of sale is in evidence for Vehicle #225. Twigg's report indicates the vehicle has no damage. Spears's expert report lists forklift damage to the exhaust, drive shaft, and left doors and glass. It also notes that the tires and interior are dry-rotted, and the paint is faded and cracking.

#226
Description: 1996 Mitsubishi Gallant, VIN 4A3AJ56G5TE346214
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $6,000
HB Auto's estimate of value prior to incident: $4,000
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,350
Spears's estimate of present value (as of August 1, 2007): $75
Other evidence: No title or bill of sale for Vehicle #226 is in evidence. Twigg's report indicates the vehicle has damage to the left fender and mirror. Spears's expert report lists forklift damage to the floor boards and rocker panel, and it states that the tires are dry-rotted, the paint is faded, the interior is deteriorated, and the vehicle has miscellaneous dents.

HB Auto is not entitled to any damages for Vehicles #225 and #226 for the same reasons

set forth for Vehicle #191.

**Vehicle #227**

Description: 1997 Chevrolet Cavalier, VIN 1G1JC1249VM118526
Mileage: 79,917
Date purchased by HB Auto: June 14, 2000
NADA value on August 1, 2002: unknown
HB Auto's estimate of value prior to incident: $4,500
HB Auto's estimate of value after incident: $1,700
Spears's estimate of value after incident: no opinion
Spears's estimate of present value (as of August 1, 2007): no opinion
Other evidence: The evidence reflects that HB Auto sold this vehicle sometime prior to when the experts examined the vehicles.

HB Auto is not entitled to any damages for Vehicle #227 for the same reasons stated for

Vehicle #31.

**Vehicle #228**

> Description: 1999 Daewoo Lanos, VIN KLATB5260XB364057
> Mileage: 78,712
> Date purchased by HB Auto: December 11, 2002

Vehicle #228 must be excluded from the list of vehicles damaged by Brokers's

negligence.  It was purchased after HB Auto relocated to its new location and would not have

been damaged through the events that are the subject of this Complaint.

**Vehicle #229**

> Description: 1993 Nissan Altima, VIN 1N4BU31D55C157076
> Mileage: unknown
> Date purchased by HB Auto: unknown
> Purchase price: unknown
> NADA value on August 1, 2002: $4,200
> HB Auto's estimate of value prior to incident: $4,500
> HB Auto's estimate of value after incident: $1,000
> Spears's estimate of value after incident: $1,200
> Spears's estimate of present value (as of August 1, 2007): $100
> Other evidence:  Neither the title nor the bill of sale for the vehicle is in evidence.
> Twigg's report indicates the vehicle has "bad paint" and no damage.  Spears's expert
> report lists forklift damage to the right front door, left front frame rail, rocker panel, and
> floor board, and that the tires are dry-rotted, paint faded and chipping, interior
> deteriorated, and engine parts stolen.

The Court finds that HB Auto is not entitled to any damages for Vehicles #229 for the

same reasons set forth for Vehicle #191.

**Vehicle #230 and  #231**

> #230
> Description: 1995 Plymouth Voyager, VIN 2P4GH2532SR122675
> Mileage: 153,247
> Date purchased by HB Auto: November 27, 2002

> #231
> Description: 1993 Plymouth Laser, VIN 4P3CF44E3PE047947

Mileage: 94,449
Date purchased by HB Auto: October 30, 2002

Vehicles #230 and #231 must be excluded from the list of vehicles damaged by Brokers's negligence. They were purchased after HB Auto relocated to its new location and would not have been damaged through the events that are the subject of this Complaint.

## Vehicle #232

Description: 1998 Pontiac Sunfire, VIN 1G2JB524XW7570913, black
Mileage: unknown
Date purchased by HB Auto: unknown
Purchase price: unknown
NADA value on August 1, 2002: $6,550
HB Auto's estimate of value prior to incident: $3,800
HB Auto's estimate of value after incident: $1,000
Spears's estimate of value after incident: $1,500
Spears's estimate of present value (as of August 1, 2007): $300
Other evidence: Neither a title nor bill of sale is in evidence for this vehicle. Twigg's report notes forklift damage with minor damage to the right rear door. Spears's report lists forklift damage to the left front door. His report also states that the vehicle has a dent on the right rear door, the paint is faded, the tires are dry-rotted, and the interior is depreciated.

HB Auto has not established that it is entitled to any damages for Vehicles #232 for the same reasons set forth for Vehicle #191.

## Vehicle #233

Description: 1997 Hyundai Elantra, VIN KMHJF24M1VU433172
Mileage: 110,237
Date purchased by HB Auto: January 22, 2003

Vehicle #233 must be excluded from the list of vehicles damaged by Brokers's negligence. It was purchased after HB Auto relocated to its new location and would not have been damaged through the events that are the subject of this Complaint.

## Vehicle #234

Description: 1997 Ford Escort, VIN 1FAFP10P9WW166862,[48] 4-door
Mileage: 122,138
Date purchased by HB Auto: August 8, 2001
Purchase price: $475
NADA value on August 1, 2002: $4,375
HB Auto's estimate of value prior to incident: $3,900
HB Auto's estimate of value after incident: $900
Spears's estimate of value after incident: $500
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence: The bill of sale indicates the Vehicle #234 was sold to HB Auto at auction as a red light, damaged and disabled with "miles over."  Twigg's report indicates the vehicle has forklift damage with the left mirror broken, as well as the hood and engine parts missing.  Spears's report lists forklift damage to the floor boards, rockers, and both right doors.  His report indicates that miscellaneous interior and exterior parts are missing, the tires and interior are dry-rotted, and the paint is faded.  From the photos, it is clear that this vehicle was vandalized.

Based upon the evidence presented, the Court finds that Vehicle #234 had a value of $3,900 immediately before the incident.  This value is 89% of the NADA value, which is already adjusted for the high mileage.  Thus, this value is low enough to account for the fact that the vehicle might have been in less than average condition when purchased, as HB Auto had little time to repair or detail it.  There is evidence of the occurrence of an intervening criminal act after Brokers moved Vehicle #234 to the Lower Lot, breaking chain of causation and rendering it impossible for the Court to determine what amount of damages is attributable to Brokers. Therefore, no damages will be awarded for any reduction in value after the vehicle was parked in the Lower Lot.

**Vehicle #235**

Description: 1996 Mazda Protégé, VIN JM1BB1413T0314225
Mileage: 79,208
Date purchased by HB Auto: August 24, 2000
NADA value on August 1, 2002: $4,325

---

[48] Various exhibits summarizing the evidence list the VIN as 1FAFP10P944166862, but the correct VIN as stated on the title is listed above.

HB Auto's estimate of value prior to incident: $3,500
HB Auto's estimate of value after incident: $500
Spears's estimate of value after incident: $1,000
Spears's estimate of present value (as of August 1, 2007): $25
Other evidence:  Vehicle #235 was purchased by HB Auto as a salvage vehicle as defined by N.C. Gen. Stat. § 20-4.01(33)(d).  HB Auto submitted documentation into evidence that the vehicle was reconstructed and passed a final inspection by the DMV.  A clean title was issued on December 13, 2001.  Spears's report indicates the vehicle has forklift damage to the floor boards, rocker panel, and right front and rear doors, and it notes that the windshield is cracked, miscellaneous interior and exterior parts are missing, the tires are dry-rotted, the paint is faded, and the interior is rotten.  Twigg's expert report indicates the vehicle had forklift damage with the front end, bumper, grille, lamps and cooling gone.  Based upon a photo, Twigg testified that it appeared to him that parts had been taken off of the vehicle and he believed the damage was not forklift damage.

Based upon the evidence presented, the Court finds that Vehicle #235 had a value of $2,811 immediately before the incident.  The evidence does not support either the NADA value or HB Auto's estimated value, which is simply too high because it does not properly account for the vehicle's salvage history.  Based upon the expert testimony, the Court finds that the vehicle's value, as a rebuilt salvage vehicle, is 35% less than the NADA value.

Additionally, there is clear evidence that Vehicle #235 was the target of an intervening criminal act after it was moved to the Lower Lot. Given the evidence of vandalism, the Court cannot determine with reasonable certainty the amount of damages proximately caused by Brokers once this vehicle was moved to the Lower Lot.  Therefore, the Court will not award damages for injury to Vehicle #235 subsequent to it being moved to the Lower Lot.

**Damage Totals**:

Based upon the foregoing, HB Auto was damaged in the amount of $346,313 as a direct result of Brokers' negligence and trespass to chattel when Brokers moved HB Auto's vehicles to the Lower Lot with forklifts in 2002.  Subsequent to that point in time, HB Auto incurred additional damages in the amount of $130,882 prior to any reduction for the failure to mitigate

that were proximately caused by Brokers' negligence and trespass as a result of continued deterioration, erosion, and flooding.

## Mitigation

A plaintiff has a duty to mitigate damages by using due care to minimize the loss caused by a defendant's negligence. *Miller v. Miller*, 273 N.C. 228, 239, 160 S.E.2d 65, 73-74 (1968). *See also United Labs., Inc. v. Kuykendall,* 102 N.C. App. 484, 489, 403 S.E.2d 104, 108 (1991) (stating that "an injured plaintiff, whether his case be tort or contract, must exercise reasonable care and diligence to avoid or lessen the consequences of the defendant's wrong."). The failure to mitigate damages will not operate as a bar to recovery, but it is cause for a reduction in the amount of damages because "a plaintiff is barred from recovering for those losses which could have been prevented through the plaintiff's *reasonable efforts*." *Smith v. Childs*, 112 N.C. App. 672, 683, 437 S.E.2d 500, 507 (1993). Reasonable efforts include those that can be done "with reasonable exertion or at a trifling expense." *Durham Constr. Co. v Wright*, 189 N.C. 456, 456, 127 S.E. 580, 582 (1925). Reasonable efforts do not include measures that a reasonable person would consider imprudent, impractical, or futile, *Smith v. Childs*, 112 N.C. App. at 683, 437 S.E.2d at 507, and whether mitigation efforts are reasonable is a question of fact. *Smith v. Martin*, 124 N.C. App. 592, 600, 478 S.E.2d 228, 233 (1996).

Notwithstanding this duty to mitigate, after the injury has begun, a plaintiff is entitled to rely upon representations or assurances by a defendant that the defendant will remedy the injury. *Little v. Rose*, 285 N.C. 724, 728, 208 S.E.2d 666, 669-70 (1974). Such assurances excuse a plaintiff's failure to mitigate until it becomes apparent that the defendant will not, in fact, follow through with these assurances. *Id*. The burden is on the defendant to show that the plaintiff

213

neglected to mitigate damages.  *Smith v. Childs*, 112 N.C. App. at 682, 437 S.E.2d at 507.

Here, HB Auto was under a duty to mitigate damages after Brokers moved the vehicles to the Lower Lot.  Initially, Bowers gave assurances that Brokers would remedy the injury.  HB Auto was entitled to rely on such assurances for a period of time, and clearly HB Auto did rely on these representations for quite some time, insomuch as HB Auto continued to pay rent of $750 per month to Brokers.  The Ahmadis had known Bowers for over a decade and had a long-standing personal relationship with him.  Bowers died, however, on June 6, 2003.  At this point, it should have become apparent to the Ahmadis and HB Auto that Brokers would not, in actuality, follow through with these assurances.  HB Auto should have documented the injuries, moved the vehicles to a more secure location, and, at minimum, used tarps to cover vehicles with broken windows.  The Ahmadis were in the used car business; they understood the consequences of leaving a vehicle to sit for an extended period of time.  Furthermore, they had the means to move the vehicles (and could have documented any expenses in doing so), and they had a new location upon which to relocate the vehicles.  Under these circumstances, such efforts would have been reasonable.  Yet, HB Auto is claiming damages for injuries incurred over a period of approximately five years, from the time of the incident in the spring/summer of 2002 until when Spears valued the vehicles in August of 2007.  The Court finds that HB Auto is only entitled to recover damages for deterioration and water damage incurred during the first year subsequent to the incident which was prior to Bowers's death.  Accordingly, HB Auto is entitled to $26,176, which is 20% of the damage for injuries subsequent to the vehicles being moved to the Lower Lot.

**Punitive Damages**

Punitive damages may be awarded to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts.  N.C. Gen. Stat. § 1D-1; *Harrell v. Bowen*, 362 N.C. 142, 144-45, 655 S.E.2d 350, 352 (2008).  The North Carolina General Statutes provide, in relevant part, as follows:

> (a) Punitive damages may be awarded only if the claimant proves the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
>> (1) Fraud.
>> (2) Malice.
>> (3) Willful or wanton conduct.
>
> (b) The claimant must prove the existence of an aggravating factor by clear and convincing evidence.
> (c) Punitive damages shall not be awarded against a person solely on the basis of vicarious liability for the acts or omissions of another.  Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to the punitive damages.

N.C. Gen. Stat. § 1D-15.  If the plaintiff meets the requirements of §1D-15, the jury or trier of fact, may determine, in its discretion, whether to award punitive damages.  *See* N.C. Gen. Stat. § 1D-35.  *See also Horner v. Byrnett*, 132 N.C. App. 323, 328, 511 S.E.2d 342, 346 (1999).  An award of punitive damages shall not exceed three times the amount of compensatory damages or $250,000.00, whichever is greater.  N.C. Gen. Stat. § 1D-25(b).  When determining the amount of punitive damages, the trier of fact shall consider the purpose of punitive damages stated in N.C. Gen. Stat. §1D-1 and may consider the following evidence:

> a. the reprehensibility of the defendant's motives and conduct
> b. the likelihood, at the relevant time, of serious harm
> c. the degree of the defendant's awareness of the probable consequences of its conduct
> d. the duration of the defendant's conduct

> e. the actual damages suffered by the claimant
> f. any concealment by the defendant of the facts or consequences of its conduct
> g. the existence and frequency of any similar past conduct by the defendant
> h. whether the defendant profited from the conduct
> I. the defendant's ability to pay punitive damages, as evidence by its revenues or net worth

N.C. Gen. Stat. § 1D-35.

On the motion to dismiss HB Auto's punitive damages claim filed on September 6, 2007, Brokers argued that (1) punitive damages are inapplicable in this case as a result of the death of Bowers, or, in the alternative, (2) it would be inequitable to allow a punitive damages claim against a debtor, to the detriment of other creditors in the case. The Court addressed these arguments in its order denying the motion to dismiss dated December 3, 2007 and found them to be inapplicable in this case. The reasoning set forth in that order is incorporated as if fully set forth herein.

The Court has already found that Brokers's conduct was willful and wanton. HB Auto has proven the existence of this aggravating factor by clear and convincing evidence. Additionally, HB Auto has established that an officer of Brokers, Bowers, participated in and condoned the conduct constituting this aggravating factor. Brokers set out to deliberately damage HB Auto's property as the Ahmadis were caring for their ailing and elderly father. The testimony of Brokers's employees clearly establishes that Brokers was aware that its conduct was inflicting serious harm as it was occurring. Subsequent to Bowers's death, Brokers continued to act in wanton disregard of HB Auto's property. Preston unequivocally testified that the fate of HB Auto's property or claim has never been discussed at a board meeting, and he has been a director of the corporation since January 2004. The directors' clear indifference regarding the continuing damage to HB Auto's property resulting from the corporation's willful and wanton conduct is exceptional. The Court recognizes

216

that punitive damages are intended to punish a defendant and are not meant to compensate the plaintiff. *Oestreicher v. Am. Nat'l Stores, Inc.,* 290 N.C. 118, 134, 225 S.E.2d 797, 807-08 (1976). After considering the facts and circumstances in this case, including the factors set forth in N.C. Gen. Stat. § 1D-35, the Court finds that the evidence supports an award of punitive damages in the amount of $50,000.

## Conclusion

Based upon the foregoing, the Court finds that HB Auto is entitled to compensatory damages in the amount of $372,489 and punitive damages in the amount of $50,000 and shall have an allowed unsecured claim in the total amount of $422,489 which shall be paid in accordance with the treatment designated for Class X Claims in the Order Confirming Chapter 11 Plan entered on January 27, 2006.[49]  The Court will enter an order consistent with the findings of this memorandum opinion as set forth herein.

---

[49] Paragraph 3.10c of the Second Amended Plan of Liquidation dated December 2, 2005 provides that holders of Allowed Class X Claims, other than Potential Environmental Claims, shall be paid in full no later than the effective date of the plan, together with interest running from the Petition Date at the rate of 6.25% until the date such claim is paid in full.  A claim to which the Debtor has objected is to be paid within ten business days following the entry of a final, non-appealable Order allowing the Claim.

| Vehicle Number | Initial Damages | Damages from exposure |
|---|---|---|
| 1 | $2,900.00 | $900.00 |
| 2 | $2,000.00 | $0.00 |
| 3 | $2,200.00 | $750.00 |
| 4 | $1,400.00 | $1,400.00 |
| 5 | $2,600.00 | $1,350.00 |
| 6 | $1,600.00 | $450.00 |
| 7 | $2,500.00 | $0.00 |
| 8 | $2,400.00 | $1,600.00 |
| 10 | $1,775.00 | $1,175.00 |
| 11 | $2,000.00 | $2,450.00 |
| 12 | $3,500.00 | $2,700.00 |
| 13 | $1,100.00 | $1,750.00 |
| 14 | $1,300.00 | $1,150.00 |
| 15 | $2,500.00 | $0.00 |
| 16 | $4,500.00 | $2,700.00 |
| 17 | $2,000.00 | $0.00 |
| 19 | $1,700.00 | $775.00 |
| 20 | $3,300.00 | $800.00 |
| 21 | $1,100.00 | $1,375.00 |
| 22 | $3,000.00 | $2,500.00 |
| 23 | $1,600.00 | $950.00 |
| 24 | $2,700.00 | $650.00 |
| 25 | $2,500.00 | $1,950.00 |
| 27 | $900.00 | $1,700.00 |
| 28 | $1,000.00 | $875.00 |
| 29 | $2,900.00 | $550.00 |
| 30 | $1,400.00 | $0.00 |
| 32 | $1,925.00 | $1,000.00 |
| 34 | $2,800.00 | $850.00 |
| 35 | $2,000.00 | $800.00 |
| 36 | $2,000.00 | $900.00 |
| 37 | $266.00 | $2,700.00 |
| 38 | $2,200.00 | $650.00 |
| 39 | $2,450.00 | $1,200.00 |
| 40 | $2,500.00 | $1,200.00 |
| 43 | $2,200.00 | $700.00 |
| 44 | $2,122.00 | $1,400.00 |
| 45 | $0.00 | $2,527.00 |
| 46 | $800.00 | $1,925.00 |
| 47 | $1,505.00 | $600.00 |

| Vehicle Number | Initial Damages | Damages from exposure |
|---|---|---|
| 48 | $1,500.00 | $2,300.00 |
| 49 | $2,165.00 | $925.00 |
| 50 | $775.00 | $1,175.00 |
| 51 | $1,800.00 | $1,050.00 |
| 52 | $1,000.00 | $0.00 |
| 53 | $1,375.00 | $0.00 |
| 54 | $2,900.00 | $0.00 |
| 55 | $3,000.00 | $1,450.00 |
| 58 | $1,793.00 | $0.00 |
| 59 | $2,500.00 | $975.00 |
| 60 | $3,651.00 | $2,800.00 |
| 61 | $1,700.00 | $775.00 |
| 62 | $1,500.00 | $950.00 |
| 63 | $0.00 | $375.00 |
| 64 | $3,275.00 | $0.00 |
| 65 | $2,900.00 | $0.00 |
| 66 | $1,025.00 | $0.00 |
| 67 | $2,400.00 | $475.00 |
| 69 | $2,900.00 | $0.00 |
| 70 | $525.00 | $1,150.00 |
| 71 | $2,600.00 | $2,000.00 |
| 72 | $725.00 | $950.00 |
| 73 | $1,175.00 | $575.00 |
| 74 | $393.00 | $775.00 |
| 75 | $3,500.00 | $1,950.00 |
| 76 | $2,200.00 | $750.00 |
| 77 | $1,500.00 | $0.00 |
| 78 | $284.00 | $0.00 |
| 79 | $1,800.00 | $1,175.00 |
| 81 | $600.00 | $1,275.00 |
| 82 | $1,795.00 | $475.00 |
| 83 | $1,400.00 | $475.00 |
| 84 | $2,533.00 | $1,850.00 |
| 85 | $2,600.00 | $1,300.00 |
| 86 | $500.00 | $1,950.00 |
| 87 | $2,000.00 | $2,300.00 |
| 88 | $1,500.00 | $950.00 |
| 89 | $2,230.00 | $950.00 |
| 90 | $2,100.00 | $700.00 |
| 92 | $2,500.00 | $800.00 |

| Vehicle Number | Initial Damages | Damages from exposure |
|---|---|---|
| 93 | $4,500.00 | $0.00 |
| 94 | $3,800.00 | $0.00 |
| 95 | $2,600.00 | $1,175.00 |
| 96 | $1,500.00 | $950.00 |
| 97 | $1,600.00 | $300.00 |
| 98 | $655.00 | $550.00 |
| 99 | $1,500.00 | $950.00 |
| 100 | $1,800.00 | $0.00 |
| 101 | $2,000.00 | $1,150.00 |
| 102 | $675.00 | $0.00 |
| 103 | $2,400.00 | $1,050.00 |
| 104 | $2,500.00 | $900.00 |
| 105 | $1,500.00 | $475.00 |
| 106 | $1,800.00 | $1,050.00 |
| 107 | $1,500.00 | $0.00 |
| 108 | $1,200.00 | $0.00 |
| 109 | $3,300.00 | $0.00 |
| 110 | $1,160.00 | $775.00 |
| 111 | $1,500.00 | $1,700.00 |
| 112 | $2,000.00 | $800.00 |
| 113 | $2,600.00 | $950.00 |
| 114 | $1,915.00 | $0.00 |
| 115 | $2,000.00 | $0.00 |
| 116 | $1,312.00 | $575.00 |
| 117 | $1,600.00 | $1,375.00 |
| 118 | $944.00 | $1,475.00 |
| 119 | $1,600.00 | $0.00 |
| 120 | $1,500.00 | $475.00 |
| 121 | $1,400.00 | $175.00 |
| 122 | $1,700.00 | $250.00 |
| 123 | $1,200.00 | $175.00 |
| 124 | $2,000.00 | $0.00 |
| 125 | $960.00 | $375.00 |
| 126 | $2,300.00 | $0.00 |
| 127 | $1,475.00 | $925.00 |
| 128 | $1,800.00 | $0.00 |
| 129 | $1,800.00 | $975.00 |
| 131 | $925.00 | $0.00 |
| 132 | $2,380.00 | $950.00 |
| 133 | $3,200.00 | $0.00 |

| Vehicle Number | Initial Damages | Damages from exposure |
|---|---|---|
| 134 | $2,800.00 | $900.00 |
| 135 | $1,600.00 | $350.00 |
| 136 | $1,100.00 | $575.00 |
| 138 | $250.00 | $0.00 |
| 141 | $3,800.00 | $800.00 |
| 142 | $1,700.00 | $450.00 |
| 143 | $3,025.00 | $0.00 |
| 145 | $2,200.00 | $700.00 |
| 146 | $3,247.00 | $0.00 |
| 147 | $1,700.00 | $750.00 |
| 148 | $3,200.00 | $400.00 |
| 150 | $3,000.00 | $800.00 |
| 151 | $3,000.00 | $925.00 |
| 152 | $0.00 | $3,130.00 |
| 153 | $1,100.00 | $575.00 |
| 154 | $3,300.00 | $700.00 |
| 155 | $1,985.00 | $2,100.00 |
| 156 | $1,775.00 | $0.00 |
| 157 | $1,011.00 | $475.00 |
| 161 | $1,600.00 | $375.00 |
| 164 | $2,300.00 | $1,000.00 |
| 165 | $1,800.00 | $1,850.00 |
| 166 | $1,255.00 | $475.00 |
| 167 | $933.00 | $775.00 |
| 170 | $375.00 | $950.00 |
| 173 | $3,500.00 | $0.00 |
| 176 | $700.00 | $175.00 |
| 177 | $4,900.00 | $600.00 |
| 179 | $2,100.00 | $0.00 |
| 181 | $1,800.00 | $175.00 |
| 182 | $600.00 | $900.00 |
| 183 | $2,500.00 | $350.00 |
| 184 | $3,400.00 | $400.00 |
| 185 | $2,200.00 | $275.00 |
| 186 | $3,400.00 | $300.00 |
| 188 | $2,600.00 | $200.00 |
| 189 | $2,300.00 | $475.00 |
| 190 | $2,100.00 | $375.00 |
| 192 | $1,783.00 | $350.00 |
| 194 | $2,600.00 | $350.00 |

| Vehicle Number | Initial Damages | Damages from exposure |
|---|---|---|
| 195 | $2,700.00 | $150.00 |
| 196 | $2,700.00 | $275.00 |
| 197 | $2,200.00 | $200.00 |
| 198 | $1,800.00 | $200.00 |
| 199 | $2,400.00 | $0.00 |
| 200 | $1,600.00 | $350.00 |
| 201 | $3,200.00 | $600.00 |
| 203 | $2,300.00 | $500.00 |
| 204 | $1,300.00 | $175.00 |
| 206 | $2,100.00 | $500.00 |
| 209 | $1,300.00 | $150.00 |
| 211 | $2,000.00 | $450.00 |
| 224 | $3,000.00 | $300.00 |
| 234 | $3,000.00 | $0.00 |
| 235 | $2,311.00 | $0.00 |
| | **$346,313.00** | **$130,882.00** |